**No. 19-5042**
Consolidated with 19-5043, 19-5044

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

DAMIEN GUEDES, *et al.,*

Appellants,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al*.,

Appellees.

---

On Appeal from the United States District Court
for the District of Columbia,
No. 1:18-cv-02988 (DLF)

---

**Brief for Appellants Damien Guedes, Shane Roden, Firearms Policy
Foundation, Madison Society Foundation, Inc., and Florida Carry, Inc.**

---

Joshua Prince, Esq.
Adam Kraut, Esq.
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297 (t)
Joshua@princelaw.com
AKraut@princelaw.com
*Counsel for Plaintiffs-Appellants*

Erik S. Jaffe
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060 (t)
ejaffe@schaerr-jaffe.com
*Of Counsel*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**1. Parties and *Amici***

Pursuant to Circuit Rule 28(a)(1)(A), Appellants Damien Guedes, Shane Roden, Firearms Policy Foundation, Madison Society Foundation, Inc., and Florida Carry, Inc. certifies that the parties and *amici curiae* in this case are as follows:

Damien Guedes

Shane Roden

Firearms Policy Foundation

Madison Society Foundation, Inc.

Florida Carry, Inc.

Firearms Policy Coalition, Inc.

Bureau of Alcohol, Tobacco, Firearms and Explosives

Matthew Whitaker

Thomas E. Brandon

United States of America

**2. Ruling Under Review**

The ruling under review is the district court order and accompanying memorandum opinion denying Guedes, *et al.* a preliminary injunction precluding

the implementation and enforcement of the new regulation. Judge Dabney L. Friedrich of the D.C. District Court issued both the order and opinion on February 25, 2018. The order is entry 26 on the district court docket. The opinion does not yet have an official citation but can be found on the district court docket as entry 27.

### 3. Related Cases

As Codrea, *et al.*, v. Barr, *et al.,* No. 19-5044, has been consolidated with this matter, there are no other known related cases. This current matter has not been before this Court before.

<u>/s/ Adam Kraut</u>
Adam Kraut, Esq.
  *Counsel of Record*
D.C. Bar No. PA0080
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 202-9297 (t)
(610) 400-8439 (f)
<u>AKraut@CivilRightsDefenseFirm.com</u>

# DISCLOSURE OF CORPORATE AFFILIATIONS
# AND FINANCIAL INTEREST

D.C. Circuit Case Number: 19-5042
Case Name: Guedes, *et al.*, v. Bureau of Alcohol, Tobacco, Firearms and
Explosives, *et al.*

Name of counsel: Joshua Prince, Esq., Adam Kraut, Esq., Erik S. Jaffe, Esq.

Pursuant to D.C. Cir. L.A.R. 26.1, Firearms Policy Foundation, Madison Society
Foundation, Inc., and Florida Carry, Inc. makes the following disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list
below the identity of the parent corporation or affiliate and the relationship
between it and the named party:

NO

2. Is there a publicly owned corporation, not a party to the appeal, that has a
financial interest in the outcome? If yes, list the identity of such corporation and
the nature of the financial interest:

NO

/s/ Adam Kraut
Adam Kraut, Esq.
D.C. Bar No. PA0080
Joshua Prince, Esq.
D.C. Bar No. PA0081
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
610-845-3903 (f)
AKraut@princelaw.com
Joshua@princelaw.com
*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ....... ii

1. **Parties and *Amici*** .................................................................. ii

2. **Ruling Under Review** .............................................................. ii

3. **Related Cases** ....................................................................... ii

DISCLOSURE OF CORPORATE AFFILIATIONS ................................. iii

AND FINANCIAL INTEREST ............................................................. iii

GLOSSARY OF ABBREVIATIONS ..................................................... viii

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATEMENT OF ISSUES ................................................................ 4

STATUTES AND REGULATIONS ..................................................... 4

STATEMENT OF THE CASE ............................................................ 4

SUMMARY OF THE ARGUMENT .................................................... 9

STANDARD OF REVIEW ............................................................... 11

ARGUMENT ................................................................................. 11

   I. <u>Appellants are Likely to Succeed on the Merits</u> ................................. 11

     A. **The Final Rule Contradicts the Plain Statutory Definition of a Machinegun** ........................................................................ 11

     B. **The Rule of Lenity Forecloses Executive Expansion of Ambiguous Criminal Statutes** .............................................. 20

     C. **The Final Rule Is Unreasonable, Arbitrary, and Capricious** ............ 22

   II. <u>Irreparable Injury</u> ........................................................................... 26

   III. <u>No Harm to Appellees</u> .................................................................... 27

   IV. <u>The Public Interest Favors Agency Compliance with Statutory Limits</u> ........................................................................................ 27

