## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No. 19-5043 (consolidated with Nos. 19-5042 & 19-5044)

FIREARMS POLICY COALITION, INC., CA 18-3083,
*Plaintiff-Appellant*,

DAMIEN GUEDES; FIREARMS POLICY FOUNDATION; MADISON SOCIETY
FOUNDATION, INC.; SHANE RODEN; FLORIDA CARRY, INC.,
*Plaintiffs-Appellees*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES;
WILLIAM P. BARR, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE
UNITED STATES; THOMAS E. BRANDON, IN HIS OFFICIAL CAPACITY AS
ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES; UNITED STATES OF AMERICA,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of
Columbia (Nos. 1:18-cv-02988-DLF, 1:18-cv-03086-DLF)

_____

### OPENING BRIEF FOR FIREARMS POLICY COALITION, INC.

_____

Thomas C. Goldstein
Daniel Woofter
Charles H. Davis
Erica Oleszczuk Evans
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
tgoldstein@goldsteinrussell.com

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 28(a)(1), Plaintiff-Appellant Firearms Policy Coalition, Inc. (FPC) certifies as follows:

**(A)  Parties and *Amici*.**  The defendants in district court, and appellees here, are:  Matthew G. Whitaker, in his official capacity; the Bureau of Alcohol, Tobacco, Firearms and Explosives; William P. Barr, in his official capacity; Thomas E. Brandon, in his official capacity; and the United States of America.  The plaintiffs in district court, and appellants here, are: FPC; Damien Guedes; Firearms Policy Foundation; Madison Society Foundation, Inc.; Shane Roden; Florida Carry, Inc.; David Codrea; Owen Monroe; and Scott Heuman.  No *amicus curiae* or intervenor appeared in the district court, and FPC is not aware of any intervenors or *amici* in this Court at this time.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, FPC states that it has no parent companies and no publicly held company has a 10% or greater ownership interest in the entity.  The general nature and purpose of FPC insofar as relevant to the litigation is defending the U.S. Constitution and the People's rights, privileges, and

immunities deeply rooted in the Nation's history and tradition, especially the fundamental right to keep and bear arms.

**(B)  Rulings Under Review.**  Under review in this appeal are an order and memorandum opinion entered on February 25, 2019, in the U.S. District Court for the District of Columbia, No. 1:18-cv-02988-DLF, DE26 and DE27.  The matter was before U.S. District Judge Dabney L. Friedrich.  The memorandum opinion is not yet published in the *Federal Supplement* but is available at 2019 WL 922594.

**(C)  Related Cases.**  The case on review was not previously before this Court.  The following cases involve some of the same parties and/or the same or similar issues as presented in this appeal:  *In re Grand Jury Investigation* (D.C. Cir. 18-3052, oral argument held Nov. 8, 2018, before Judges Henderson, Rogers, and Srinivasan), *United States ex rel. Landis v. Tailwind Sports Corp.* (D.C. Cir. No. 18-7143), *Blumenthal v. Whitaker* (D.D.C. No. 1:18-cv-02644), *O.A. v. Trump* (D.D.C. No. 1:18-cv-02718), *Michaels v. Whitaker* (D.D.C. No. 1:18-cv-02906).

FPC is not aware of any other related cases pending before this Court, any other U.S. court of appeals, or any local or federal court in the District of Columbia.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES .......................................................................................... i

TABLE OF AUTHORITIES ..................................................... iv

GLOSSARY ............................................................................... ix

JURISDICTIONAL STATEMENT ........................................... 1

ISSUES PRESENTED ............................................................... 1

STATUTES AND REGULATIONS ........................................... 1

STATEMENT OF THE CASE .................................................. 1

STANDARD OF REVIEW .......................................................... 4

SUMMARY OF THE ARGUMENT ............................................ 5

ARGUMENT ............................................................................... 6

I.   The President's Designation Of Matthew Whitaker Was
     Contrary To Statute. .......................................................... 6

     A.   The Vacancies Act Does Not Apply When A Specific Statute
          Designates An Acting Official For An Office .................. 7

     B.   The Arguments Invoked By The District Court Lack Merit. ...... 24

          1.   There Is No Merit To The District Court's Reliance On
               Two Provisions Of The AG Act. .............................. 24

          2.   There Is No Merit To The District Court's Reliance On
               The Exclusion Of Certain Multi-Member Bodies In
               Section 3349c Of The Vacancies Act. ..................... 29

II.  This Court Should Construe The Governing Statutes To Avoid
     The Serious Constitutional Doubt Raised By The District
     Court's Interpretation. ....................................................... 31

CONCLUSION .......................................................................... 42

# TABLE OF AUTHORITIES

## CASES

*Burrow-Giles Lithographic Co. v. Sarony*,
  111 U.S. 53 (1884) ................................................................ 40

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*,
  139 F.3d 203 (D.C. Cir. 1998) ............................................. 27

*Duncan v. Walker*,
  533 U.S. 167 (2001) .............................................................. 16

*Edmond v. United States*,
  520 U.S. 651 (1997) ................................................. 34, 35, 42

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ................................................... 13, 20

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ................................................................ 1

*Freytag v. Comm'r*,
  501 U.S. 868 (1991) .............................................................. 34

*Golan v. Holder*,
  565 U.S. 302 (2012) .............................................................. 40

*Gordon v. Holder*,
  632 F.3d 722 (D.C. Cir. 2011) ............................................... 4

*In re Grand Jury Investigation*,
  __ F.3d __, 2019 WL 921692 (D.C. Cir. Feb. 26, 2019) ............. 8, 35, 42

*Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997) ............................................. 18

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) .............................................................. 22

*Jam v. Int'l Fin. Corp.*,
  __ S. Ct. ___, 2019 WL 938524 (U.S. Feb. 27, 2019) ............ 28

*Jama v. ICE*,
  543 U.S. 335 (2005) .............................................................. 25

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) .......................................................... 35

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) .................................................................. 15

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .................................................................. 17

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) .................................................................. 13

*See Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) ................................................................ 1

*The Pocket Veto Case*,
   279 U.S. 655 (1929) .................................................................. 32

*United States v. Eaton*,
   169 U.S. 331 (1898) ...................................................... 36, 37, 39

*United States v. Giordano*,
   416 U.S. 505 (1974) .................................................................. 18

*Weiss v. United States*,
   510 U.S. 163 (1994) .................................................................. 41

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) .................................................................. 32

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. II, § 2, cl. 2 ......................... 4, 9, 32, 33, 34, 35, 36, 38, 39

