**No. 19-5042**
Consolidated with 19-5043, 5044

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAMIEN GUEDES, *et al.*,
*Appellants,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*,
*Defendant-Appellant.*

On Appeal From The United States District Court
For the District of Columbia

**BRIEF OF *AMICUS CURIAE* CATO INSTITUTE
IN SUPPORT OF APPELLANTS**

Ilya Shapiro
  *Counsel of Record*
Josh Blackman*
Matthew Larosiere*
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, D.C. 20001
(202) 842-0200
ishapiro@cato.org
 *not admitted in this Court

March 8, 2019

# COMBINED CERTIFICATES

## Certificate as to Parties, Rulings, and Related Cases

As required by Circuit Rule 28(a)(1), counsel for *amicus curiae* Cato Institute certify as follows: Except for Cato itself, all parties, intervenors, and *amici* that have appeared in this Court are listed in the Appellant's Brief. The rulings at issue and related cases also appear in the Appellant's Brief.

## Certificate of Counsel under Circuit Rules 29(c)(4) and 29(c)(5)

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward those ends, Cato publishes books and studies, conducts conferences, issues the annual *Cato Supreme Court Review*, and files *amicus* briefs with the courts. Cato's brief addresses an issue that no other *amicus* discusses: the executive branch cannot use the administrative process to accomplish legislative goals that Congress declined to enact. The implications of this case extend far beyond bump stocks.

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus* certifies that it has no parent corporation, and that no publicly held company has 10% or greater ownership in the Cato Institute. All parties have consented to this brief.

/s/Ilya Shapiro  
Ilya Shapiro  
Counsel for *Amicus Curiae*

## TABLE OF CONTENTS

COMBINED CERTIFICATES ................................................................................ i
TABLE OF AUTHORITIES ................................................................................ iii
GLOSSARY ........................................................................................................... iv
INTEREST OF *AMICUS CURIAE* ........................................................................ 1
SUMMARY OF ARGUMENT ............................................................................... 2
ARGUMENT ........................................................................................................... 3
I.  THE ATF'S INTERPERATIVE REVERSAL IS NOT BASED ON STATUTORY AMBIGUITY, BUT ON POLITICAL EXPEDIENCY .............. 3
II. THE RULEMAKING EXPANDS ATF'S AUTHORITY, AND THREATENS TO BRING AN UNKNOWABLE NUMBER OF FIREARMS WITHIN THE NFA'S PURVIEW .................................................. 8
CONCLUSION ...................................................................................................... 10
CERTIFICATE OF COMPLIANCE ..................................................................... 11
CERTIFICATE OF SERVICE ............................................................................... 12

# TABLE OF AUTHORITIES

\* Authorities upon which we chiefly rely are marked with an asterisk.

Page(s)

**Cases**

*\*Util Air Regulatory Grp. v. EPA*, 572 U.S. 302 (2014) ..........................................8

*Watt v. Alaska*, 451 U.S. 259 (1981) ........................................................................8

**Statutes**

\*26 U.S.C. 5845(b) ....................................................................................................3

**Other Authorities**

82 Fed. Reg. 66514 (2018) ........................................................................................3

83 Fed. Reg. 13442 (2018) ..................................................................................... 3-4

Ali Watkins, *Despite Internal Review, Justice Department Officials Say Congress Needs to Act on Bump Stocks*,
  N.Y. Times, Dec. 21, 2017, https://nyti.ms/2EFFpy9 ......................................... 5-6

Ali Watkins, *Pressured by Trump, A.T.F. Revisits Bump Stock Rules*,
  N.Y. Times, Mar. 13, 2018, https://nyti.ms/2tczdWI .............................................6

ATF Rul. 2004-5 ........................................................................................................9

Chris Dumm, *Electric Cartridge Primers: Gone But Not Lamented*,
  The Truth About Guns, Dec. 19, 2013, https://bit.ly/2NLkhbb .............................9

Donald Trump (@realDonaldTrump), Twitter (Mar. 23, 2018, 1:50 PM),
  https://bit.ly/2DPV1cY ..........................................................................................6

Josh Blackman, *Presidential Maladministration*,
  2018 U. Ill. L. Rev. 397 (2018) .......................................................................... 7-8

Miles, Bullpup 2016: Vadum Electronic eBP-22 Bullpup, TheFirearmBlog,
  Sept. 28, 2016, https://bit.ly/2IAieb1 ....................................................................9

Remarks by President Trump, Vice President Pence, and Bipartisan Members
  of Congress in Meeting on School and Community Safety (Feb. 28, 2018),
  https://bit.ly/2M6Mjvz ...................................................................................... 4-5

Rev. Rul. 55-528 .......................................................................................................8

## GLOSSARY

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| GCA | Gun Control Act of 1968 |
| NFA | National Firearms Act of 1934 |

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, issues the annual *Cato Supreme Court Review*, and files *amicus* briefs with the courts.

