Nos. 19-5042, 19-5043, 19-5044 (Consolidated Appeals)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAMIEN GUEDES, FIREARMS POLICY FOUNDATION, MADISON SOCIETY
FOUNDATION, INC., SHANE RODEN, FLORDIA CARRY, INC., FIREARMS
POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, WILLIAM
P. BARR, ATTORNEY GENERAL OF THE UNITED STATES, THOMAS E.
BRANDON, ACTING DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, THE UNITED STATES OF AMERICA,

*Defendants-Appellees*.

—————————

On Appeal from the United States District Court
for the District of Columbia
Case Nos. 1:18-cv-02988-DLF, 1:18-cv-03086-DLF

—————————

# BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE AND
# W. CLARK APOSHIAN IN SUPPORT OF APPELLANTS

—————————

Steve Simpson
  *Counsel of Record*
Mark Chenoweth
Caleb Kruckenberg
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Steve.Simpson@ncla.legal

*Counsel for Amici Curiae*

# Table of Contents

Table of Contents ...................................................................ii

Table of Authorities............................................................ iii

Interests of Amici Curiae .................................................... 1

Statement of Compliance with Rule 29 ............................... 4

SUMMARY OF ARGUMENT ............................................... 5

ARGUMENT ........................................................................ 8

  I. THE NATIONAL FIREARMS ACT IS NOT AMBIGUOUS ............ 8

  II. THE GOVERNMENT'S REPUDIATION OF *CHEVRON* DEFERENCE WAS CONSTITUTIONALLY REQUIRED ............ 14

    A. *Chevron* Deference Is Constitutionally Invalid .......... 15

      1. *Chevron* Requires Judges to Abandon Their Duty of Independent Judgment .................................... 16

      2. *Chevron* Violates the Due Process Clause ............... 19

    B. The Application of Deference in this Case Is Improper Under this Court's Own Precedents ................... 21

      1. The ATF's Change in Interpretation Makes Deference Inappropriate ......................................... 22

      2. The ATF's Interpretation Is Not the Product of Its Expertise.. 24

      3. The Rule of Lenity Prohibits the Application of Deference....... 25

  III. THE ATF'S REWRITTEN STATUTORY DEFINITION IS NOT THE "BEST READING" OF THE NATIONAL FIREARMS ACT .......................................... 28

CONCLUSION ..................................................................... 31

# Table of Authorities

## Cases

*Abramski v. United States*, 134 S.Ct. 2259 (2014) ..................................25

*BNSF R. Co. v. Loos*, --- S.Ct. ----, 2019 WL 1005830 (Mar. 4, 2019) ...16, 21, 22

*California Indep. Sys. Operator Corp. v. F.E.R.C.*, 372 F.3d 395 (D.C. Cir. 2004) .......................................................................9, 14

*Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009) ........................20

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ......................................................................... 2, 9, 14

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ...........23

*Esquivel-Quintana v. Lynch*, 810 F.3d 1019 (6th Cir. 2016)............26, 27

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..................23

*Lin-Zheng v. Atty. Gen.*, 557 F.3d 147 (3d Cir. 2009) (en banc). ............10

*Marbury v. Madison*, 5 U.S. 137 (1803) ...................................................2

*Michigan v. EPA*, 135 S. Ct. 2699 (2015)...............................................17

*Miller v. Clinton*, 687 F.3d 1332 (D.C. Cir. 2012)..................................28

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., Inc.*, 545 U.S. 967 (2005). .................................................................................22

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ..........................17

*Prestol Espinal v. Attorney Gen.*, 653 F.3d 213 (3d Cir. 2011)..............14

*Staples v. United States*, 511 U.S. 600 (1994) ..................................28, 29

*United States v. Apel*, 571 U.S. 359 (2014) ......................................15, 26

*United States v. Camp*, 343 F.3d 743 (5th Cir. 2003)............................12

*United States v. Fleischli*, 305 F.3d 643 (7th Cir. 2002). ........... 11, 28, 29

*United States v. Kozminski*, 487 U.S. 931 (1988) ..................................25

*United States v. Lanier*, 520 U.S. 259 (1997) .......................................25

*United States v. Olofson*, 563 F.3d 652 (7th Cir. 2009). ............. 11, 12, 28

*United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686 (9th Cir. 2006)...............................................10

*United States v. Williams*, 364 F.3d 556 (4th Cir. 2004).......................10

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650 (D.C. Cir. 2011) ........................................................................ 9, 14, 24, 25