CONCLUSION ............................................................................... 28

**CERTIFICATE OF COMPLIANCE** ................................................... 30

**CERTIFICATE OF SERVICE** ......................................................... 31

# TABLE OF AUTHORITIES

## Cases

*Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (2017 D.C. Cir.)............... 23

*Burrage v. United States*, 571 U.S. 204 (2014) ...................................................... 22

*Butte Cty v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)......................................... 23, 24

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) 11, 26, 28

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995). 11

*Colautti v. Franklin*, 439 U.S. 379 (1979) ............................................................. 19

*Crandon v. United States*, 494 U.S. 152 (1990) .................................................... 21

*East Bay Sanctuary Covenant, et al. v. Donald J. Trump, et al.,* No. 18-17274, 2018 WL 6428204 (9th Cir. Dec. 7, 2018)............................................................ 23

*Fleming v. Moberly Milk Products Co.*, 160 F.2d 259 (D.C. Cir. 1947)............... 28

*Garnett v. Zellinger*, 313 F.Supp.3d 147 (D.D.C. 2018) ....................................... 27

*Gun Owners of America, Inc., et al., v. William P. Barr, et al.*, No. 1:18-cv-01429, W.D. Mich, South Division ................................................................................... 20

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ....................................................... 13

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...................................................... 13

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)................... 11, 27

*Lewis v. United States*, 445 U.S. 55 (1980) ........................................................... 21

*Liparota v. United States*, 471 U.S. 419 (1985)..................................................... 20

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998).......................... 11

*Staples v. United States*, 511 U.S. 600 (1994)........................................................ 13

*United States v. Apel*, 571 U.S. 359 (2014) ........................................................... 22

*United States v. Gradwell*, 243 U.S. 476 (1917) ................................................... 21

*United States v. McGoff*, 831 F.2d 1071 (D.C. Cir. 1987) ..................................... 22

Authorities principally relied upon are marked with an  *

*United States v. Thompson/Ctr. Arms Co., 504 U.S. 505 (1992)............................22

*United States v. Universal C. I. T. Credit Corp., 344 U.S. 218 (1952)..................21

Util. Air Regulatory Grp. v. E.P.A., 572 U.S. 302 (2014) ......................................18

W. Clark Aposhian v. William P. Barr, et al., No. 2:19-cv-00037, D. Utah, Central
    Division ............................................................................................................22

Wisconsin Cent. Ltd. v. United States, 138 S.Ct. 2067 (2018) ..............................19

**Statutes**

18 U.S.C. § 921 ........................................................................................................ 1

*18 U.S.C. § 921(a)(23) ...................................................................................... 1, 11

26 U.S.C. § 5801 ...................................................................................................... 1

26 U.S.C. § 5845(b) ................................................................................................. 1

28 U.S.C. § 1292(a)(1) ............................................................................................ 3

28 U.S.C. § 1331 ...................................................................................................... 3

5 U.S.C. § 702 .......................................................................................................... 3

5 U.S.C. § 704 .......................................................................................................... 3

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal
    Texts 81 (2012) ................................................................................................13

Cass R. Sunstein, Nondelegation Canons, 67 U. Chi. L. Rev. 315 (2000)............21

George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973..............15

Webster's II New Riverside-University Dictionary (1988)....................................15

**Regulations**

27 C.F.R. § 478.11 ............................................................................................... 1, 8

27 C.F.R. § 479.11 ............................................................................................... 1, 8

27 C.F.R. § 479.182 ................................................................................................27

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| FPC | Firearms Policy Coalition |
| FPF | Firearms Policy Foundation |
| GCA | Gun Control Act |
| NFA | National Firearms Act |
| NRPM | Notice of Proposed Rulemaking |

# INTRODUCTION

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b). Prior to the current rulemaking, the regulatory definition of a machine gun simply mirrored the statutory definition. 27 C.F.R. § 478.11; 27 C.F.R. § 479.11.

ATF concedes that this definition in the Gun Control Act, 18 U.S.C. § 921, *et seq.* ("GCA") and the National Firearms Act, 26 U.S.C. § 5801, *et seq.* ("NFA"), "alone determines whether a firearm is a machinegun." Fed. Reg. 66533-34. Yet the Final Rule considerably expands that definition to cover so-called bump-stock-type devices admittedly not covered by the language of the statute itself and requires citizens to surrender or destroy such devices under threat of felony prosecution.

The district court held that the statutory words "single function of the trigger" and "shoot ... automatically" in the above definition were ambiguous and approved ATF's expansive redefinition of those words to encompass any process

1

using recoil to reset a trigger thus allowing it to be reengaged by the shooter with greater speed.