## STATUTES

5 U.S.C. § 293 & note (1958) .................................................... 26

5 U.S.C. § 293 (1925) ............................................................. 26

5 U.S.C. § 293 (1952) ............................................................. 26

5 U.S.C. § 3345(a) ..................................................... 10, 16, 41

5 U.S.C. § 3345(a)(1) ................................................................ 2, 10

5 U.S.C. § 3345(a)(2) ................................................................... 2

5 U.S.C. § 3345(a)(3) ................................................................... 2

5 U.S.C. § 3345(b) ....................................................................... 2

5 U.S.C. § 3346 ........................................................................... 2

5 U.S.C. § 3347(a) ..................................................... 7, 8, 9, 29

5 U.S.C. § 3347(a)(1) ............................................... 2, 6, 8

5 U.S.C. § 3347(a)(1)(B) .............................. 2, 6, 22, 24, 28, 30

5 U.S.C. § 3347(a)(2) ..................................................... 9

5 U.S.C. § 3347(b) .................................................. 2, 20

5 U.S.C. § 3349c ......................................................... 29

10 U.S.C. § 132(b) ...................................................... 19

10 U.S.C. § 154 .......................................................... 19

10 U.S.C. § 7017 ..................................................... 2, 15

10 U.S.C. § 8017 ..................................................... 2, 15

10 U.S.C. § 9017 ..................................................... 2, 15

28 U.S.C. § 1292(a)(1) ................................................... 1

28 U.S.C. § 1331 .......................................................... 1

28 U.S.C. § 508 ........................................................ 1, 6

28 U.S.C. § 508(a) .................................................... 3, 8

28 U.S.C. § 508(b) ................................................ 3, 6, 25

28 U.S.C. §§ 511-19 ...................................................... 12

38 U.S.C. § 304 .......................................................... 15

40 U.S.C. § 302 .......................................................... 15

42 U.S.C. § 7132(a) ....................................................... 1

42 U.S.C. § 902(b)(4) .................................................... 15

50 U.S.C. § 3026(a)(6) ................................................... 19

Act of Aug. 7, 1789, ch. 7, 1 Stat. 49 .............................. 19, 41

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415 ........................... 13, 39

Act of July 20, 1870, ch. 150, 16 Stat. 162 ............................ 13

Act of July 27, 1789, ch. 4, 1 Stat. 28 ............................... 41

Act of May 8, 1792, ch. 37, 1 Stat. 280 ............................ 13, 39

Reorganization Plan No. 4 of 1953, 67 Stat. 636 .................... 26, 27

Rev. Stat. § 179 (1st ed. 1874) .................................... 13, 28

Rev. Stat. § 179 (2d ed. 1878).............................................28

Rev. Stat. § 347 (2d ed. 1878).............................................26

Rev. Stat. § 374 (1st ed. 1874)............................................26

**REGULATIONS**

28 C.F.R. pt. 600 ...............................................................12

**OTHER AUTHORITIES**

1 Op. Att'y Gen. 65 (May 26, 1796)......................................40

7 Op. Att'y Gen. 189 (May 25, 1955)....................................40

144 Cong. Rec. S11,022-23 (Sept. 28, 1998) .......................23

144 Cong. Rec. S12,822 (Oct. 21, 1998) ..............................21

145 Cong. Rec. S33 (Jan. 6, 1999).......................................23

*Agency Reporting Requirements Under the Vacancies Reform Act*
(Mar. 21, 2001), http://bit.ly/2EDmAdC..............................7

*Application of Vacancy Act Limitations to Presidential Designation*
*of an Acting Special Counsel*, 13 Op. O.L.C. 144 (1989) ....................19

Devlin Barrett, *Senior Justice Dept. Officials Told Whitaker*
*Signing Gun Regulation Might Prompt Successful Challenge to*
*His Appointment*, Wash. Post (Dec. 21, 2018),
https://wapo.st/2CEjTHE.......................................................4

*Designating an Acting Attorney General*, 42 Op. O.L.C. __
(Nov. 14, 2018), slip op., http://bit.ly/2B3ilF8.....................38

*Designating an Acting Director of the Bureau of Consumer*
*Financial Protection*, 41 Op. O.L.C. __ (2017),
https://bit.ly/2XAM7v5.........................................................7

*Designation of Acting Director of the Office of Management and*
*Budget*, 27 Op. OLC 121 (2003)..........................................34

Exec. Order No. 13,481, 73 Fed. Reg. 75531 (Dec. 11, 2008)....................7

Exec. Order No. 13,557, 75 Fed. Reg. 68679 (Nov. 9, 2010) ....................7

Exec. Order No. 13,762, 82 Fed. Reg. 7619 (Jan. 19, 2017)....................7

Exec. Order No. 13,775, 82 Fed. Reg. 10697 (Feb. 14, 2017)...................7

Exec. Order No. 13,787, 82 Fed. Reg. 16,723 (Apr. 5, 2017) ..................7

Sadie Gurman & Aruna Viswanatha, *Declining to Recuse, Whitaker Extends Reputation for Political Instinct*, Wall St. J. (Dec. 22, 2018), https://on.wsj.com/2Vi3r7g ........................................... 4

H. Rep. No. 89-901 (1966) ......................................................... 26

Stephen Migala, *The Vacancies Act and an Acting Attorney General* (Nov. 15, 2018) (submitted for publication), http://bit.ly/2EvHhXj ................................................................. 23, 28

S. 1761 (Mar. 16, 1998) ............................................................. 22

S. 1764 (Mar. 16, 1998) ............................................................. 22

S. Rep. No. 105-250 (1998) ................................. 19, 20, 21, 22, 23, 24, 29

S. Rep. No. 89-1380 (1966) ................................................... 26, 27

Lucy M. Salmon, *History of the Appointing Power of the President* (1886) ..................................................................................... 40

# GLOSSARY

| | |
|---|---|
| AG | Attorney General |
| AG Act | Attorney General Succession Act |
| DE | Docket Entry |
| DOJ | Department of Justice |
| GAO | Government Accountability Office |
| JA | Joint Appendix |
| OLC | Office of Legal Counsel |
| Vacancies Act | Federal Vacancies Reform Act |

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and equity. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). The district court entered an Order denying plaintiff's motion for preliminary injunction on February 25, 2019. JA16. Plaintiff timely noticed its appeal that day. DE29; JA7. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# ISSUES PRESENTED

Whether the President's designation of Matthew Whitaker to serve as Acting Attorney General was unlawful or unconstitutional.

# STATUTES AND REGULATIONS

The relevant statutes are reproduced in the Addendum.

# STATEMENT OF THE CASE

1. Federal statutes govern service by acting officials when a Senate-confirmed officer is unavailable or the office is vacant. Roughly three dozen statutes govern specific offices. Most are strict, designating a Senate-confirmed "first assistant"—the officer's second in command—to serve with no time limits; the President has no power to designate anyone else. *See, e.g.*, 28 U.S.C. § 508 (Attorney General); 42 U.S.C. § 7132(a)

(Secretary of Energy). A few designate the first assistant by default, but then grant the President the authority to pick someone else—sometimes specifically under the Federal Vacancies Reform Act (Vacancies Act). *See, e.g.*, 10 U.S.C. § 7017 (Secretary of Army); *id.* § 8017 (Navy); *id.* § 9017 (Air Force).

The Vacancies Act is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" almost all of the roughly 1,200 Senate-confirmed offices "unless" an exception applies. 5 U.S.C. § 3347(a)(1). One exception occurs when one of the office-specific statutes "designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(B). A statute that merely allows the delegation of an official's responsibilities does not qualify. *Id.* § 3347(b).