Cato addresses an issue that no other *amicus* discusses: the executive branch cannot use the administrative process to accomplish legislative goals that Congress declined to enact. The implications of this case extend far beyond bump stocks.

---

[1] All parties were timely notified of and consented to this brief. No one other than the *amicus* and its counsel wrote this brief in whole or in part. The cost of this brief's preparation and submission was paid solely by *amicus*.

## SUMMARY OF ARGUMENT

For decades, Congress, the executive branch, and the people shared a common understanding: "single function of the trigger" and "automatically," as those terms are used in the National Firearms Act of 1934 (NFA) and Gun Control Act of 1968 (GCA), were not ambiguous. In response to a tragic mass killing in Las Vegas, however, President Trump announced that his administration would change course. Expressly declining to pursue a legislative solution, he directed his administration to redefine bump-stock devices—a type of firearm accessory used by the Las Vegas killer—as automatic weapons. In turn, the Bureau of Alcohol, Tobacco, and Firearms (ATF) broke from decades of precedent and discovered a new power to prohibit that widely held type of firearm accessory. This expansion of regulatory authority, motivated by political expediency, is arbitrary and capricious.

But this change is not limited to a ban on bump stocks. ATF has asserted the plenary authority to prohibit new classes of weapons that long-extant federal law did not address. This approach broadly expands the executive branch's power to rewrite generally applicable criminal laws, and threatens to stifle new developments in firearm technology.

# ARGUMENT

I. **THE ATF'S INTERPERATIVE REVERSAL IS NOT BASED ON STATUTORY AMBIGUITY, BUT ON POLITICAL EXPEDIENCY**

The NFA and the GCA include the same definition of a machine gun: "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). Between 2008 and 2016, the Bush and Obama administrations determined in a series of classification decisions that "bump-stock type devices were not machine guns." 82 Fed. Reg. 66514, 66518 (2018). In 2018, the Trump administration reversed course. The new executive action determined that the prior classifications "do[] not reflect the best interpretation of the term 'machinegun' under the GCA and NFA." 83 Fed. Reg. 13442, 13443 (2018). Indeed, the rulemaking attacks the prior classifications for not "includ[ing] extensive legal analysis relating to the definition of 'machinegun.'" *Id*.

What prompted this reversal? The proposed rulemaking reveals that the impetus for this change in position was not an organic review of agency policy. Instead, the change was triggered by public outrage following the October 2017 mass killing in Las Vegas. The shooter used a bump-stock-type device:

> Following the mass shooting in Las Vegas on October 1, 2017, ATF has received correspondence from members of the United States Senate and the United States House of Representatives, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory

3

> definition. *In response*, on December 26, 2017, as an initial step in the process of promulgating a federal regulation interpreting the definition of ''machinegun'' with respect to bump- stock-type devices, ATF published an Advance Notice of Proposed Rulemaking (ANPRM) in the Federal Register.

*Id*. at 13446.

The ATF admits that the rulemaking was commenced "in response" to outside political pressure. The proposed rule recounts the president's role in this reversal:

> On February 20, 2018, President Trump issued a memorandum to Attorney General Sessions concerning "bump fire" stocks and similar devices. The memorandum noted that the Department of Justice had already started the process of promulgating a Federal regulation interpreting the definition of "machinegun" under Federal law to clarify whether certain bump stock type devices should be illegal. The President then directed the Department of Justice, working within established legal protocols, to dedicate all available resources to complete the review of the comments received in response to the ANPRM, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns.

*Id*. (cleaned up). Publication of this NPRM is the next step in the process of promulgating such a rule.