*Watt v. Alaska*, 451 U.S. 259 (1981)........................................................22
*Whitman v. United States*, 135 S. Ct. 352 (2014) ...........................26, 28
*Yates v. United States*, 135 S.Ct. 1074 (2015) .................................25, 27

## Statutes

18 U.S.C. § 922(o) .......................................................................................27
18 U.S.C. § 924(a)(2)...................................................................................27

## Other Authorities

George Orwell, *1984* (Secker and Warburg, 1949) .................................31
John R. Spencer, Chief, Firearms Technology Branch, *Approval Letter*
    (June 18, 2008) .....................................................................................29
Oxford English Dictionary (1933) ...........................................................13
Philip Hamburger, *Chevron Bias*, 84 Geo. Wash. L. Rev. 1187 (2016)..18
Philip Hamburger, *Is Administrative Law Unlawful?* (2014)...........2, 18
*See Something, Say Something: Oversight of the Parkland Shooting and
    Legislative Proposals to Improve School Safety: Hearing Before the S.
    Comm. on the Judiciary*, 115th Cong. (Mar. 14, 2018) (Judiciary
    Comm. Testimony) (testimony of Acting Director Brandon)...............24
Webster's New International Dictionary (2d ed. 1934) ..........................12

## Regulations

*Bump-Stock-Type Devices*, 83 Fed. Reg. 66514, 66555 (Dec. 26, 2018) ..3,
    12, 30

## Constitutional Provisions

U.S. Const. art. III...................................................................................16

## Interests of Amici Curiae

The New Civil Liberties Alliance (NCLA) is a nonprofit civil-rights organization and public-interest law firm devoted to defending constitutional freedoms. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, the right to be tried in front of an impartial and independent judge, and the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, federal administrative agencies, and sometimes even the courts have trampled them for so long.

NCLA views the administrative state as an especially serious threat to civil liberties. No other current aspect of American law denies more rights to more Americans. Although Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed

1

to prevent.[1] This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's attention.

In this case, NCLA is particularly concerned with the district court's decision to eschew its fundamental duty "to say what the law is," *Marbury v. Madison*, 5 U.S. 137 (1803) by deferring to the Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) interpretation of the National Firearms Act pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Because the statute is criminal in nature, and was promulgated by the very agency responsible for criminally prosecuting alleged violations, not even the ATF asked the district court to defer to its interpretation. Nevertheless, the weight of deference doctrines caused the district court to improperly sustain the validity of the challenged regulation and thereby depart from its judicial duty and deny the due process of law.

W. Clark Aposhian is a resident of Utah, who lawfully acquired a bump stock device in reliance on the ATF's prior determination that the device "is a firearm part and is not regulated as a firearm under [the]

---

[1] *See generally* Philip Hamburger, *Is Administrative Law Unlawful?* (2014)

2

Gun Control Act or the National Firearms Act." Mr. Aposhian continues to possess his Slide Fire device for lawful purposes, but has been directed by the ATF "to destroy the device[] or abandon [it] at an ATF office prior to" "March 26, 2019." *Bump-Stock-Type Devices*, 83 Fed. Reg. 66514, 66555 (Dec. 26, 2018). Mr. Aposhian has challenged this rule in the United States District Court for the District of Utah, in case Number 19-cv-00037-JNP.

NCLA files this brief on its own behalf and on behalf of Mr. Aposhian.

## <u>Statement of Compliance with Rule 29</u>

All appellants have consented to the filing of this brief. Appellees have not consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the amici curiae, NCLA's members, or NCLA's counsel contributed money that was intended to finance the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The Constitution provides foundational rules for the operation of our government. Congress writes the laws. The Executive Branch enforces them. And the Judiciary independently interprets them. But this case threatens to consolidate all three functions in a single administrative agency—the ATF—and to contravene both the laws written by Congress and prior judicial interpretations of those laws. Worse, the ATF has rewritten a criminal statute and is prepared to prosecute hundreds of thousands of law-abiding citizens who relied on prior approval of their ownership of "bump stocks" from that same agency.

This result subverts the constitutional order and could only arise from an unwarranted extension of an already questionable constitutional doctrine: *Chevron* deference. As several justices on the Supreme Court have noted, the *Chevron* doctrine is, to say the least, constitutionally problematic. Among other things, the doctrine requires courts to abandon their duty of independent judgment, and it violates due process by requiring courts to favor one litigant—the government—

5

over another. As a practical matter, *Chevron* creates a perverse incentive for Congress and the courts to shirk their constitutional responsibilities and turn difficult legislative or interpretive decisions over to administrative agencies. In amici's view, *Chevron* is itself unconstitutional.