Those redefinitions neither fit the words of the statute nor comport with the mechanical operation of triggers on lawful semi-automatic firearms, and are arbitrary and capricious. A "single function of the trigger" involves the mechanical movement of the mechanism that constitutes the trigger. It is complete when the trigger traverses its range of motion and initiates the firing sequence. A separate function occurs when the trigger is released and returns to its starting point to reset. Any other interpretation of that phrase is contrary to the contemporary understanding of those words and yields absurd results.

The word "automatically" likewise means by mechanical process without further human intervention and to "shoot … automatically" means to continue to fire without further human action beyond a single function of the trigger. A bump-stock-type device does not involve a single function of the trigger, but rather, multiple functions – engagements and releases of the trigger – all mediated by the human intervention of repeatedly forcing the gun body and trigger forward to reengage the trigger after it has been returned to its starting position and has reset. Whether an individual pulls their finger against a trigger or pushes the firearm forward to meet their finger, human intervention occurs, and nothing is

accomplished "automatically." And nothing alters the fact there are multiple functions of the trigger.

In any event, even if the statutory definition was thought to be ambiguous in connection with the various ways lawful semi-automatic firearms can be fired with increased speed, the rule of lenity would preclude ATF's expansive interpretation of a criminal statute.

Appellants readily satisfy the other requirements for a preliminary injunction, and nothing in the opinion below suggests otherwise. Confiscation or destruction of property under threat of felony is irreparable injury and there is no countervailing equity or public interest that outweighs the need to maintain the status quo for the pendency of this suit.

## JURISDICTIONAL STATEMENT

District Court jurisdiction is pursuant to 5 U.S.C. §§ 702 and 704 and 28 U.S.C. § 1331, based on claims under the Administrative Procedure Act and the Constitution and laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court denied Appellants an injunction on February 25, 2018. JA016. Appellants noticed appeal the same day. JA007.

# STATEMENT OF ISSUES

The issues on appeal are:

1. Whether the District Court erred in concluding ATF acted within its authority when expanding the definition of a machinegun?

2. Whether the rule of lenity applies if the definition of machinegun was ambiguous?

# STATUTES AND REGULATIONS

Statutory authorities are included in the addendum to this brief.

# STATEMENT OF THE CASE

On March 29, 2018, ATF published a Notice of Proposed Rulemaking ("NPRM") that proposed to expand the regulatory definition of a "machinegun" to include previously legal so-called "bump stocks". [1]

As relevant to this litigation, legal bump-stock-type devices do not change the function of a firearm to which they are attached. For example, the fire control group of a semi-automatic AR-15 has three main components: the trigger, disconnector, and hammer. Image 1.

---

[1] 83 Fed.Reg. 13442; https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices.



When the firearm is set to fire, the hammer rests on the internal edge of the trigger. Image 2. Pulling the trigger – a single function – releases the hammer, which strikes the firing pin and results in a single round being discharged. Images 3-4.



While the empty casing is being ejected from the firearm, the bolt carrier slides rearwards and the hammer is pushed back towards the disconnector. The disconnector grabs and holds the hammer, preventing it from firing another round

without the trigger being "reset." Images 5-6. Indeed, unlike with a machinegun, keeping the trigger depressed actually prevents gun from firing again because the disconnector keeps hold of the hammer.



A second function of the trigger occurs when the trigger is released causing the disconnector to let go of the hammer, which then again rests on the "reset" edge of the trigger, awaiting the next function of the trigger to initiate the next firing sequence. Image 7.



*See* animation at http://publicfiles.firearmspolicy.org/ar15.gif. Enlarged individual images are also reproduced in the attached Addendum at 43-49.

A bump-stock-type device does not change these functions. Regardless whether the shooter "pulls" their finger against the trigger or pushes the firearm and trigger forward against a stationary finger, neither the operation of the trigger's component parts nor the operation of the firearm vary. Each round discharged is the result of a single function of the trigger initiated by the manual act of putting pressure on the reset trigger.

Notwithstanding the undisputable mechanical facts of trigger operation, ATF's NPRM stated, *inter alia*, that:

1) [A] bump-stock-type device … harnesses the recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter. The bump-stock-type device functions as a self-acting and self-regulating force that channels the firearm's recoil energy in a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger so long as the trigger finger remains stationary on the device's extension ledge (as designed). No further physical manipulation of the trigger by the shooter is required; [2]

2) These bump-stock-type devices are generally designed to operate with the shooter … maintaining constant forward pressure with the non-trigger hand on the barrel-shroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure. The device itself then harnesses the

[2] 83 Fed.Reg. 13443.

recoil energy of the firearm, providing the primary impetus for automatic fire; and [3]

3) [I]ndividuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger finger to fire more rapidly. To the extent that individuals are capable of doing so, this would be their alternative to using bump-stock-type devices. [4]

Several of those assertion were palpably false and self-contradictory, not the least of which are the claims that a bump-stock-style device uses "recoil energy to slide the firearm … forth," that there is "no further physical manipulation of the trigger by the shooter," and that the device itself harnesses recoil energy to provide the "primary impetus" for automatic fire.  Indeed, in the second quote above, ATF admits that it is the shooter's volitional and manual "constant forward pressure" on the front of the weapon, and not the backward recoil, that actually pushes the weapon and trigger "forth" after each shot and causes the next manipulation and hence function of the trigger.