When it applies, the Vacancies Act provides that the first assistant serves by default. *Id.* § 3345(a)(1). However, the President may designate someone else: either another Senate-confirmed officer or a senior agency employee. *Id.* § 3345(a)(2)-(3). Service under the Vacancies Act is subject to various restrictions, including time limits. *Id.* §§ 3345(b), 3346.

2. In 2017, the Senate confirmed Jeff Sessions as Attorney General. Mr. Sessions recused himself from the ongoing investigation into matters related to whether the President or his campaign had colluded with Russia. Mr. Sessions' first assistant—the Senate-confirmed Deputy Attorney General, Rod Rosenstein—then became Acting Attorney General with respect to the investigation. He did so under the Attorney General Succession Act (AG Act), which provides that in the event of the Attorney General's unavailability, "the Deputy Attorney General may exercise all the duties of that office." 28 U.S.C. § 508(a). If the Deputy is unavailable, the Senate-confirmed "Associate Attorney General shall" serve, followed by other Senate-confirmed officials in the order specified by the Attorney General. *Id.* § 508(b). No time limits apply.

In 2018, the President requested and received Mr. Sessions' resignation. Mr. Rosenstein began serving indefinitely as Acting Attorney General under the AG Act. The next day, the President purported to designate Matthew Whitaker to serve temporarily as Acting Attorney General under the Vacancies Act. *See* JA277. Mr. Whitaker was at the time a department employee—not an officer—serving as the Attorney General's Chief of Staff.

Mr. Whitaker took almost no formal public actions, as the Department of Justice sought to evade judicial review of his designation. *See* Sadie Gurman & Aruna Viswanatha, *Declining to Recuse, Whitaker Extends Reputation for Political Instinct*, Wall St. J. (Dec. 22, 2018), https://on.wsj.com/2Vi3r7g. But Mr. Whitaker did sign a Final Rule regulating certain so-called "bump stock" devices on firearms. Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,554 (Dec. 26, 2018); Devlin Barrett, *Senior Justice Dept. Officials Told Whitaker Signing Gun Regulation Might Prompt Successful Challenge to His Appointment*, Wash. Post (Dec. 21, 2018), https://wapo.st/2CEjTHE.

Plaintiff-Appellant filed suit, alleging that the President's designation of Mr. Whitaker violated the governing vacancies statutes and the Appointments Clause. The district court denied a preliminary injunction, holding that the designation was lawful. JA18-81. This appeal followed.

## STANDARD OF REVIEW

The district court denied a preliminary injunction on purely legal grounds that are reviewed de novo. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

## SUMMARY OF THE ARGUMENT

The Vacancies Act and the AG Act prohibit the President from displacing the Deputy Attorney General as Acting Attorney General. The Vacancies Act does not apply when, as here, an office-specific statute designates an acting official. The district court's contrary ruling cannot be reconciled with the statutes' text and structure, or with the well-settled role of office-specific designation statutes as exceptions to the President's authority under the general vacancies law. Indeed, the district court's ruling inverts Congress's intent to limit the President's authority to choose between the Vacancies Act and departments' organic statutes.

Any remaining ambiguity is resolved by avoiding the significant constitutional doubts raised by the district court's construction. Even the Government concedes that there is significant doubt that the President may designate an employee like Mr. Whitaker to perform the functions of an officer. Further, there is grave doubt that the President may displace an available first assistant with a non-confirmed official. That is particularly true when, as here, there is not any exigency, given the availability of a Senate-confirmed successor.

# ARGUMENT

## I. The President's Designation Of Matthew Whitaker Was Contrary To Statute.

The parties agree that when the Attorney General is unavailable, the AG Act automatically designates the Deputy Attorney General to serve. They also agree that the Vacancies Act sometimes permits the President to designate an Acting Attorney General.

The Government argues—and the district court held—that the Vacancies Act permits the President to override the AG Act at any time. JA50. Plaintiff argues, by contrast, that the President may invoke the Vacancies Act only when the AG Act does not "designate" the Acting Attorney General because the officials specified by the AG Act are unavailable. 5 U.S.C. § 3347(a)(1)(B); 28 U.S.C. § 508.[1]

Until recently, the Executive Branch agreed with Plaintiff's interpretation. The White House Counsel adopted that reading in official guidance. *Agency Reporting Requirements Under the Vacancies Reform*

---

[1] This case does not present the question whether the President's authority under the Vacancies Act applies (1) whenever the officials designated by statute (the Deputy Attorney General and Associate Attorney General) are unavailable (*see* 5 U.S.C. § 3347(a)(1)(B); 28 U.S.C. § 508), or instead (2) only when the further successors designated by the Attorney General are unavailable as well (*see* 5 U.S.C. § 3347(a)(1)(A); 28 U.S.C. § 508(b)).

*Act* 2 & n.2 (Mar. 21, 2001), http://bit.ly/2EDmAdC.  So did subsequent Executive Orders providing the order of succession for the Attorney General.  Exec. Order No. 13,787, 82 Fed. Reg. 16,723 (Apr. 5, 2017); Exec. Order No. 13,775, 82 Fed. Reg. 10697 (Feb. 14, 2017); Exec. Order No. 13,762, 82 Fed. Reg. 7619 (Jan. 19, 2017); Exec. Order No. 13,557, 75 Fed. Reg. 68679 (Nov. 9, 2010); Exec. Order No. 13,481, 73 Fed. Reg. 75531 (Dec. 11, 2008).  It was not until November 2017 that the Department of Justice first expressly took the position that the President could use the Vacancies Act to override a statute specifically designating an available acting official.  *Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. __ (2017), https://bit.ly/2XAM7v5.

Plaintiff's reading is more consistent with the statutory text and structure, as well as the purpose and history of the Vacancies Act.

### A.    The Vacancies Act Does Not Apply When A Specific Statute Designates An Acting Official For An Office.

The Vacancies Act is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" almost every Senate-confirmed officer, "unless" an exception applies.  5 U.S.C. § 3347(a).  One exception is if "a statutory provision expressly . . . desig-

nates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1). The AG Act unquestionably "designates an officer"—the Deputy Attorney General, who was available—"to perform the functions and duties" of the Attorney General. *Id.*; *see* 28 U.S.C. § 508(a); *see also In re Grand Jury Investigation*, ___ F.3d ___, 2019 WL 921692, at *7 (D.C. Cir. Feb. 26, 2019).

The district court assumed without explanation that, in Section 3347(a), the word "unless" modifies "exclusive." JA57. On that basis, it held that when an exception applies the Vacancies Act continues to apply as well, but is "non-exclusive." In turn, the district court held, the President can choose whether to apply the Vacancies Act or instead the office-specific designation provision. *Id.* In other words, it read the exception to broaden the President's authority, rather than narrow it. Strikingly, the district court's analysis on this central question consists of a single, unelaborated sentence: "Where, as here, an agency-specific statute designates a successor, the [Vacancies Act] is no longer the *exclusive* means of filling a vacancy, but it remains *a* means of filling the vacancy." *Id.* at 52.