That process, however, was a *fait accompli*. On February 28, 2018, the president hosted a meeting with members of Congress to discuss school and community safety. Senator John Cornyn, the majority whip, suggested that Congress could pass legislation "on a bipartisan basis" to deal with "the bump stock issue." Remarks by President Trump, Vice President Pence, and Bipartisan Members of Congress in Meeting on School and Community Safety (Feb. 28, 2018),

4

https://bit.ly/2M6Mjvz. President Trump interjected that there was no need for legislation because he would deal with bump stocks through executive action:

> And I'm going to write that out. Because we can do that with an executive order. I'm going to write the bump stock; essentially, write it out. So you won't have to worry about bump stock. Shortly, that will be gone. We can focus on other things. Frankly, I don't even know if it would be good in this bill. It's nicer to have a separate piece of paper where it's gone. And we'll have that done pretty quickly. They're working on it right now, the lawyers.

*Id.* Later during the meeting, Rep. Steve Scalise, the House majority whip, proposed other gun-control measures that Congress could vote on. Again, the president reiterated that there was no need to legislate on bump stocks, because his administration would prohibit the devices through executive action:

> And don't worry about bump stock, we're getting rid of it, where it'll be out. I mean, you don't have to complicate the bill by adding another two paragraphs. We're getting rid of it. I'll do that myself because I'm able to. Fortunately, we're able to do that without going through Congress.

*Id.*

The president left little doubt how his administration would "clarify" the NFA and GCA. Yet, according to press accounts, there was internal dissent within the administration about whether the executive branch had the statutory authority to prohibit bump stocks. "[P]rivate and public comments from Justice Department officials following the October shooting," the *New York Times* reported, "suggest there is little appetite within the agency to regulate bump stocks, regardless of

5

pressure from the Trump administration." Ali Watkins, *Despite Internal Review, Justice Department Officials Say Congress Needs to Act on Bump Stocks*, N.Y. Times, Dec. 21, 2017, https://nyti.ms/2EFFpy9. Reportedly, Justice Department officials told Senate Judiciary Committee staff that the government "would not be able to take [bump stocks] off shelves without new legislation from Congress." *Id*. Likewise, the ATF director told police chiefs that his agency "did not currently have the regulatory power to control sales of bump stocks." *Id.*

While the Department stated that "no final determination had been made," President Trump boasted that the "legal papers" to prohibit bump stocks were almost completed. Indeed, moments before the rulemaking was announced, President Trump tweeted: "Obama Administration legalized bump stocks. BAD IDEA. As I promised, today the Department of Justice will issue the rule banning BUMP STOCKS with a mandated comment period. We will BAN all devices that turn legal weapons into illegal machine guns." Donald Trump (@realDonaldTrump), Twitter (Mar. 23, 2018, 1:50 PM), https://bit.ly/2DPV1cY. The *Times* would later report that "[t]he reversal was the culmination of weeks of political posturing from Mr. Trump, whose public demands have repeatedly short-circuited his administration's regulatory process and, at times, contradicted his own Justice Department." Ali Watkins, *Pressured by Trump, A.T.F. Revisits Bump Stock Rules*, N.Y. Times, Mar. 13, 2018, https://nyti.ms/2tczdWI.

6

*Amicus* has no objection when the president exercises his constitutional authority to direct the actions of his principal officers. Indeed, the president's duty of faithful execution depends on his ability to supervise subordinates. There can be a problem, however, when those actions *reverse* past executive actions by *discovering* new authority in old statutes. One of us has referred to the former phenomenon as *presidential reversals*[2] and the latter as *presidential discovery*.[3] When interpreting an unambiguous statute, courts should hesitate before deferring to exercises of reversal coupled with discovery:

> There is nothing nefarious when a new administration disagrees with a previous administration. Indeed, it is quite natural that presidents see things differently. The question is how courts should treat this reversal. Outside of *Chevron*'s framework, the Supreme Court has maintained that presidential reversals are "entitled to considerably less deference." . . . Within the cozy confines of "*Chevron*'s domain," however, old interpretations of ambiguous statutes are not chiseled in stone, so "sharp break[s] with prior interpretations" do not weaken deference. Both blends of reversals are policy decisions all the way down and should

---

[2] Josh Blackman, *Presidential Maladministration*, 2018 U. Ill. L. Rev. 397, 405 (2018) ("The first species of presidential maladministration [*presidential reversal*] is by far the most commonplace: when the incumbent administration abandons a previous administration's interpretation of a statute. Every four to eight years, to comply with the new President's regulatory philosophy, political appointees in agencies alter certain interpretations of the law.").