While NCLA recognizes that the constitutional validity of the *Chevron* doctrine is not a matter for this Court to resolve in opposition to the Supreme Court, the Supreme Court's reliance on *Chevron* has waned over the last half a decade. All courts should thus be mindful of the danger *Chevron* poses to due process, judicial independence and the separation of powers. Only then can they be sure they are discharging their duty to say what the law *is*, not what the law *should be*. Only then can they be sure, when the government is a party, that they are not denying due process to the other party. And only then, in controversial cases such as this one, can they be sure that, whatever the merits of banning bump stocks, the decision remains with Congress—not the ATF, not the President, and not the courts.

Congress has not banned bump stocks. It has banned machineguns, but the statutory definition of "machinegun" does not include bump stocks—a fact which the ATF understood up until bump stocks became a matter of great public concern. In upholding the Final Rule, the district court misapplied *Chevron* step one in two ways. First, it improperly concluded that the statute is ambiguous because Congress did not define the terms "automatically" and "single function of the trigger" in the definition of "machinegun." Second, it conflated *Chevron* step one with step two, by choosing the ATF's rewrite of the statute because it is allegedly "reasonable." But, as a number of courts have held, the statutory definition of "machinegun" is not ambiguous, so it was improper for the district court to consider the reasonableness of the ATF's new definition at all.

But even if the statute were ambiguous, the district court still improperly ignored the impact of the rule of lenity. Finally, without *Chevron* deference, the ATF's interpretation of the statute fails because it clearly is not the "best view" of the statutory language.

7

This Court must now remedy those errors. In a case such as this, where accepting the agency's construction will result in the prosecution of otherwise innocent Americans, this Court cannot abdicate its independent constitutional responsibility to say what the law is.

## **ARGUMENT**

The Constitution does not allow a prosecutorial agency to rewrite the text of an unambiguous criminal law and hide behind its assertion that its edits present a reasonable view of what conduct should warrant a prison sentence. Yet that is what occurred in this case. Indeed, the district court concluded, without even being asked to do so by the ATF, that "the plaintiffs' administrative law challenges are foreclosed by the *Chevron* doctrine, which permits an agency to reasonably define undefined statutory terms." (Mem. Op. at 2.) NCLA writes separately to explain why the district court's application of *Chevron* was unconstitutional and ran counter to this Court's precedents.

## I. THE NATIONAL FIREARMS ACT IS NOT AMBIGUOUS

The first step of the *Chevron* analysis asks whether "Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v.*

*Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984). "And if the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as *Chevron* puts it, 'that is the end of the matter'—the agency's interpretation is unlawful." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 659-60 (D.C. Cir. 2011) (quoting 467 U.S. at 842).

 *Chevron* does not grant administrative agencies the power to define any undefined terms in a statute. The ambiguity that gives rise to an agency's authority to fill gaps in a statute "is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). The issue is not whether a statute is "in some abstract sense, ambiguous, but rather whether, read in context and using the traditional tools of statutory construction," the terms used in the statute indicate "whether Congress has directly spoken to the precise question at issue." *California Indep. Sys. Operator Corp. v. F.E.R.C.*, 372 F.3d 395, 400 (D.C. Cir. 2004) (quoting *Chevron*, 467 U.S. at 842). The question is whether Congress left gaps in a statute for an agency to fill. It is not whether a statute is silent on a particular

9

question or whether Congress did not define particular terms. "A statute's silence on a given issue does not confer gap-filling power on an agency unless the question is in fact a gap—an ambiguity tied up with the provisions of the statute." *Lin-Zheng v. Atty. Gen.*, 557 F.3d 147, 156 (3d Cir. 2009) (en banc).

Here, as courts have repeatedly held, the definition of "machinegun" is simply not ambiguous. *See, e.g., United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 n. 4 (9th Cir. 2006) (refusing to defer to the "ATF's definition of 'machinegun'" "because the statute is unambiguous," and the Court need "simply follow the standard course of applying the definition to the facts"); *United States v. Williams*, 364 F.3d 556, 558 (4th Cir. 2004) (finding the definition of "machinegun" to be unambiguous).