Notwithstanding its erroneous and contradictory description of the operation of bump-stock-style devices, the NPRM proposed adding two sentences to the definition of "machine gun" in 27 C.F.R. §§ 478.11 and 479.11 as follows:

For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single

_____

[3] *Id.* at 13446.
[4] *Id.* at 13454.

function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

Appellants Firearms Policy Coalition ("FPC") and Firearms Policy Foundation ("FPF") commented in opposition to the NPRM. Appellant Guedes owns a bump-stock-type device, that ATF had previously determined was lawful.

On December 18, 2018, Appellants sued and sought a preliminary injunction. The Complaint seeks declaratory and injunctive relief alleging, *inter alia*, that ATF had exceeded its authority and acted arbitrarily and capriciously.

The district court denied the motion for preliminary injunction, applying *Chevron* and finding the statutory definition of a machinegun was ambiguous and ATF's regulation was a permissible reinterpretation of the definition. JA020, 033-044, and 046-047. The district court did not address the other factors for obtaining a preliminary injunction.

## SUMMARY OF THE ARGUMENT

The words "single function of the trigger" and "automatically" in the statutory definition of a machinegun are not ambiguous as relevant to this case and the District Court erred in accepting ATF's proposed expansion of those words as being permissible and reasonable.

The words "single function of the trigger" plainly look to the movement and operation of the trigger itself, not the manner in which an individual actuates the operation of the trigger. Similarly, the words "shoot … automatically" must be read to require mechanical successive firing without further input from the operator. ATF and the court below ignored these fundamentals, causing the definition to be internally incoherent and to encompass virtually all semi-automatic firearms, contrary to express statutory design and the original public meaning of the language as used and understood by Congress. ATF's alternative reading is unreasonable and not a ground for finding or resolving ambiguity.

If, however, the definition of machinegun is ambiguous, then the rule of lenity precludes ATF's expanding the reach of a criminal statute. Congress must define federal crimes and any ambiguity must be resolved in favor of the narrower alternative. Appellants thus have a substantial likelihood of success on the merits.

The remaining elements for injunctive relief are not in serious dispute. Deprivation of property or the danger of severe criminal penalties are irreparable injuries, as conceded by Appellees. The equities favor Appellants for similar reasons and because Appellees' interests are not materially harmed. And the public interest favors precluding agency expansion of crimes beyond the bounds clearly adopted by Congress.

**STANDARD OF REVIEW**

A preliminary injunction movant must show 1) substantial likelihood of success on the merits, 2) irreparable injury, 3) no substantial injury to others, and 4) that the injunction furthers the public interest. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). The district court's "legal conclusions as to each of the four factors" is reviewed *de novo*, and "its weighing of them for abuse of discretion." *League of Women Voters v. Newby*, 838 F.3d 1, 6-7 (D.C. Cir. 2016). Each of the factors should be balanced together, *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995), and if "the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

**ARGUMENT**

I.  **Appellants are Likely to Succeed on the Merits**

A. **The Final Rule Contradicts the Plain Statutory Definition of a Machinegun**

Congress defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 18 U.S.C. § 921(a)(23). Also included are "any combination of parts from which

a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id*.

The statutory language is plain and unambiguous regarding the issues here, as ATF has acknowledged. 83 Fed. Reg. at 66533-34 ("the statutory definition *alone* determines whether a firearm is a machinegun"; "automatically" and "single function of the trigger" are unambiguous as they "accord with the plain meaning of those terms") (emphasis added).

Regarding what constitutes a single function of the trigger, the primary function of the trigger is to release the hammer in response to an external or manual input moving the trigger from the one position to another. That function is complete once the hammer is released. A second function occurs when the release of the trigger uncouples the disconnector from the hammer and the hammer is again held back by the reset trigger. Each of those are a delineated function, initiated by the movement of the trigger backwards or forwards. What matters is the mechanical operation of the "trigger," not the *manner* in which that operation is initiated. Regardless of the mechanism by which the shooter acts to move the trigger – whether by pulling on it with a moving finger or pushing/pulling the gun against a stationary finger – it is the movement of the trigger releasing the hammer, or the movement of the trigger releasing the disconnector and resetting the hammer

on the trigger awaiting further input, that define the boundaries of two distinct "single" functions of the trigger. Only the first such function actually fires a shot.