The district court erred in its assumption of how the exception is structured. In fact, "unless" modifies "means." When the exception applies, the Vacancies Act is not a "means" to authorize an acting official. The Vacancies Act therefore does not apply. That is the better reading of the statute for seven reasons.

*First*, statutes are read as a whole, and the exceptions to Section 3347(a) are unambiguous. The Vacancies Act is also "exclusive . . . unless" "the President makes an appointment to fill a vacancy in such office" under the Constitution's Recess Appointments Clause. 5 U.S.C. § 3347(a)(2). Plainly, when that exception applies, the Vacancies Act does not; there is not even a vacancy left to address. The Vacancies Act is also "exclusive" with respect to offices "other than the Government Accountability Office." *Id.* § 3347(a). The obvious purpose of that provision is to exclude the GAO altogether, not to give the President the choice whether to designate an acting official under the Vacancies Act.

So too, the obvious structure of the office-specific designation exception is to narrow—not expand—the President's options. There are three possibilities under the Vacancies Act: (1) the first assistant serves; (2)

the President selects a Senate-confirmed officer; or (3) the President selects a senior department employee. 5 U.S.C. § 3345(a). The office-specific designation statutes uniformly track possibility (1)—the first assistant serves. So Section 3345(a)(1) reads as: "The three options provided by the Vacancies Act are the exclusive means of selecting an acting official, unless a statute designates the first option." It makes little sense to say that Congress gave the President a choice between three options and also one of those same options.

*Second*, the whole purpose of office-specific designation statutes like the AG Act is to exempt the office from the general vacancies statute in order to prevent the President from displacing the officer's deputy with someone else. When, as here, the purpose of a "designation" is to narrow the available options, it is controlling. The point is illustrated by parallel hypotheticals, such as:

(a)    The general venue statute is the exclusive means to determine where a suit may be filed, unless the statute providing the cause of action expressly designates a venue.

(b)　　The "wheel" is the exclusive means to specify the district judge to whom a case is assigned, unless the case is expressly designated as related to another matter.

(c)　　The Federal Rules of Civil Procedure are the exclusive means to determine the deadlines for serving a complaint, unless the local rules expressly designate a deadline.

In each of those examples—and innumerable others—the word "unless" modifies "means," such that the "designation" provision is controlling. None are fairly read to render the general rule still applicable, but merely non-exclusive. None creates a choice as to which to follow.

Those hypotheticals are analogous to the exception at issue in this case. The office-specific statutes were intended to eliminate the President's power under the general vacancies statute. They were enacted in parallel with the general vacancies law, and their principal function was to depart from its default rule.

The district court specifically did not doubt that the actual, overriding purpose of the AG Act is to limit *who* will serve as Acting Attorney General—and specifically to prevent the President from picking someone else—not *how long* they will serve. By giving the President the choice

whether to follow the AG Act, the district court's reading fundamentally changes the statute's operation.

The AG Act's very point is thus to ensure that by default the Nation's highest law enforcement official is a Senate-confirmed officer within the chain of command of the Department of Justice—one whom the Senate has already considered with the possibility of such performance of the Attorney General's functions in mind—and to forbid the President from appointing a hand-picked employee to that role whenever he likes. The reasons for this regime are obvious and illustrated by the facts of this case. The Attorney General exercises vast authority over, for example, criminal and national security matters. 28 U.S.C. §§ 511-19. The role calls for the highest levels of integrity and personal judgment, prerequisites safeguarded by the Constitution's command that principal officers be subject to the check provided by Senate confirmation. Indeed, the Attorney General plays a particularly vital role with respect to the separation of powers: Except in cases of recusal, the Attorney General has the power to oversee an investigation of the President himself. 28 C.F.R. pt. 600.

Notably, Congress has *never* permitted the President to invoke the Vacancies Act to displace the second in command to the Attorney General. The original general vacancies laws did not apply to the Attorney General, because they were limited to executive departments. Act of May 8, 1792, ch. 37, § 8, 1 Stat. 280, 281; Act of Feb. 13, 1795, ch. 21, 1 Stat. 415. When Congress later created the Department of Justice in 1870, it designated the Solicitor General to serve as Acting Attorney General. Act of July 20, 1870, ch. 150, § 2, 16 Stat. 162. Recognizing Congress's intent to override the general vacancies statute, the codifiers of federal law expressly exempted the Attorney General from it. Rev. Stat. § 179 (1st ed. 1874). That provision remained until it was supplanted by the current, broader exception for all office-specific designation statutes.

The district court's construction is strongly disfavored because it amounts to an implied repeal of office-specific designation statutes such as the AG Act. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). Permitting the President to choose between a general vacancy provision and a more-specific designation would deprive the latter of nearly all its force. That reading is accordingly disfavored. For example, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 158 (1976), involved a non-exclusive

general venue provision applicable to securities suits and a specific provision applicable to suits against national banks.  The Court held that a plaintiff suing a national bank under the securities laws could not choose between the two; the specific provision governing national banks controlled.  That was true even though the bank-specific provision would remain fully effective outside the securities context.

The district court in this case reasoned to the contrary that its interpretation still left the AG Act some function.  It explained that both the Vacancies Act and the AG Act "impose[] unique requirements that provide alternative mechanisms for filling a vacancy" because the Vacancies Act "limit[s] the length of time an individual may serve" and provides that a nominee to the post "is generally prohibited from serving in an acting capacity."  JA57.  But the district court's interpretation is still subject to the presumption against implied repeals, despite the fact that it leaves the AG Act some nominal role to fill.  The fundamental point is that the district court's reading takes a statute intended to eliminate the President's discretion and flips it into a statute that expands that discretion.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644,

664 n.8 (2007) ("It does not matter whether [an] alteration is character-ized as an amendment or a partial repeal. Every amendment of a statute effects a partial repeal to the extent that the new statutory command displaces earlier, inconsistent commands, and we have repeatedly recog-nized that implied amendments are no more favored than implied re-peals.").

*Third*, when Congress instead intends to give the President the power to override an office-specific designation statute, it both (1) says so expressly, and (2) specifies a default rule for the common circumstance in which the President does nothing. That is specifically true when Con-gress intends to permit the President to use the Vacancies Act to override a default designation for a particular office. 10 U.S.C. § 7017 (President may use the Vacancies Act to override default designation of Acting Sec-retary of the Army); *id.* § 8017 (Navy); *id.* § 9017 (Air Force); *see also* 38 U.S.C. § 304 (President may override default designation for Secretary of Veterans Affairs); 40 U.S.C. § 302 (Administrator of General Services Ad-ministration); 42 U.S.C. § 902(b)(4) (Commissioner of Social Security).