[3] *Id*. at 423 ("The second species of presidential maladministration is *presidential discovery*, which occurs when the President's administration of the regulatory process affects the location of some new authority, jurisdiction, or discretion that was heretofore unknown. This influence may constitute a reversal . . . or it may be a novel discovery altogether on a question the agency never considered.").

7

> give courts pause to consider whether the newly minted interpretation is any more reasonable than the abandoned one.

Josh Blackman, *Presidential Maladministration*, 2018 U. Ill. L. Rev. 397, 405 (2018). It is a "core administrative-law principle" that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 572 U.S. 302, 328 (2014). The phrase "single function of the trigger," as used in the NFA, is not ambiguous, so *Chevron* deference is inappropriate. Furthermore, due to the combination of presidential reversal and presidential discovery, the proposed rulemaking ought to be "entitled to considerably less deference." *Watt v. Alaska*, 451 U.S. 259, 273 (1981).

## II. THE RULEMAKING EXPANDS ATF'S AUTHORITY, AND THREATENS TO BRING AN UNKNOWABLE NUMBER OF FIREARMS WITHIN THE NFA'S PURVIEW

The proposed rule would not only ban bump stocks: ATF's expanded definition of "automatically" places an unknowable amount of firearm owners in criminal peril. For example, crank-operated Gatling guns have never been considered "machineguns" under the NFA. *See* Rev. Rul. 55-528, 1955-2 C.B. 482. Gatling guns fire when the operator rotates a crank, which cocks and releases a series of strikers, firing successive rounds of ammunition. The crank mechanism of a Gatling guns requires far less "manual input" than does a bump stock. Accordingly, under the proposed rulemaking, Americans with Gatling guns face a credible threat of prosecution.

8

Moreover, ATF has previously distinguished manually operated guns from electrically operated versions. An M-134 "minigun" for example, is considered a machine gun. Functionally, it resembles a Gatling gun, except the role of the crank is performed by an electric motor, which is activated by a switch. The M-134 and its derivatives have always been considered "machineguns." ATF Rul. 2004-5. This type of weapon differs from a Gatling gun in one regard: the weapon fires continuously merely by pressing an electric switch, rather than by manually turning a crank. For decades, a machine gun was understood to fire continuously without additional manual input. The ATF's expansive interpretation obliterates this distinction. *Cf. id.* (ATF's previous explanation that the Gatling gun "is not a 'machinegun' as that term is defined . . . because it is not a weapon that fires automatically").

There are many novel semi-automatic firing mechanisms that exist, including solenoid-actuated mechanical triggers[4] and electric-fired primers.[5] Indeed, innovation abounds and new mechanisms will likely come to market in the future. These new approaches can improve the accuracy of a firearm, provide access to the

---

[4] *See, e.g.* Miles, Bullpup 2016: Vadum Electronic eBP-22 Bullpup, TheFirearmBlog, Sept. 28, 2016 https://bit.ly/2IAieb1.

[5] *See, e.g.* Chris Dumm, *Electric Cartridge Primers: Gone But Not Lamented*, The Truth About Guns, Dec. 19, 2013 https://bit.ly/2NLkhbb.

9

disabled, and even make guns safer. The ATF should not be allowed to arbitrarily re-interpret a statute targeting machineguns to lock firearm technology in time and put innovators in peril of being locked in federal prison.

## CONCLUSION

For the foregoing reasons, and those stated by the Appellant, the district court should be reversed.

Respectfully submitted this 8th day of March, 2019,

>Ilya Shapiro
>  *Counsel of Record*
>Josh Blackman\*
>Matthew Larosiere\*
>CATO INSTITUTE
>1000 Mass. Ave., N.W.
>Washington, D.C. 20001
>(202) 842-0200
>ishapiro@cato.org
>  \*Not admitted in this Court

10

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 2,177 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. Rule 32(a)1.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman, 14 point font.

/s/Ilya Shapiro
Ilya Shapiro
Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 8, 2019, I filed the foregoing brief with this Court by causing a true digital copy to be electronically uploaded to the Court's CM/ECF system and by causing nine true and correct copies to be delivered by hand to the Court. Service on counsel was achieved via the CM/ECF system.

/s/Ilya Shapiro<br>
Ilya Shapiro<br>
Counsel for *Amicus Curiae*