In fact, courts also have declared the precise terms at issue here unambiguous. The "common meaning of 'automatically' is readily known by laypersons" and "a person of ordinary intelligence would have understood the common meaning of the term—'as the result of a self-acting mechanism.'" *United States v. Olofson*, 563 F.3d 652, 660 (7th

10

Cir. 2009). Furthermore, the phrase "a single function of the trigger" is "plain enough" that efforts to parse it further become "brazen" and "puerile." *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002). As a result, the ATF had no power to issue the Final Rule, because there was no ambiguity for it to resolve.

The District Court sidestepped this fact and concluded that the definition of "machinegun" is ambiguous because the terms "automatically" and "single function of the trigger" are not defined in the statute. (Mem. Op. at 17, 19-20.) The court then reviewed definitions of these terms from 1934, when the National Firearms Act was drafted, and it concluded that neither definition shed light on the key question in the case. (Mem. Op. at 19-20.)

However, as contemporary sources make clear, the language chosen by Congress was actually quite deliberate and runs counter to the ATF's rule in its proffered interpretation of both the phrase "single function of the trigger" and the term "automatically." As the ATF notes in the Final Rule, "in a congressional hearing leading up to the NFA's enactment, the National Rifle Association's then-president testified"

11

using the phrases "single pull of the trigger" and "a single function of the trigger" analogously. *Final Rule*, 83 Fed. Reg. at 66517 (quoting *National Firearms Act: Hearings Before the Committee on Ways and Means*, HR. 9066, 73rd Cong., 2nd Sess., at 40 (1934)). Despite this claim, Congress then deliberately chose to use only the phrase "single function of the trigger" in the statute. This rejection of the term "pull" suggests that the phrase "single function of the trigger" "implies no intent to restrict" the meaning to only encompass "pulling a small lever," and instead means any action that "initiated the firing sequence." *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003) (internal citation and quotation marks omitted).

Furthermore, as the Seventh Circuit has said, "a leading dictionary from 1934 [the year of the statutory enactment] tells us that … 'automatic'" means "'having a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation.'" *Olofson*, 563 F.3d at 658 (citing Webster's New International Dictionary 187 (2d ed. 1934)). While "[a]nother contemporaneous dictionary similarly describes 'automatic' as 'self-

12

acting under conditions fixed for it, going of itself.'" *Id.* (quoting Oxford English Dictionary 574 (1933)).

While Congress did not necessarily anticipate the development of bump stocks, it did clearly choose to use unambiguous statutory terms to draw a line between weapons that fire one bullet with a single function of the trigger and machineguns, which fire multiple rounds continuously with one function of the trigger. Semi-automatic weapons existed at the time the National Firearms Act was drafted and passed. Congress understood the distinction between those weapons and machineguns and that there was a difference in the internal mechanism that allowed a machinegun to fire multiple rounds continuously with one function of the trigger and a semi-automatic weapon, which fires only one round with each function of the trigger. (*See* Brief for Damien Guedes, *et al.* at 11 (describing in detail the function of a semi-automatic weapon versus a machinegun).)

Neither the Appellees nor the courts can "manufacture[] an ambiguity" from Congress' failure to define every term in the statute or "foreclose each exception that could possibly be conjured or imagined."

13

*See Prestol Espinal v. Attorney Gen.*, 653 F.3d 213, 220-21 (3d Cir. 2011). The statutory terms "read in context and using the traditional tools of statutory construction," indicate that "Congress has directly spoken to the precise question at issue." *See California Indep. Sys. Operator Corp.*, 372 F.3d at 400. And as the ATF insisted for years, Congress' directive was that bump stocks do not meet the unambiguous statutory terms. Thus, regardless of whether the Final Rule is reasonable, it is "unlawful" before even considering *Chevron* step two. *See Vill. of Barrington, Ill.*, 636 F.3d at 660. Moreover, because Congress has already spoken contrary to the ATF's proffered interpretation, "that is the end of the matter[.]" *See Chevron*, 467 U.S. at 843.

## II. The Government's Repudiation of *Chevron* Deference Was Constitutionally Required

In this and related cases, the ATF has conceded that it is not entitled to *Chevron* deference in its interpretation of the National Firearms Act. *See Gun Owners of America, Inc., et al., v. William P. Barr, et al.*, No. 1:18-cv-01429 (W.D. Mich.), *Notice of Supplemental Authority* Doc. 38, ("Defendants have not contended that the deference

14

afforded under *Chevron* … applies in this action."). Indeed, the ATF has acknowledged that it would not be entitled to deference based on other constitutional doctrines. *W. Clark Aposhian v. William P. Barr, et al.*, No. 2:19-cv-00037, (D. Utah), *Notice of Supplemental Authority* (Doc. 27), (in "'the interpretation of criminal statutes ... agencies are not ordinarily entitled to deference'" (quoting *United States v. Apel*, 571 U.S. 359, 369 (2014))). These concessions are mandated not only by precedent, but by clear constitutional limits on the power of courts to defer to administrative agencies.