These meanings are confirmed by the original public understanding of the statutory terms at the time of their adoption. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 81 (2012) (discussing original public meaning of Constitution). As reflected in the debates surrounding passage of the law, persons at the time understood the phrase "single function of the trigger" to mean a single mechanical movement of the trigger from its starting position to its ending position and understood that function to be terminated when the trigger was fully depressed. *See* JA202. *See also Staples v. United States*, 511 U.S. 600 (1994) *Id*. at n1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. *That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted*." (emphasis added)); *Kolbe v. Hogan*, 849 F.3d 114, 158 (4th Cir. 2017) ([S]emiautomatic firearms require that the shooter pull the trigger for each shot fired, while…"machine guns"—do not require a pull of the trigger for each shot and will [shoot] as long as the trigger is depressed. (Traxler, J., dissenting)(citation omitted)); *Hollis v. Lynch*, 827 F.3d 436, Fn. 2 (5th Cir. 2016) (a machinegun

"fir[es] more than one round per trigger-action" and a semiautomatic firearm "fires only one round per trigger-action.").

Indeed, even ATF has conceded the mechanical reality that "additional physical manipulation of the trigger" results in an additional "function of the trigger." 83 Fed. Reg. 66519. [5]

ATF's discussion of so-called "binary triggers" confirms the narrow boundaries of what constitutes a "single function of the trigger." In denying that binary-trigger-equipped guns are machineguns, ATF noted that while "semiautomatic firearms may shoot one round when the trigger is pulled, the shooter must release the trigger before another round is fired. Even if this release results in a second shot being fired, it is as the result of a separate function of the trigger. This is also the reason that binary triggers cannot be classified as 'machineguns' under the rule—one function of the trigger results in the firing of only one round." 83 FR 66534.

The language of the statute as applied to even rudimentary knowledge of the operation of a trigger could not be plainer. One function of the trigger means one physical movement of the trigger either backward or forward to release the hammer and fire or reset the trigger (or sometimes to do both for each movement).

---

[5] *See also* JA288 (ATF expert testifying that bump-stock-devices "are not classified as machine guns because *the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like*.").

Likewise, to "shoot … automatically" plainly means additional discharge of bullets without further manual or volitional input by the shooter beyond maintaining the trigger in the depressed or rearward position. Because automated shooting must occur "by a single function of the trigger," the continual mechanical and "automatic[]" discharge necessarily must occur before or without a second function of the trigger. [6]

Under such plain understanding of the statute, bump-firing a gun, with or without a bump-stock-type device, requires multiple functions of the trigger and does not occur automatically, but rather as a result of the operator electing to and continuing to push forward on the firearm to repeatedly push the trigger against a stationary finger, thereby causing multiple and *distinct* trigger functions. Contrary to ATF's claim, the recoil energy of an initial shot does not move a weapon fitted with a bump-stock-type device "back and forth," it only moves it *back*. Its effect releases pressure on the trigger by moving it away from the shooter's finger, thereby terminating the initial trigger function and initiating the next trigger function of resetting it awaiting further manual input. The next movement of the trigger is not initiated by the recoil or otherwise "automatically," but by the manual

---

[6] *See* ATF Rul. 2004-5 ("automatic" defined to include "any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots") (quoting George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973)); Webster's II New Riverside-University Dictionary (1988) (automatically): "acting or operating in a manner essentially independent of external influence or control"); John Quick, Dictionary of Weapons and Military Terms 40 (McGraw-Hill 1973) (automatic fire: "continuous fire from an automatic gun, lasting until pressure on the trigger is released").

volitional act of the shooter pushing/pulling the body of the gun (and hence the trigger) *forward* until it contacts a stationary trigger finger and moves the trigger backward through its next function. The back and forth necessarily depends on the release of the trigger and subsequent human action of pushing forward and is neither a "single" function of the trigger nor does it cause the gun to "shoot … automatically."

An analytical video showing the operation of a bump-stock-type device and expert testimony of Rick Vasquez, former Acting Chief of the ATF's Firearms Technology Branch, who reviewed the video, was submitted to the district court. JA289, also available at https://youtu.be/1OyK2RdO63U. Mr. Vasquez declared (1) "bump-stock-device requires two functions of the trigger before a subsequent round can be discharged (*i.e.* after the firearm is discharged for the first time, the trigger must be fully released, reset, and then fully pulled rearward for a subsequent round to be discharged)," (2) "even when the shooter maintains constant forward pressure with the non-trigger hand on the [fore-end] of the rifle, and maintains the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged. ... This is no different than any factory semi-automatic firearm," and (3) "bump-stock-device[s] do[] not permit automatic fire by harnessing the recoil energy of

the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself." JA295-296, ¶¶ a, d, e.