The district court's reading ignores the congressional design, and moreover impermissibly renders all those provisions superfluous. *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

Those regimes enacted by Congress are moreover coherent in an important way that the district court's decision is not. Those statutes designate a default official, then allow the President to pick *someone else*. By contrast, the district court read the AG Act to designate the Deputy Attorney General, then the Vacancies Act inexplicably to allow the President to designate the *same* official (who is the "first assistant" under 5 U.S.C. § 3345(a)) but subject to various restrictions (such as time limits). Further, the President's "choice" between the Vacancies Act and the AG Act has nonsensical consequences. Most obvious, if the President opts not to subject the Deputy Attorney General to the time limits of the Vacancies Act, then the President loses the power to designate another official. The district court was unable to identify any *reason* that Congress would have created such a ham-fisted regime—where the President gets to choose whether to follow statutory time limits, in turn triggering consequences that are logically unrelated.

Faced with the absence of any provision applicable here that grants the President a choice, the district court simply granted him that power by *ipse dixit*. But there is no support for the district court's assumption that when two statutes apply to a given circumstance, the President can choose between them. The bedrock rule is instead that when two statutes apply to given facts they must be reconciled—including when "a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). To the extent they cannot, the more-specific provision controls. *Id.* Only Plaintiff's interpretation is consistent with those principles. When (as here) an office-specific statute designates an acting official, it controls; but when there is no such designation (because the statutorily designated successor is unavailable), then the Vacancies Act applies.

On the district court's contrary view, numerous precedents applying the principle that the more-specific statute controls would be wrongly decided. Take, for example, a case in which two different statutes—one general, one specific—nominally authorize a department head to delegate authority. The general provision in such a case by definition is "not

exclusive." But the department head is nonetheless not permitted to choose which to follow. Rather, the specific provision controls. *See United States v. Giordano*, 416 U.S. 505, 507-08 (1974) (Attorney General could not choose to delegate wiretap authority using general delegation power when wiretap statute provided AG more specific and limited delegation authority). When both apply, the general delegation provision is not, as the head of an agency might argue, an "alternative source of delegation power." *Halverson v. Slater*, 129 F.3d 180, 181-82 (D.C. Cir. 1997).

*Fourth*, the implications of the district court's reading are so sweeping that if Congress intended them it would have implemented them expressly, not indirectly. The district court held that Congress intended to permit the President to displace the Deputy Attorney General and Associate Attorney General with any of roughly 6,000 attorneys in the Department of Justice who would qualify under the Vacancies Act, or with any of the more than 1,000 Senate-confirmed officials in other departments. But the district court's decision sweeps even more widely. Congress designated a Senate-confirmed official to serve on an acting basis

in not just the AG Act but also in provisions governing other critical offices. These include the Secretary of Defense, Chairman of the Joint Chiefs of Staff, and Director of National Intelligence. 10 U.S.C. § 132(b); *id.* § 154; 50 U.S.C. § 3026(a)(6). Those provisions date to the 1800s. *See, e.g.*, Act of Aug. 7, 1789, ch. 7, § 2, 1 Stat. 49, 50 (succession in Department of War Organic Act); Act of June 22, 1870, ch. 150, § 2, 16 Stat. 162 (succession in DOJ Organic Act).

Congress was well aware of the office-specific statutes, and their function. *See, e.g.*, S. Rep. No. 105-250, at 15-16 (1998). The Executive Branch had expressly construed the prior version of the Vacancies Act as "non-exclusive." *E.g.*, *Application of Vacancy Act Limitations to Presidential Designation of an Acting Special Counsel*, 13 Op. O.L.C. 144, 145 (1989), https://bit.ly/2NwFBko. It specifically took that position with respect to the Department of Justice beginning in 1973. *See id.* But no Administration had ever taken the position that the general vacancies statute allowed the President to override an express statutory designation of an acting official.

If Congress in fact intended to fundamentally alter the operation of the AG Act and other office-specific designation provisions by allowing

the President to override them, it would have said so expressly—as it did in several other statutes. The courts will not construe statutes to find elephants in mouseholes or lightly conclude that Congress departed from well-settled practice. *E.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626-27 (2018).

*Fifth*, the district court's reading inverts Congress's principal purpose in enacting the Vacancies Act, including particularly its use of the word "exclusive." Congress principally sought to reject the position of the Office of Legal Counsel that the President could choose whether to designate an acting official under either the general vacancies statute or instead the organic statute of a department—including particularly in the Department of Justice. As noted, beginning in 1973, OLC took the position that the general vacancies statute was "non-exclusive." It maintained that an acting official could be named by delegating that official's responsibility to some other officer. S. Rep. No. 105-250, at 8-10. Congress enacted the Vacancies Act in 1998 to reject that position. *See id.*; *see also* 5 U.S.C. § 3347(b). The district court's interpretation inverts the statute's purpose, giving the President exactly the kind of choice Congress intended to eliminate.

Congress specifically used the word "exclusive" to reject OLC's reliance on delegation statutes, not perversely to give the President additional choices. The draft legislation provided that the Vacancies Act would be "applicable" to various offices. S. Rep. No. 105-250, at 26. But that language arguably would have permitted OLC to continue to maintain its prior position that delegation provisions were "applicable" as well. The bill was then amended to use "exclusive" to block such a maneuver. Senator Thompson, the bill's principal sponsor, explained on the floor:

> The phrase "applicable to" is replaced by "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" in § 3347(a) to ensure that the Vacancies Act provides the sole means by which temporary officers may be appointed unless contrary statutory language as set forth by this legislation creates an explicit exception. . . . Thus, the organic statutes of the Cabinet departments do not qualify as a statutory exception to this legislation's exclusivity in governing the appointment of temporary officers.

144 Cong. Rec. S12,822, 12,823 (Oct. 21, 1998).

*Sixth*, and relatedly, Congress substituted the office-specific designation exception for draft language that would have operated exactly as the district court read the statute, but which Congress removed. The initial draft legislation provided that the Vacancies Act and office-specific

statutes were both "applicable" to an office unless the latter *explicitly* provided otherwise. *See* S. 1761 § 3 (Mar. 16, 1998); S. 1764 § 3 (Mar. 16, 1998); S. 2176 § 2 (June 12, 1998 committee draft); S. Rep. No. 105-250, at 26. But Congress removed that provision and adopted instead the current office-specific designation exception. 5 U.S.C. § 3347(a)(1)(B). The district court's construction impermissibly reads the Vacancies Act as if it included the exact provision that Congress actually eliminated from the legislation—it held that both the Vacancies Act and the AG Act apply here. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.").

*Seventh*, the legislative history is unambiguous that Congress intended to continue to treat office-specific designation statutes as controlling over the general vacancies statute. Senator Lieberman explained the provision's purpose when he introduced it in committee: "it is not our intention to override those specific judgments by previous Congresses that have taken different positions out of the Vacancies Act." *See* Stephen Migala, *The Vacancies Act and an Acting Attorney General* 34-35, App.76 (Nov. 15, 2018) (submitted for publication), http://bit.ly/2EvHhXj

(Migala).  Senator Thompson stated that he agreed.  *Id.* at 35, App.80.