## A. *Chevron* Deference Is Constitutionally Invalid

As a matter of first principles, despite prior judicial approval, the practice of "*Chevron* deference" violates the Constitution for two separate and independent reasons. First, *Chevron* requires judges to abandon their duty of independent judgment, in violation of Article III and the judicial oath. Second, *Chevron* violates the Due Process Clause by commanding judicial bias toward a litigant. While amici recognize that this Court cannot overturn or ignore *Chevron*, all courts should be cognizant of the constitutional problems with *Chevron* deference so they

15

may avoid the temptation or the appearance that they are allowing the Executive Branch to "dictate an inferior interpretation of the law that may be more the product of politics than a scrupulous reading of the statute." *BNSF R. Co. v. Loos*, --- S.Ct. ----, 2019 WL 1005830, at *11 (Mar. 4, 2019) (Gorsuch, J., dissenting).

Amici address each of these constitutional violations in turn.

## 1. *Chevron* Requires Judges to Abandon Their Duty of Independent Judgment

The federal judiciary was established as a separate and independent branch of the federal government, and its judges were given life tenure and salary protection to shield their decisionmaking from outside influences. *See* U.S. Const. art. III. Yet *Chevron* has sometimes been interpreted to command Article III judges to abandon judicial independence by giving automatic weight to an agency's opinion of what a statute it enforces means—not on account of its persuasiveness, but on account of the brute fact that this non-judicial entity has weighed in on the interpretive question before the Court. *See BNSF R. Co. v. Loos*, --- S.Ct. ----, 2019 WL 1005830, at *11 (Mar. 4, 2019) (Gorsuch, J., dissenting) ("*Chevron* deference" deprives litigants

16

of "an independent judicial interpretation of the law"); *Michigan v. EPA*, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring) ("'The judicial power … requires a court to exercise its independent judgment in interpreting and expounding upon the laws,' … [D]eference precludes judges from exercising that judgment." (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1217 (2015) (Thomas, J., concurring))).

This abandonment of independent judgment would never be tolerated in any other context—even if it were commanded by statute and even if it commanded deference to a uniquely expert body. Imagine if a statute established a committee of expert law professors and instructed the federal judiciary to "defer" to this committee's announced interpretations of federal statutes or regulations so long as its pronouncements were "reasonable." A statute of this sort would be laughed out of court; it would be declared an invasion of the judicial prerogatives of Article III and a perversion of the independent judgment that the Constitution requires from the judiciary. Yet *Chevron* operates precisely the same way: It allows a non-judicial entity—the ATF in this case—to partake in the powers of judicial interpretation, and it

17

commands judges to "defer" to the legal pronouncements of a supposedly expert body external to the judiciary. And for constitutional purposes, it does not matter whether a statute or an Article III precedent is causing the offense.[2]

*Chevron* deference is nothing more than a command that courts abandon their duty of independent judgment and assign weight to a non-judicial entity's interpretation of the law. It is no different in principle from an instruction that courts assign weight and defer to statutory interpretations announced by a congressional committee, a group of expert legal scholars, or the *Washington Post* editorial page. In each of these scenarios, the courts would be following another entity's interpretation of the law so long as it were "reasonable"—even if the court's own judgment would lead it to conclude that the law means

---

[2] *See* Philip Hamburger, *Chevron Bias*, 84 Geo. Wash. L. Rev. 1187, 1202-03, 1205–10 (2016); Hamburger, *Is Administrative Law Unlawful?* 316-17. Hamburger writes that "the deference to interpretation is an abandonment of judicial office. The Constitution grants judicial power to the courts, consisting of judges, who were assumed to have an office or duty of independent judgment. The Constitution thereby establishes a structure for providing parties with the independent judgment of the judges, and this means their own, personal judgment, not deference to the judgment of the executive, let alone the executive when it is one of the parties. Nonetheless, the judges defer to judgments of the executive, and they thereby deliberately deny the benefit of judicial power to private parties and abandon the central feature of their office as judges."