And ATF's prior determinations agree, acknowledging that a bump-stock-type device "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function when installed. In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand." JA089 (ATF determination letter, June 6, 2010); *id*. at 090-091. (ATF determination letter, Apr. 2, 2012) (when "an <u>intermediate</u> amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow *the trigger to mechanically reset*. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, *the firing of each shot being accomplished by a single trigger function*. … [Such] device is *incapable of initiating an automatic firing cycle*") (emphasis added).

Nothing in language or mechanics has changed since ATF made those determinations, other than the addition of a naked political desire to exceed the limits set by Congress.

Furthermore, because ATF admits virtually all semiautomatic rifles can be "bump-fired" with or without a bump-stock-type device, and often with use of common household items – or even one's finger – ATF's definition would render all such firearms illegal as a "combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." That is plainly beyond the original public understanding of the statutory language and hence unreasonable. *See* JA146 (Karl Frederick's congressional testimony) (phrase "with one function of the trigger" necessarily included in the definition of a machinegun "[b]ecause that is the *essence* of a machine gun. Otherwise you have the ordinary repeating rifle … which is no sense and *never has been thought of* as a machine gun.") (emphasis added). Congress obviously agreed with the suggestion by including that language. A definition with such a result is absurd and contrary to the plain limits of the statutory language and context.

The "core administrative-law principle" is that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. E.P.A.*, 572 U.S. 302, 328 (2014). "As a rule, [a] definition

which declares what a term 'means' ... excludes any meaning that is not stated." *Colautti v. Franklin,* 439 U.S. 379, 392–393, n. 10 (1979).

Here ATF concedes that the statutory definition of a machinegun is "narrow," JA303 n.4, 307-308, that it lacks the authority to expand that definition, *id*. at 307, and that its prior regulations which mirror verbatim the statutory language did not allow restriction of bump-stock-type devices, JA093, 292. It nonetheless claims precisely the need for expansion of the regulatory definition to cover bump-stock-type devices not covered by the incorporated statutory language alone. The contradiction is evident.

"Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law. *Wisconsin Cent. Ltd. v. United States*, 138 S.Ct. 2067, 2074 (2018); *Utility Air Regulatory Grp. v. E.P.A.*, 572 U.S. 302, 328 (2014) (same).

While the court below erred in ignoring the plain language of the statute and inappropriately accorded the government deference under the second stage of *Chevron* analysis. JA019 ("[m]ost of the plaintiffs' administrative law challenges are foreclosed by the *Chevron* doctrine, which permits an agency to reasonably define undefined statutory terms."). The government did not seek such deference

and has conceded elsewhere that ATF is not entitled to such deference. *Gun Owners of America, Inc., et al., v. William P. Barr, et al.*, No. 1:18-cv-01429, W.D. Mich., South Division, ECF Doc. 38 ("Defendants have not contended that the deference afforded under *Chevron* ... applies in this action.").

The district court abused its discretion in finding the statutory language ambiguous and erred as a matter of law in according ATF *Chevron* deference regarding the terms "single function of the trigger" and "automatically."

### B. The Rule of Lenity Forecloses Executive Expansion of Ambiguous Criminal Statutes

Even if the definition of machinegun were deemed ambiguous, the rule of lenity demands a narrowing interpretation of such ambiguity, not deference to administrative expansion of crimes. Whatever the policy arguments for restrictions on new types of weapons, acting on such arguments is for Congress, not the Executive Branch.

The "first principle" of criminal law requires that crimes be explicitly and unambiguously specified in advance by statute. *Liparota v. United States*, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute" (citation omitted)).

As Professor Sunstein has explained:

> One function of the lenity principle is to ensure against delegations.
> Criminal law must be a product of a clear judgment on Congress's part.
> Where no clear judgment has been made, the statute will not apply merely
> because it is plausibly interpreted, by courts or enforcement authorities, to fit
> the case at hand. The rule of lenity is inspired by the due process constraint
> on conviction pursuant to open-ended or vague statutes. While it is not itself
> a constitutional mandate, it is rooted in a constitutional principle, and serves
> as a time-honored nondelegation canon.

Cass R. Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315, 332 (2000).

As the Supreme Court likewise recognizes, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952); *see also Lewis v. United States*, 445 U.S. 55, 65 (1980) ("[T]he touchstone" of the lenity principle "is statutory ambiguity."), *United States v. Gradwell*, 243 U.S. 476, 485 (1917) ("before a man can be punished as a criminal under the federal law his case must be 'plainly and unmistakably' within the provisions of some statute.").