He then repeated the same thing on the floor in explaining the legisla-

tion.  144 Cong. Rec. S11,022-23 (Sept. 28, 1998) (Vacancies Act would

"cover all advice and consent positions in executive Agencies except those

that are covered by express specific statute"); 145 Cong. Rec. S33 (Jan. 6,

1999) (office-specific statutes are "retain[ed] in lieu of the procedures con-

tained in the" Vacancies Act).

The district court addressed none of that history and instead placed

dispositive weight on part of one sentence in one Senate Report, to the

effect that "the Vacancies Act would continue to provide an alternative

procedure for temporarily occupying the office."  S. Rep. No. 105-250, at

17; *see* JA59.  But the district court failed to recognize that the Senate

Report corresponded to a bill that *did not include* the designation excep-

tion.  Nor did it even include the "exclusivity" provision on which the dis-

trict court rested its decision.  Instead, the bill at that time provided that

the Vacancies Act would be "applicable" unless an office-specific statute

expressly provided otherwise—the language Congress later rejected. *See* S. Rep. No. 105-250, at 26 (§ 3347(a)).[2]

## B. The Arguments Invoked By The District Court Lack Merit.

### 1. *There Is No Merit To The District Court's Reliance On Two Provisions Of The AG Act.*

The district court believed that its ruling was supported by two provisions of the AG Act. But the Vacancies Act looks to only one characteristic of an office-specific statute: does it "designate" an acting official? The AG Act unquestionably does. The precise manner in which it does so is irrelevant under Section 3347(a)(1)(B). Moreover, there is no serious argument that Congress would have intended the Vacancies Act to apply to the Attorney General because of the precise language of the AG Act,

---

[2] The district court misunderstood even the part of the one sentence it quoted. The Senate Report stated *unequivocally* that office-specific statutes would be "exceptions" to the Vacancies Act. *Id.* at 2. The bill at that time also expressly excluded the Attorney General, meaning that the Vacancies Act could not have been an "alternative" procedure. *Id.* at 13. The Report could not have meant that the general vacancies statute would "continue" to provide an alternative even if those specific laws remained on the books: the general statute had *never* before been read as an alternative to office-specific designation statutes, so there was no such practice to "continue." The language quoted by the district court instead referred to what "would" happen if Congress were to "repeal" the office-specific designation statutes. *Id.* at 17.

but not to apply to other important offices that are similarly subject to specific designation statutes.

In any event, neither provision of the AG Act cited by the district court indicates Congress's intent to allow the President to override the statutory designation of the Deputy Attorney General.

*First*, the district court relied on the fact that the AG Act states that "the Deputy Attorney General 'may' assume the responsibilities of the Attorney General during a vacancy," which "'customarily connotes discretion,' rather than a mandatory requirement." JA56 (quoting *Jama v. ICE*, 543 U.S. 335, 346 (2005)). Even accepting that as true, the consequence would be that the Deputy has the discretion whether to serve, or instead to leave that responsibility to the Associate Attorney General, who "shall" serve. 28 U.S.C. § 508(b). The statute manifestly does not say that "the President may" determine whether the Deputy serves.

But even the Government agrees that the Deputy's service is automatic and mandatory—as when Mr. Sessions recused from the Russia investigation. The history of the statutory language makes its meaning clear. The original version of the AG Act provided that in the case of a vacancy, the Solicitor General "shall have the power to exercise all the

duties of" the Attorney General. *See* Rev. Stat. § 374 (1st ed. 1874); *see also* Rev. Stat. § 347 (2d ed. 1878) (same); 5 U.S.C. § 293 (1925) (same); 5 U.S.C. § 293 (1952) (same). That language was unquestionably mandatory and was uniformly treated as such for decades. In 1953, the Solicitor General's power was transferred to the Deputy Attorney General pursuant to President Eisenhower's reorganization plan. *See* Reorganization Plan No. 4 of 1953, § 1(a), 67 Stat. 636; *see also* 5 U.S.C. §§ 293 & note, 294 & note (1958).

When Titles 5 and 28 were codified in 1966, the codifiers merely shortened the phrase "shall have the power to" by using the more concise "may." *See* H. Rep. No. 89-901, at 184 (1966) ("The last sentence of R.S. § 347 is cited as authority inasmuch as the function contained therein was the function transferred to the Deputy Attorney General by 1953 Reorg. Plan No. 4. The word 'may' is substituted for 'have the power.'"); S. Rep. No. 89-1380, at 203 (1966) (same). That change in verbiage did not substantively change the law. H.R. Rep. No. 89-901, at 1 ("The purpose of this bill is to restate in comprehensive form, without substantive change, the statutes in effect before July 1, 1965 . . . and to enact title 5 of the United States Code."); *see Doolin Sec. Sav. Bank, F.S.B. v. Office*

*of Thrift Supervision*, 139 F.3d 203, 210 (D.C. Cir. 1998) ("No 'substantive changes' were intended [in the 1966 recodification].") (quoting S. Rep. No. 89-1380, at 20, 70-71). The word "may," like the prior "shall have the power to," simply reflects the statute's recognition that there is a back-up successor—the Associate Attorney General—who will serve if the Deputy cannot.

*Second*, the district court noted that the AG Act identifies the Deputy Attorney General as the "first assistant" "for the purpose of section 3345 of title 5." JA55. The district court believed "that Congress included a cross-reference in the AG Act because it intended" that the Vacancies Act "establishes a first-assistant default rule that operates in tandem with the AG Act, but it also permits the President to override the AG Act." *Id.* The statutes' history refutes that reading.

The 1953 reorganization plan for the Department of Justice included in the AG Act a statement that "for the purposes of" the general vacancies statute, "the Deputy Attorney General shall be deemed to be the first assistant." Reorg. Plan. No. 4 of 1953, § 1(a), 67 Stat. 636. The Government understood this provision to have no substantive effect, be-

cause the Attorney General was *already expressly excluded* from the President's power under the general vacancies statute to designate an acting official. *See* Rev. Stat. § 179 (1st ed. 1874); Rev. Stat. § 179 (2d ed. 1878). The AG Act's "first assistant" provision merely acknowledged that both the AG Act and the general vacancies law would designate the same acting official: the Deputy Attorney General.

Subsequently, the 1998 Vacancies Act replaced the targeted exclusion of the Office of the Attorney General with the general exception for office-specific designation statutes. *See* 5 U.S.C. § 3347(a)(1)(B); *see also, e.g.*, Migala 38-39 (staffers asking to "Delete 3345(c)," the AG Act exemption, "because it is included in 3347(a)").

The district court looked solely to the text of the AG Act as it exists *now*—*i.e.*, only the vestigial "first assistant" cross-reference. That was error. Under the "reference canon," the AG Act's targeted cross-reference to Section 3345 of the Vacancies Act retains its original meaning, notwithstanding the latter's subsequent amendment. *Jam v. Int'l Fin. Corp.*, __ S. Ct. ___, 2019 WL 938524, at *6 (U.S. Feb. 27, 2019) ("[A] statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the

28

referring statute was enacted, without any subsequent amendments."). In 1953, Congress understood that the first assistant cross-reference would have no substantive effect. The fact that a later Congress in 1998 replaced the express exclusion of the Attorney General in the general vacancies statute but did not also go to the trouble of amending the AG Act to delete the cross reference does not change the AG Act's meaning.