18

something else. A judge who acted in such a manner without being commanded to do so by a ruling of the Supreme Court would be accused of gross dereliction of judicial duty and would be violating Article III, which not only empowers but requires independent judges to resolve the "cases" and "controversies" within their jurisdiction. Article III makes no allowance for judges to abandon their duty to exercise their own independent judgment, let alone to rely upon the judgment of entities that do not necessarily enjoy life tenure or salary protection. But, if anything, the constitutional offense is even greater if courts behave this way in lockstep under the command of the Supreme Court.

## 2. *Chevron* Violates the Due Process Clause

A related and more serious problem with *Chevron* is that it requires the judiciary to display systematic bias toward agencies whenever they appear as litigants. It is bad enough that a court would abandon its duty of independent judgment by "deferring" to a non-judicial entity's interpretation of a statute. But for a court to abandon its independent judgment in a manner that favors an actual litigant before the court is an abomination. The Supreme Court has held that

19

even the appearance of potential bias toward a litigant violates the Due Process Clause. *See Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009). Yet *Chevron* institutionalizes a regime of systematic judicial bias, by requiring courts to "defer" to agency litigants whenever a disputed question of statutory interpretation arises. Rather than exercise their own judgment about what the law is, judges under *Chevron* defer to the judgment of one of the litigants before them.

A judge who openly admits that he accepts a prosecutor's interpretation of a statute whenever it is "reasonable"—and that he automatically rejects any competing interpretations that might be offered by a defendant—would be impeached and removed from the bench for bias and abuse of power. Yet this is exactly what judges do whenever they apply *Chevron* deference in cases where the agency appears as a litigant. And when citizens are inevitably prosecuted under this new rule, ATF will be asking courts to display this bias in a criminal case.[3] The government litigant wins simply by showing that its

---

[3] As discussed above, while this is the view adopted by the district court in this case, even the ATF has recognized the impropriety of such an outcome. *See Gun Owners of America, Inc., et al., v. William P. Barr, et al.*, No. 1:18-cv-01429 (W.D. Mich.),

20

preferred interpretation of the statute seems "reasonable" even if it is wrong—while the opposing litigant gets no such indulgence from the court and must show that the government's view is not merely wrong but unreasonably so.

Judges take an oath to "administer justice without respect to persons" and to "faithfully and impartially discharge and perform all the duties incumbent upon me," and judges are ordinarily very careful to live up to these commitments. Nonetheless, under *Chevron*, judges who are sworn to administer justice "without respect to persons" take a peek from behind the judicial blindfold and weigh the scales in favor of the government's position. *See BNSF R. Co.*, 2019 WL 1005830, at * 11.

## B. The Application of Deference in this Case Is Improper Under this Court's Own Precedents

Even where *Chevron* deference would ordinarily apply, courts have recognized several instances in which deference would be improper. Three of those exceptions clearly apply in this case.

---

Notice of Supplemental Authority Doc. 38, ("Defendants have not contended that the deference afforded under *Chevron* … applies in this action.").

## 1. The ATF's Change in Interpretation Makes Deference Inappropriate

First, courts do not generally defer to an agency's unexplained change in interpretation. *See Watt v. Alaska*, 451 U.S. 259, 273 (1981) ("The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference."). This exception exists because deference assumes that an agency has operated with a better understanding of the statute it has been tasked with administering than a court. *See Chevron*, 467 U.S. at 865 (deference is premised on the assumption that an agency "with great expertise and charged with responsibility for administering the provision would be in a better position to do so" than courts). But, "[u]nexplained inconsistency" signals something other than expertise. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs., Inc.*, 545 U.S. 967, 981 (2005). Often, it signals that an agency or the Executive Branch is operating, not on the basis of a good faith understanding of the statute, but on the basis of brute politics. *See BNSF R. Co.*, 2019 WL 1005830, at * 11 (noting the potential danger of political motivations in executive interpretations of law) (Gorsuch, J.,

22

dissenting). As a result, an agency must provide a "reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by [] prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). This need is especially true when that interpretation has been longstanding, as here. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012).

The Court owes no deference here because the ATF has not provided adequate justification for its shift in policy. As set out below, the ATF consistently interpreted the statutory language to exclude bump stocks for well over a decade, and did so even after the tragic Las Vegas shooting on October 1, 2017. This consistent history of interpretation across administrations of both political parties was based on the agency's physical examination of these devices and its expertise in the area. Suddenly, the ATF changed course without conducting additional physical examinations, and without providing adequate reasons for disregarding its prior interpretation. The new interpretation is therefore not owed any deference. *See Fox*, 556 U.S. at 516.