Narrow construction of ambiguous criminal laws is especially important in the administrative context. Because agencies have a natural tendency to broadly interpret the statutes they administer, deference in the criminal context "would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178

(1990) (Scalia, J., concurring). Indeed, the Supreme Court found that lenity displaced *Chevron* deference specifically as applied to ATF. In *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517-18 (1992), addressing ATF's interpretation of another definition relating to firearms, the court applied the rule of lenity to an ambiguous term because the statute had "criminal applications." This Court in *United States v. McGoff*, 831 F.2d 1071, 1077 (D.C. Cir. 1987), also has held that lenity supersedes *Chevron* deference:

> [T]he law of crimes must be clear. There is less room in a statute's regime for flexibility, a characteristic so familiar to us on this court in the interpretation of statutes entrusted to agencies for administration. We are, in short, far outside *Chevron* territory here.

Even the Government in this case and others has conceded that the rule of lenity precludes deference to ATF. JA309 (citing *Burrage v. United States*, 571 U.S. 204, 216 (2014)); *W. Clark Aposhian v. William P. Barr*, *et al.*, No. 2:19-cv-00037, D. Utah, Central Division, Government Notice of Supplemental Authority (Doc. 27) (in "'the interpretation of criminal statutes ... agencies are not ordinarily entitled to deference'" (quoting *United States v. Apel*, 571 U.S. 359, 369 (2014))).

## C. The Final Rule Is Unreasonable, Arbitrary, and Capricious

Even assuming ambiguity and that lenity did not apply, *Chevron* deference should be rejected because the Final Rule was not based on unbiased and reasoned consideration and is unreasonable, arbitrary, and capricious. "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not

intended it to consider, … [or] offered an explanation for its decision that runs counter to the evidence before the agency.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (2017 D.C. Cir.) (citation omitted).

First, as noted by the Cato Institute, the rulemaking here "was a fait accompli" from inception. Cato Institute Comments on Definition of "Machinegun," at 2, *available at* https://www.regulations.gov/document?D=ATF-2018-0002-65898. President Trump declared he would "write out" bump-stock devices "myself because I'm able to." *Id*. Appellants expect the Cato Institute to elaborate on this point in an amicus brief and endorse their suggestion that biased and pre-ordained rulemaking reversing past reasoned determinations is arbitrary and capricious and not entitled to deference. "The agency's statement must be one of reasoning; it must not be just a [foregone] conclusion." *Butte Cty v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (citation omitted). The Final Rule stems from political compulsion, not agency expertise. Political determinations in criminal statutes must be made by Congress, not the President.[7]

Second, the new definition on its own terms is arbitrary and capricious in its treatment of the phrase "shoot … automatically." The district court endorsed ATF's expansion of the word automatically to mean "'functioning as the result of a

---

[7] *East Bay Sanctuary Covenant, et al. v. Donald J. Trump, et al.,* No. 18-17274, 2018 WL 6428204, *51 (9th Cir. Dec. 7, 2018) ("[j]ust as [the Judiciary] may not [], 'legislate from the bench,' neither may the Executive legislate from the Oval Office").

self-acting or self-regulating mechanism,'" and *amazingly* then found that expansion itself to be ambiguous because "[a]utomatic devices regularly require *some* degree of manual input" and "[b]ecause [neither] the statute [nor the regulation] … specify how much manual input is too much." JA038-039. Of course, the statute does indeed state the maximum level of manual input allowed – a *single* function of the trigger – but regardless, defining a supposedly ambiguous term with an even more ambiguous concept conflating automatic and manual is arbitrary and capricious.

Additionally, in endorsing ATF's conflation of the mechanical phrase "function of the trigger" with the human-focused concept of "pull" of the trigger, JA040, the court and ATF obscured other acts of manual and volitional behavior necessary to fire additional shots even with a bump-stock. Thus the court incorrectly stated that multiple rounds would be fired with a single "pull" by the shooter thereafter "'maintaining the trigger finger on the device's extension ledge with constant rearward pressure.'" *Id*. (Internal citations omitted). That ignores that the extension ledge is not the trigger, that the shooter must manually and volitionally *push* the trigger into such stationary finger, and that the video evidence presented by Appellants demonstrating that subsequent firing requires manual input and multiple discrete trigger "functioning." *See* JA289, also available at https://youtu.be/1OyK2RdO63U (showing need for manual and volitional forward

pressure on forebody of rifle by the shooter, forcing the trigger into a stationary

finger thereby moving it through its firing function after each recoil removes

pressure from the trigger allowing it to travel forward through its reset function).

An agency may not "ignore evidence contradicting its position." *Butte Cty.*, 613

F.3d at 194 (citation omitted).

The court and ATF's suggestion, JA040-041, that "a bump stock relieves a

shooter of enough of the otherwise necessary manual inputs to warrant the

'automatic' label," again ignores the language of the statute and fails to distinguish

a semi-automatic weapon, which automatically loads the next round. The only

manual input relevant to the line between semi-automatic and automatic is the need

to apply pressure to and move a reset trigger in a manner that causes the next

hammer strike and hence the next shot. That is the relevant "function" of the

trigger in the context of the statute. That a bump-stock-style device or any other

method for bump-firing, may permit the trigger to reset via recoil, does not even

remotely show that it automatically "shoots" the next round, just as the automatic

chambering of the next round in a semi-automatic does not automatically shoot

that round without further manual input on the trigger.