    2.    *There Is No Merit To The District Court's Reliance On The Exclusion Of Certain Multi-Member Bodies In Section 3349c Of The Vacancies Act.*

The district court believed that if Congress intended to exempt the Office of the Attorney General from the Vacancies Act altogether, it would have listed that office in a separate provision identifying certain offices to which the Vacancies Act "shall not apply." 5 U.S.C. § 3349c. That provision, however, does not purport to be exhaustive. *See, e.g.*, 5 U.S.C. § 3347(a) (separately excluding GAO). Rather, Section 3349c is a provision directed to a very specific kind of office: multi-member bodies, which Congress already believed had "always been" excluded from the Vacancies Act; the provision was simply added "to avoid any confusion." S. Rep. No. 105-250, at 22.

But in any event, the district court was attacking a straw man. Plaintiff's position is *not* that the Office of the Attorney General is categorically exempt from the Vacancies Act. Rather, the Vacancies Act applies, but only when the officials specified by the AG Act are unavailable. If Congress had instead included the Office of the Attorney General in Section 3349c, the statute would not have operated as intended.

The district court believed that under Plaintiff's interpretation the Vacancies Act would never apply to the Office of the Attorney General. It reasoned that "the AG Act would always 'designate' or 'chose' the First Assistant—or another successor listed in the AG Act—and the [Vacancies Act] would never apply, even when all of the AG Act successors are unavailable." JA57. The district court's reading is hard to follow, but it apparently regarded the exception provided by Section 3347(a)(1)(B) as categorically applying to an office, no matter what the circumstances. On that view, the AG Act is a *type* of statute that "designates" a successor, such that the Office of the Attorney General is always subject to Section 3347(a)(1)(B).

That is plainly wrong. In fact, as the Executive Branch acknowledged in its longstanding adoption of plaintiff's reading, whether the exception applies depends on the availability of the listed officers. That must be true: the statute identifies different officials who will serve, depending on their respective availability. No one would fairly say that the AG Act designates *both* the Deputy Attorney General *and* the Associate Attorney General. In turn, when the Deputy Attorney General and the Associate Attorney General are unavailable—for example, because both have resigned in a presidential transition—the AG Act does not "designate" either to serve as Acting Attorney General.

## II. This Court Should Construe The Governing Statutes To Avoid The Serious Constitutional Doubt Raised By The District Court's Interpretation.

President Trump forced out the Attorney General, then designated the Attorney General's Chief of Staff to serve on an acting basis, displacing the Deputy Attorney General. The President thereby designated an employee to serve indefinitely as an acting principal officer, despite the availability of a Senate-confirmed first assistant. So far as can be determined, no President had ever done that before, in all of American history. "Long settled and established practice is a consideration of great weight

in a proper interpretation of constitutional provisions." *The Pocket Veto Case*, 279 U.S. 655, 689 (1929). Holding that this designation was authorized by statute would make this the first case to decide whether and when the President may designate an employee to perform all the functions of a principal officer. The Court should construe the governing statutes to avoid raising that significant constitutional question. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

There must be serious constitutional doubt that the President has the power claimed here, for the straightforward reason that it would essentially enable the President to circumvent the Appointments Clause. According to the district court, the Constitution permits the President to remove every principal officer—for example, the entire Cabinet—and assign all of their responsibilities to "any person." JA68-69, 78. The universe of candidates would not be limited to officers, or even employees. The President could pick personal friends to take over the responsibilities of all of the nation's most sensitive offices, which the Constitution expressly requires be subject to Senate confirmation.

Moreover, according to the district court, the President could do so at any time—and in particular, in the absence of any exigency preventing

the position from being filled by an officer who the Senate confirmed specifically anticipating that he would step in if the principal officer was unavailable. Here, the Senate confirmed Rod Rosenstein as the Deputy Attorney General, knowing that he would serve as Acting Attorney General—as the Deputy does regularly in cases of the Attorney General's recusal.

The only limitation the district court recognized was that, as of some unidentified date, the acting official would have served so long as to be no longer "temporary." JA77-78. But the court indicated that the outer time limitations would be determined by Congress. *Id.* And the Vacancies Act, for example, permits the President to designate acting officials for nearly two years. *See* 5 U.S.C. § 3346 (designation may last through at least three periods of 210 days each). If the Senate then confirmed a permanent principal officer, the President would presumably be able to remove that person and start the clock over once again. The Senate's essential power to reject principal officers would be largely illusory.

The district court's holding approving that result is fundamentally inconsistent with the role of the Appointments Clause in maintaining the separation of powers. The Senate's role is vital, "serv[ing] both to curb

Executive abuses of the appointment power and 'to promote a judicious choice of [persons] for filling the offices of the union.'" *Edmond v. United States*, 520 U.S. 651, 659-60 (1997) (quoting *The Federalist No. 76*, at 386-87, internal citations omitted).  For the founders, the "'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power, because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (quoting G. Wood, *The Creation of the American Republic 1776-1787*, at 79 (1969)).

The Office of Legal Counsel itself has recognized that there is significant constitutional doubt that the President may direct an employee to temporarily perform all the functions of *any* officer—much less a principal officer.  *Designation of Acting Director of the Office of Management and Budget*, 27 Op. OLC 121, 124-25 (2003).  The district court disagreed. Despite OLC's own views and the absence of any historical precedent, the court found no "serious doubt" that Mr. Whitaker's designation satisfied the Appointments Clause.  JA61.  That is not correct, and the authorities on which the court relied do not support its conclusion.

The district court—like the parties—looked to four principal sources. *First*, there is the text of the Appointments Clause itself. U.S. Const. art. II, § 2, cl. 2. The Clause distinguishes officers (who must be appointed) from ordinary employees (who can be hired). *Id.* An officer is someone who holds a continuing position in which she exercises significant discretion in administering the laws of the United States. *Lucia v. SEC*, 138 S. Ct. 2044, 2051-52 (2018).

The Appointments Clause further distinguishes between principal officers (who require Senate confirmation) and inferior officers (who Congress can allow to be appointed by the President, courts, or department heads). *Id.* An inferior officer is one who generally has a superior. *Edmond*, 520 U.S. at 662; *In re Grand Jury Investigation*, 2019 WL 921692, at *3.

The constitutional text supports the conclusion that the President cannot designate an employee to perform all the functions of an officer— much less a principal officer—at least absent an exigency. The text draws a broad and stark distinction between mere employees (who can themselves be hired by other employees) and principal officers (who must be nominated by the President personally and confirmed by a majority of

the Senate). Tellingly, the Constitution does not recognize a power to designate a temporary principal officer, strongly suggesting that the process of Senate confirmation must be followed whenever possible—*i.e.*, absent an exigency. But if the President can remove a principal officer and indefinitely assign that officer's responsibilities to an employee (indeed, to "any person"), then this central distinction is largely illusory. It no longer plays any material role in preserving the separation of powers.