## 2. The ATF's Interpretation Is Not the Product of Its Expertise

Second, the ATF disregarded its own expertise in writing the rule, and thus no deference is warranted for this reason as well. Because deference doctrines rely on the presumption that an "agency has the expertise to produce a reasoned decision," "[i]f an agency fails or refuses to deploy that expertise—for example, by simply picking a permissible interpretation out of a hat—it deserves no deference." *Vill. of Barrington, Ill.*, 636 F.3d at 660. But even after the Las Vegas shooting, ATF Acting Director Thomas E. Brandon consulted with "technical experts," "firearms experts" and "lawyers" within the ATF, and the consensus within the agency was that "bump stocks" "didn't fall within the Gun Control Act and the National Firearms Act." *See Something, Say Something: Oversight of the Parkland Shooting and Legislative Proposals to Improve School Safety: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (Mar. 14, 2018) (Judiciary Comm. Testimony) (testimony of Acting Director Brandon). Nevertheless, the agency issued the Final Rule at the insistence of the President and the then-Acting Attorney General, overruling the experts within the agency. *See id.*

24

Because the ATF disavowed its own expertise in crafting the rule, "it deserves no deference." *Vill. of Barrington, Ill.*, 636 F.3d at 660.

### 3. The Rule of Lenity Prohibits the Application of Deference

Third, the ATF is owed no deference here because to do so would violate the rule of lenity. A court owes no deference to a prosecutor's interpretation of a criminal law. *Abramski v. United States*, 134 S.Ct. 2259, 2274 (2014). Instead, "any ambiguity concerning the ambit of criminal statutes" is resolved "in favor of lenity." *Yates v. United States*, 135 S.Ct. 1074, 1088 (2015) (internal citation and quotation marks omitted). The rule of lenity is rooted in constitutional due-process and separation-of-powers concerns. It ensures that would-be lawbreakers have fair notice of the consequences of their actions, and it ensures that the legislature establishes crimes and punishments rather than leaving those tasks to subsequent interpreters such as prosecutors or courts. *See United States v. Lanier*, 520 U.S. 259, 266 (1997) (describing the rule of lenity as one of the "manifestations of the fair warning requirement" in the Due Process Clause); *United States v. Kozminski*, 487 U.S. 931, 952 (1988) ("The purposes underlying the rule of lenity

25

[are] to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts").

Moreover, when a court is tasked with interpreting an ambiguous criminal statute the "Court has never held that the Government's reading of a criminal statute is entitled to any deference." *United States v. Apel*, 571 U.S. 359, 360 (2014). To defer, in such instances, would "upend ordinary principles of interpretation" and allow "federal administrators [to] in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain." *Whitman v. United States*, 135 S. Ct. 352, 353 (2014) (Scalia, J., statement regarding denial of certiorari, joined by Thomas, J.). The application of *Chevron* deference in such a setting "threatens a complete undermining of the Constitution's separation of powers, while the application of the rule of lenity preserves them by *maintaining the legislature as the creator of crimes*." *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1030 (6th Cir. 2016) (Sutton, J., concurring and dissenting in

part) (emphasis added) *reversed on other grounds by* 137 S.Ct. 1562 (2017).

Here, *Chevron* cannot empower the ATF to rewrite even an ambiguous statute contrary to the rule of lenity, particularly when it would also overrule Supreme Court precedent in the process. A first-time offender faces up to ten years in federal prison for possessing a machinegun, 18 U.S.C. §§ 922(o), 924(a)(2), which reflects Congress' reasoned judgment about what penalties are appropriate for possessing certain types of prohibited weapons. But the Final Rule rejects Congress' view and rewrites the definition of what items are subject to those harsh criminal penalties. Likewise, the Final Rule makes bump stocks illegal retroactively, which is something Congress chose not to do even with actual "machineguns."

Any ambiguity in the definition of machinegun must be resolved "in favor of lenity." *Yates*, 135 S.Ct. at 1088. This is constitutionally necessary to preserve fair notice of the law's reach and to prevent prosecutors from usurping legislative roles both as to criminal culpability and sentencing. *Esquivel-Quintana*, 810 F.3d at 1030

27

(Sutton, J., concurring and dissenting in part). Deferring to the ATF based on ambiguity in the definition would upend this rule and do so at the expense of prior court interpretations of the statute. *See Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994); *Olofson*, 563 F.3d at 658; *Fleischli*, 305 F.3d at 655. This would allow "federal administrators [to] in effect create (and uncreate) new crimes at will, so long as they do not roam beyond ambiguities that the laws contain." *See Whitman*, 135 S. Ct. at 353 (Scalia, J., statement regarding denial of certiorari, joined by Thomas, J.).