Third, the new definition is arbitrary and capricious in that it would

encompass virtually all semiautomatic weapons. The relevant question under the

statute and rule is whether a weapon can shoot or can be combined with other parts

in a person's possession to shoot "more than one shot … by a single function of the trigger." ATF's definition covers not merely a specific device, but anything that would make a gun *capable* of bump-firing – *i.e.*, permitting the recoil of a gun to relieve pressure on and reset the trigger – regardless whether the next actuation of the trigger requires the manual action of the shooter to push the reset trigger into a stationary finger. Such bump-firing is not dependent on any particular firearm device or modification, but is a technique that can be utilized with the intrinsic capabilities of most *factory* semi-automatic firearms, including common rifles and pistols such as the AR-15 and the 1911. Indeed, ATF admits bump-firing can be done with a belt loop, a rubber band, or just one's finger. 83 Fed. Reg. 13454.

That ATF has disavowed the intent to apply its broad definition to those circumstances is irrelevant. The regulatory *definition*, by its new terms, covers such weapons and therefore is unreasonable, arbitrary, and capricious regardless whether ATF exercises arbitrary administrative "grace" in not enforcing its overbroad and illegal definition.

## II.  **Irreparable Injury**

Appellees concede that the deprivation of property or the threat of criminal penalties is irreparable injury. Doc. 16 at 71, n. 40; *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. (describing nature of irreparable harm).

## III.  No Harm to Appellees

Absent a preliminary injunction, Appellants and a half-million others, 83 Fed. Reg. 13451, will be deprived of their lawful property or face prosecution, up to 10 years in jail and other severe penalties, per violation. 26 U.S.C. §§ 5861, 5872; 18 U.S.C. § 3571; 27 C.F.R. § 479.182.

Appellees would only be enjoined, pending judicial review, from implementing the new regulation and ATF concedes that the Final Rule is not based on bump-stock-type devices having been or having "the potential to be, used in crime." 83 Fed. Reg. 66528. It claims merely an interpretive interest "based only upon the functioning of the device and the application of the relevant statutory definition." *Id*. at 66529. That interest is de minimis in this context, supports maintaining the status quo pending unrushed judicial review, and thus strongly favors an injunction.

## IV.  The Public Interest Favors Agency Compliance with Statutory Limits

"[T]here is a public interest in enforcing compliance with the law." *Garnett v. Zellinger*, 313 F.Supp.3d 147, 159 (D.D.C. 2018); *League of Women Voters*, 838 F.3d at 12 ("substantial public interest in" agency abiding by law governing their authority"). It is essential to the constitutional design for courts, at the behest of "a person affected concretely, substantially and irreparably by administrative action" to enjoin the Executive from reaching beyond congressional authorization or

prohibition. *Fleming v. Moberly Milk Products Co.*, 160 F.2d 259, 264 (D.C. Cir. 1947). "It is an inherent power of the federal judiciary to enjoin such an act. That there be such power was one of the prime compelling reasons for the creation of the judicial branch as an independent and equal branch of the Government." *Id*.

\*          \*          \*

Even if this Court questioned the likelihood of success, the balance of factors, *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, still favors an injunction because there is undisputed irreparable harm, no harm to Appellees, and an overwhelming public interest constraining agency lawlessness.

## CONCLUSION

This Court should reverse and direct issuance of a preliminary injunction pending review.

Respectfully Submitted,

/s/ Joshua Prince
Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@princelaw.com

/s/ Adam Kraut
Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@princelaw.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
610-845-3903 (f)

*Counsel for Plaintiffs-Appellants*

/s/ Erik S. Jaffe
Erik S. Jaffe
D.C. Bar No. 440112
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060 (t)
ejaffe@schaerr-jaffe.com
*Of Counsel*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit set forth in Fed. R. App. P. 32(a)(7)(B)(i) and this Court's order regarding combined word limits because, according to the word-count feature of Microsoft Word, it contains 6,036 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(4) and the type style requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14 point font.

Dated: March 4, 2019                              Respectfully Submitted,

/s/ Adam Kraut
Adam Kraut, Esq.
D.C. Bar No. 0080
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
610-845-3903 (f)
AKraut@princelaw.com
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2019, I electronically filed the foregoing with the

Clerk of Court for the United States Court of Appeals for the District of Columbia

Circuit by using the CM/ECF system. I certify that all participants in this case are

registered CM/ECF users and that service will be accomplished by the CM/ECF

system.

/s/ Adam Kraut
Adam Kraut, Esq.