*Second*, the district court looked to the one Supreme Court decision that addressed acting officials, *United States v. Eaton*, 169 U.S. 331 (1898). That case involved a "vice consul," who was designated in advance to temporarily perform the functions of an unavailable consul general. The vice consul was an inferior officer, not an employee. *Id.* at 343. The consul general was a principal officer. *Id.* The Supreme Court held that the Appointments Clause did not require the vice consul to be confirmed by the Senate as a principal officer, reasoning:

> Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administra-

tive duties would be seriously hindered. The manifest purpose of Congress in classifying and defining the grades of consular offices . . . was to so limit the period of duty to be performed by the vice-consuls and thereby to deprive them of the character of consuls in the broader and more permanent sense of the word.

*Id.* Further, *Eaton* recognized that in the exigent circumstance that no subordinate officer was available to serve on a temporary basis, non-officers—indeed, non-employees—had done so. *Id.* at 344 (discussing the Attorney General's approval of paying a vice consul's son for his temporary service in those circumstances).

*Eaton* supports the conclusion that the President cannot assign all of a principal officer's responsibilities to an employee, absent an exigency. The Court's opinion makes clear that it was *not* sufficient that the vice consul acted "for a limited time." 169 U.S. at 343. The Court instead placed substantial weight on the fact that the vice consul in *Eaton* was an officer appointed for that particular role, as well as the fact that the vice consul's service responded to "special and temporary conditions." The Court only indicated that a non-officer could serve in the exigency that an officer was unavailable. The vice consul was moreover a position

designated in advance rather than on an *ad hoc* basis, substantially reducing the prospect that the President would use the position to evade the Senate's appointments role.

*Third*, there is the early practice of presidential appointments. Presidents regularly named temporary acting officials. Almost without exception, an available officer (not an employee) served in an acting capacity—either the department's first assistant (known at the time as the Chief Clerk) or a Senate-confirmed officer (generally a department head). *Designating an Acting Attorney General*, 42 Op. O.L.C. __, at 12-14 (Nov. 14, 2018), slip op., http://bit.ly/2B3ilF8. There are less than a handful of counter-examples. *See* Op. 57-58 & n.13.

That historical practice is inconsistent with the district court's holding that the Appointments Clause permits the President to designate "any person" to fulfill all the responsibilities of a principal officer, in any circumstances. Presidents themselves plainly did not believe that they had such authority. If that had been their view, they would have exercised the power regularly. Instead, Presidents consistently designated officers, whether the first assistant or some other Senate-confirmed official.

*Fourth*, there are the first two general vacancies statutes. The 1792 statute was limited to the "death, absence from the seat of government, or sickness" of the heads of the three then-existing departments. Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281. It thus did not apply to vacancies created by firing or resignation. Nor did it apply at all to other Senate-confirmed positions. When it applied, the 1792 statute allowed the President to designate "any person" to serve temporarily, and it did not impose any time limit in the case of a vacancy. *Id.* The 1795 version extended the President's power to include any vacancy in those three departments and imposed a time limit of six months. Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.

The district court read these statutes to establish that the Appointments Clause allows the President to designate any person for any office at any time. JA68-71. That conclusion cannot be reconciled with the Supreme Court's ruling in *Eaton*, which stresses both that the vice consul was an officer and that the vice consul served in response to special and temporary conditions. Indeed, not even the Office of Legal Counsel took the position that the original vacancies statutes are controlling. The most historically relevant provision—the original 1792 version—was

both under-inclusive (because it neither applied to most officers nor applied if a department head was removed) and over-inclusive (because it did not limit the length of an acting official's service). *Golan v. Holder*, 565 U.S. 302, 321 (2012) ("the 'construction placed upon the Constitution by'" the Second Congress, "'many of whom were members of the convention which framed it, is of itself entitled to very great weight'") (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884)). More broadly, Congress in these early statutes simply did not account for the precise requirements of, and powers created by, the Appointments Clause. *See, e.g.*, 1 Op. Att'y Gen. 65, 65-66 (May 26, 1796) (AG Lee) (statutes omitted requirement of Senate confirmation); 7 Op. Att'y Gen. 189, 194 (May 25, 1955) (AG Cushing) (statutes omitted power to appoint ministers and consuls); Lucy M. Salmon, *History of the Appointing Power of the President* 16 (1886) (statutes omitted President's removal power).

The early vacancies statutes are instead best understood to have given the Presidents broad power that accounted for the possibility of exigencies, such as when a department head's chief clerk was unavailable. That is apparent from the record of how Presidents actually applied the statutes in practice. Despite their broad language, as just discussed, it

was essentially unheard of for a President to designate "any person" as an acting official. Rather, Presidents designated either the department's second in command or another Senate-confirmed official.

Nor did Congress in those statutes consider whether the President may displace an available Senate-confirmed deputy, for the simple reason that at the time the department head's first assistant (the Chief Clerk) was not a confirmed position. *E.g.*, Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29 (Dep't of State Chief Clerk appointed by Secretary); Act of Aug. 7, 1789, ch. 7, § 2, 1 Stat. 49, 50 (Dep't of War Chief Clerk appointed by Secretary). As discussed, once Senate-confirmed deputy positions became more common, Presidents did not bypass those officers with other acting officials.[3]

_____

[3] The district court also believed that if the Constitution does not permit the President to designate an employee to perform the functions of a principal officer, then the Vacancies Act should construe itself to "appoint" Mr. Whitaker as an officer. JA78-79. But whether or not the statute effects a technical "appointment," the basic point is the same: the President is selecting a mere employee. Further, the text of the Vacancies Act will not bear the district court's proposed reading, because the statute expressly distinguishes the President's direction to an employee from an "appointment." *See* 5 U.S.C. § 3345(a); *Weiss v. United States*, 510 U.S. 163, 172 (1994) (holding that Congress did not intend to effect an appointment in a statute drawing the same distinction). Finally, if the Vacancies Act *did* appoint Mr. Whitaker as an officer for the first

## CONCLUSION

The district court's order should be reversed.

Respectfully submitted.

/s/ Thomas C. Goldstein
Thomas C. Goldstein
Daniel Woofter
Charles H. Davis
Erica Oleszczuk Evans
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
tgoldstein@goldsteinrussell.com

March 4, 2019

---

time, then he was a "principal officer" who must be confirmed by the Senate because in the entire course of that appointment he had no relationship with any superior officer. *Edmond*, 520 U.S. at 622; *In re Grand Jury Investigation*, 2019 WL 921692, at *3.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit as set out in this Court's March 1, 2019 Order because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), the appellants' briefs collectively contain 19,500 words or less. This document contains 8,305 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

March 4, 2019          /s/ Thomas C. Goldstein
                                    Thomas C. Goldstein

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on March 4, 2019. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Thomas C. Goldstein
Thomas C. Goldstein