## III. THE ATF'S REWRITTEN STATUTORY DEFINITION IS NOT THE "BEST READING" OF THE NATIONAL FIREARMS ACT

"With *Chevron* inapplicable, [a court] proceed[s] to determine the meaning of [a statute] the old-fashioned way: [it] must decide for [itself] the best reading." *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (internal citation and quotation marks omitted).

As even the district court recognized, the ATF's proposed rule is not the "best reading" of the statute. Indeed, the district court concluded that both the Petitioners' and the ATF's interpretations were reasonable, but it sided with the ATF's interpretation under *Chevron*

28

step two. (Mem. Op. at 24.) But in reaching that conclusion, the court
recognized that it was still a "close[] question." (Mem. Op. at 17, 23.)

But the new rule is plainly not the best reading of the statute. The
Final Rule rejects several criteria previously required for a firearm to
have been deemed a machinegun under the most natural reading of the
statute. As described by the Supreme Court, a machinegun is activated
"by a single function of the trigger" and continues firing "automatically"
until the "ammunition supply is exhausted." *Staples*, 511 U.S. at 602 n.
1. A firearm does not meet this definition if either [1] the shooter is
required to provide additional "manual manipulation" between shots; or
[2] the trigger "mechanical[ly] reset[s]" between shots. *Id.*; John R.
Spencer, Chief, Firearms Technology Branch, *Approval Letter* at 2
(June 18, 2008). Moreover, the requisite manipulation of the trigger can
be accomplished in ways other than simply pulling a lever on the
underside of a firearm. *Fleischli*, 305 F.3d at 655. Thus, the most
natural reading of the statute has been the one adopted by the ATF
itself since 2006—a machinegun continuously fires rounds following [1]
a single function of the trigger, no matter how initiated, and [2] without

29

additional manual manipulation, until the supply of ammunition is exhausted.

The new definition alters both conditions. The new rule says that a "single function of the trigger" actually means a "single pull of the trigger" to the exclusion of all other means of causing the trigger to function. *Final Rule*, 83 Fed. Reg. at 66553-54. The new rule also says that a weapon can be a machinegun even when additional manual manipulation is required to fire multiple shots rapidly. *Final Rule*, 83 Fed. Reg. at 66518, 66533. These new conditions are found nowhere in the statute and therefore must be rejected.

The ATF's longstanding approval of bump stocks says nearly all that needs to be said about the best reading of the statute. The ATF's view today is that the Final Rule is the best reading of the statute, which has not changed since 1934.[4] If that were so, then bump stocks have *always* been machineguns, and the ATF has *always* been wrong about what the statute means. Such a notion borders on the absurd, if

---

[4] Otherwise, the Final Rule would retroactively create new crimes for conduct that has previously been declared lawful.

30

not the Orwellian. Even if the Ministry of Truth proclaims that "Oceania has always been at war with Eastasia," this does not make it so. *See* George Orwell, *1984*, 311 (Secker and Warburg, 1949). The ATF's effort to rewrite history must be rejected by this Court.

## **<u>CONCLUSION</u>**

The district court order should be reversed.

Respectfully,

<u>*/s/ Steve Simpson*</u>
Steve Simpson
Mark Chenoweth
Caleb Kruckenberg
New Civil Liberties
Alliance
1225 19th St. NW
Suite 450
Washington, DC 20036
(202) 869-5210
*Counsel for Amici Curiae*

March 11, 2019

31

## Certificate of Service

I certify that this document has been filed with the clerk of the court and served by ECF or e-mail on March 11, 2019. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Respectfully,

*/s/ Steve Simpson*
Steve Simpson
New Civil Liberties
Alliance
1225 19th St. NW
Suite 450
Washington, DC 20036
(202) 869-5210
*Counsel for Amici Curiae*

32

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6298 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Respectfully,

*/s/ Steve Simpson*
Steve Simpson
New Civil Liberties
Alliance
1225 19th St. NW
Suite 450
Washington, DC 20036
(202) 869-5210
*Counsel for Amici Curiae*