ORAL ARGUMENT SCHEDULED FOR MARCH 22, 2019
No. 19-5043 (consolidated with Nos. 19-5042 & 19-5044)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

FIREARMS POLICY COALITION, INC., CA 18-3083,
*Plaintiff-Appellant*,

DAMIEN GUEDES; FIREARMS POLICY FOUNDATION; MADISON SOCIETY
FOUNDATION, INC.; SHANE RODEN; FLORIDA CARRY, INC.,
*Plaintiffs-Appellees*,

*v.*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; WILLIAM P.
BARR, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED
STATES; THOMAS E. BRANDON, IN HIS OFFICIAL CAPACITY AS ACTING
DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES; UNITED STATES OF AMERICA,
*Defendants-Appellees*.

———————————

*On Appeal from the United States District Court for the
District of Columbia (Nos. 1:18-cv-02988-DLF, 1:180-cv-03086-DLF)*

———————————

# BRIEF OF AMICUS CURIAE MORTON ROSENBERG IN SUPPORT
# OF PLAINTIFF-APPELLANT URGING REVERSAL

———————————

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, Texas  75206
(469) 600-9455
ccecere@cecerepc.com

*Attorney for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 28(a)(1), Amicus Morton Rosenberg certifies as follows:

**(A)     Parties and Amici.** The defendants in district court, and appellees here, are: Matthew G. Whitaker, in his official capacity; the Bureau of Alcohol, Tobacco, Firearms and Explosives; William P. Barr, in his official capacity; Thomas E. Brandon, in his official capacity; and the United States of America. The plaintiffs in district court, and appellants here, are: Firearms Policy Coalition Inc.; Damien Guedes; Firearms Policy Foundation; Madison Society Foundation, Inc.; Shane Roden; Florida Carry, Inc.; David Codrea; Owen Monroe; and Scott Heuman.

The amici before this Court in support of Petitioners are Mr. Rosenberg, Citizens for Responsibility and Ethics in Washington, law professors, and the Cato Institute.

Amicus is aware of no amici in support of Respondents.

**(B)     Ruling under Review.** Under review in this appeal are an order and memorandum opinion entered on February 25, 2019, in the U.S. District Court for the District of Columbia, No. 1:18-cv-02988-DLF, DE26 and DE27. The matter was before U.S. District Judge Dabney L. Friedrich. The

memorandum opinion is not yet published in the Federal Supplement but is available at 2019 WL 922594.

(C)   **Related Cases.**  The case on review was not previously before this Court. The following cases involve some of the same parties and/or the same or similar issues as presented in this appeal: *In re Grand Jury Investigation* (D.C. Cir. 18-3052, oral argument held Nov. 8, 2018, before Judges Henderson, Rogers, and Srinivasan), *United States ex rel. Landis* v. *Tailwind Sports Corp.* (D.C. Cir. No. 18-7143), *Blumenthal* v. Whitaker (D.D.C. No. 1:18-cv-02644), *O.A.* v. *Trump* (D.D.C. No. 1:18-cv-02718), *Michaels* v. *Whitaker* (D.D.C. No. 1:18-cv-02906). Amicus is not aware of any other related cases pending before this Court, any other U.S. court of appeals, or any local or federal court in the District of Columbia.

March 11, 2019                                  Respectfully submitted,

                                                */s/ J. Carl Cecere*

                                                **J. Carl Cecere**

# RULE 26.1 STATEMENT

Amicus is an individual.

## RULE 29 STATEMENTS

The Firearms Policy Coalition has indicated its consent to the filing of this brief. The Government opposes the filing of this brief.

Pursuant to Fed. R. App. P. 29(c)(5), amicus states that no party or party's counsel authored this brief in whole or in part, and that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief.

Pursuant to D.C. Cir. R. 29(d), amicus states that a separate brief is necessary for the following reasons:

Amicus is intimately familiar with the Vacancies Reform Act, having written the report to Congress that led directly to its creation and having been personally involved in its drafting. He therefore possesses personal, first-hand knowledge of the Act that no other amicus filing in this case can claim, and his brief is written from that singular perspective. Amicus thus understands the coverage and point of view of this brief to be significantly different from the others submitted in this case.

March 11, 2019                     Respectfully submitted,

                                   /s/ *J. Carl Cecere*

                                   **J. Carl Cecere**

iv

# TABLE OF CONTENTS

Certificate as to Parties, Rulings and Related Cases.............................................i

Rule 26.1 Statement ......................................................................................iii

Rule 29 Statements........................................................................................iv

Index of Authorities......................................................................................vi

Glossary of Abbreviations ............................................................................x

Statutes and Regulations............................................................................. 1

Statement of Interest .................................................................................. 1

Introduction and Summary of the Argument ..........................................3

Argument......................................................................................................7

The Vacancies Reform Act gives the President no discretion to evade the AG Act's mandatory and independent scheme for choosing an Acting Attorney General. ......................................................................................7

    A.    The Vacancy Reform Act's whole purpose is to confine, rather than expand, presidential appointment discretion..............8

    B.    The Vacancies Reform Act's history confirms that it preserves, not overturns, mandatory office-specific provisions like the AG Act.................................................15

    C.    Case law does not make the Vacancies Reform Act an alternative to the AG Act. ..............................................20

Conclusion .................................................................................................23

Certificate of Compliance ..........................................................................24

Certificate of Service..................................................................................25

# INDEX OF AUTHORITIES

**Cases:**

*English v. Trump,*
   279 F. Supp. 3d 307 (D.D.C. 2018) .......................................................21, 22, 23

*Hooks* v. *Kitsap Tenant Support Services,*
   816 F.3d 550 (9th Cir. 2016) ...................................................................21, 22, 23

*N.L.R.B.* v. *SW General, Inc.,*
   137 S. Ct. 929 (2017).....................................................................................2, 9

**Statutes:**

Act of July 28, 1868, ch. 227, § 2, 15 Stat. 168. ...................................................11

80 Stat. 378, 425-26 (codified at 5 U.S.C. § 3345 (1966))...................................11

Rev. Stat. (1st ed. 1874), §

   179.........................................................................................................................4

   181.......................................................................................................................11

Vacancies Reform Act of 1998, Pub. L. No. 105-277, div. C, tit. I, 112 Stat.
   2681-611 ...............................................................................................................5

5 U.S.C. §

   6 (1952).................................................................................................................5

   3345.....................................................................................................................20

   3345(a) ..................................................................................................................5

   3345(a)(2) ..............................................................................................................8

   3345(a)(3) ..........................................................................................................5, 8

   3346.....................................................................................................................20

   3347 (1988)...........................................................................................................5

**Statutes—continued:**

5 U.S.C. §

   3347................................................................................................passim

   3347(a) ....................................................................................................... 7

   3347(a)(1) .............................................................................................. 7, 15

   3347(a)(1)(A)..........................................................................2, 12, 13, 19

   3347(a)(1)(B)..........................................................................2, 12, 13, 19

   3347(c). ..................................................................................................... 12

Dodd–Frank Wall Street Reform and Consumer Protection Act (the "Dodd–
   Frank Act" or "Dodd–Frank"), Pub. L. No. 111–203, 124 Stat. 1376 (2010)
   ................................................................................................................22

10 U.S.C. § 5035................................................................................................ 18

12 U.S.C. § 5491(a) .......................................................................................... 22

*Attorney General Succession Act, 28 U.S.C. § 508 ..................................passim

28 U.S.C. §

   509............................................................................................................... 9

   510............................................................................................................... 9

**Legislative Materials:**

S. Rep. No. 100-317 (1988)................................................................................ 11

S. Rep. No. 105-250 (1998)........................................................................... 11, 16

S.2176, 105th Cong. (1998)......................................................................15, 16, 17

**Legislative Materials—continued:**

*Oversight of the Implementation of the Vacancies Act: Hearing on S. 1764 Before the S. Committee on Governmental Affairs*, 105th Cong. (1998) (S. Hrg. 105-495) ................................................................................2, 16

144 Cong. Rec. S11,022-23 (daily ed. Sept. 28, 1998) .........................................19

145 Cong. Rec. S33 (daily ed. Jan. 6, 1999).........................................................20

*Memorandum from David Plocher et al. to Senator Glenn re: Vacancies Act—GAC Mark-up* (May 14, 1998) .................................................................18

*Memorandum from Fred Ansell to Senator Thompson, re: Vacancies Act* (June 4, 1998) ...................................................................................................18

*Memorandum from Fred Ansell, Chief Counsel of the Senate Committee on Governmental Affairs, to Senator Fred Thompson, Committee Chairman, re: Vacancies Act—Managers Amendment* (Sept. 24, 1998).......................17

*Memorandum from Peiter Kiefaber and Paul Weinberger to Senator Byrd, re: the Vacancies Act* (July 1, 1998) ...............................................................19

Transcript of Proceedings, *U.S. Senate Committee on Governmental Affairs Business Meeting June 17, 1998* (1998)........................................................13, 19

**Other Authorities:**

*Democrat Wants New Hearing for Embattled Nominee*, AP, Nov. 8, 1997, available in 1997 WL 4891645 .....................................................................10

Naftali Bendavid, *Democrats Delay Panel's Vote on Civil Rights Nominee*, Chi. Trib., Nov. 7, 1997, § 1, at 3 ....................................................................10

Comptroller General's Decision B-220522, June 9, 1986, 65 Comp. Gen. 626 (1986).............................................................................................................10

Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039 (1998)............9

**Other Authorities—continued:**

*Stephen Migala, *The Vacancies Act and an Acting Attorney General* 34-35, App.76 (Nov. 15, 2018) (submitted for publication), https://ssrn.com/abstract=3285940 ......................................... 13, 16, 17, 18, 19

Stewart M. Powell, *Lee Wins Civil Rights Job Despite GOP Block: President Dodges Senate Opposition and Names L.A. Lawyer to Post on an Acting Basis*, S.F. Examiner, Dec. 15, 1997, at A1 ...................................................... 11

*Morton Rosenberg, Cong. Research Serv., *Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights* (Jan. 1998) ................................................................................ 1, 3, 4, 9, 10, 11, 12, 16

*Morton Rosenberg, Congressional Research Service Report for Congress, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (Nov. 1998) ...................................................... 2, 9, 10

"*" indicates authorities upon which we chiefly rely.

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AG | Attorney General |
| AG Act | Attorney General Succession Act |
| CRS | Congressional Research Service |
| DOJ | Department of Justice |
| JA | Joint Appendix |
| Vacancies Reform Act | Federal Vacancies Reform Act |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are set forth in the Addendum for Firearms Policy Coalition, Inc.

## STATEMENT OF INTEREST

Before his retirement in 2008, amicus Morton Rosenberg served as an analyst in the American Law Division of the Congressional Research Service (CRS) for over three decades. In that capacity, he advised Congress on numerous issues of constitutional law, administrative law, and congressional practice and procedure, with a special emphasis on Executive appointments.

He is considered a leading authority on the Federal Vacancies Reform Act (Vacancies Reform Act), having been intimately involved with its enactment. He wrote the report for Congress detailing the problems with prior legislation that led directly to the Vacancy Reform Act's legislative overhaul. Morton Rosenberg, Cong. Research Serv., *Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights* (Jan. 1998) (*Rosenberg Memo I*). He testified before Congress during debate over the resulting legislation. *Oversight of the Implementation of the Vacancies Act, Hearings Before the Senate Committee on Governmental Affairs*, Mar. 18, 1998 (Statement of Morton Rosenberg, Specialist in American Public Law,

1

Congressional Research Service), 1998 WL 8993467. And after the Act's passage, he wrote another report for Congress that explored the Act's implementation. Morton Rosenberg, Cong. Research Serv., Report for Congress, *The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative* (Nov. 1998) (*Rosenberg Memo II*). Both of his CRS reports have been cited by the Supreme Court in *N.L.R.B.* v. *Southwest General, Inc.*, 137 S. Ct. 929, 935 (2017), and by numerous commentators, *see* Joshua L. Stayn, *Vacant Reform: Why the Federal Vacancies Reform Act of 1998 Is Unconstitutional*, 50 Duke L.J. 1511, 1513 n.8 (2001); Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039, 1050 n.60 (1998). All have treated his views on the Vacancies Reform Act's legislative background as authoritative.

Mr. Rosenberg writes to provide the Court with his considered views on the Vacancies Reform Act, its impact on the rules for designating officials to serve in the office of Acting Attorney General, and the reasons why the President's appointment of Matthew Whitaker to serve in that position violates these rules.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

For as long as the Justice Department has existed, Congress has maintained a special statutory scheme for determining who would run the Department in the event of a vacancy in the office of the Attorney General. The need for this scheme can be traced to the Department's unruly origins. Before Congress first organized the Department's various functions and brought them under one roof, the Attorney General had few real responsibilities, many U.S. attorneys were contract employees, and there was no central authority to ensure that the Government maintained coherent legal interpretations across all agencies. *Rosenberg Memo I* at 9-15. Interpretive responsibilities were instead parsed out among individual agencies, leading to often-conflicting interpretations between attorneys beholden to their agencies' feuding interests rather than the national good. *Id.* at 15.

When those responsibilities were brought within the auspices of a single office, it became immediately apparent that competent continuity would be critical for the office, to ensure that only those familiar with the Department's operations, and loyal to its proper mission, would wield the Attorney General's extraordinary powers as chief law-enforcement officer and chief legal counsel to the nation, and boss to the Department's employees—which would

3

eventually number more than 110,000.

Congress thus provided that if a vacancy in the Office of the Attorney General ever arose, the Senate-confirmed deputy (originally the Solicitor General) would be automatically elevated to the position of Acting Attorney General. And Congress even provided for further Senate-confirmed backups from within the Department in the event the Deputy was unavailable. *Id.* The Senate vetting required under this scheme would ensure the candidate was qualified to lead the office and possessed the independent judgment to stand up to the President when necessary. Experience within the Department would make certain the candidate understood the office's sprawling responsibilities, and possessed undivided allegiance to the Department's mission, devoid of conflicts of interests or fealty to particular agencies. *Ibid.*

This succession scheme for filling the office of Attorney General, the Attorney General Succession Act, now located at 28 U.S.C. § 508 (the AG Act), has evolved over time. But one thing has remained fixed for more than 150 years: It has always remained exempt from *all* other vacancy-filling rules, preventing the President from choosing anyone outside the congressionally specified line of succession to serve even as temporary occupant of the Attorney General's office. *See* Rev. Stat. § 179 (1st ed. 1874); 5 U.S.C. § 6

4

(1952); 5 U.S.C. § 3347 (1988).

Yet in upholding the President's appointment of Matthew Whitaker to serve as Acting Attorney General, the district court in this case held that enactment of the Vacancies Reform Act in 1988, Pub. L. No. 105-277, div. C, tit. I, 112 Stat. 2681-611 (1998), overturned this entire independent and mandatory scheme, along with about 3 dozen similar ones for other Senate-confirmed offices. As interpreted by the district court, the Vacancy Reform Act now allows the President the option to evade any of these office-specific laws, and side-step the AG Act's 150-year practice for filling the office of Acting Attorney General, 28 U.S.C. § 508, through the use of the default statutory scheme provided for making temporary appointments generally in 5 U.S.C. § 3345(a). That allows the President to fill virtually any opening in virtually any Senate-confirmed office.  And it allows him to anoint any of thousands of senior employees within the Department to lead the DOJ—even someone who has never been Senate-confirmed to *any* position within the federal government. *Id*. § 3345(a)(3).

But the circumstances surrounding the Vacancies Reform Act's enactment show this interpretation to be antithetical to the Act's whole reason for being. The Vacancies Reform Act was enacted during another period in

5

which the President sought to create "options" allowing for temporary appointments of lower-level DOJ employees (and others) outside of a congressionally mandated scheme, through creative readings of agencies' enabling legislation. That last Executive effort resulted in administrative chaos and routine disregard of congressionally mandated restrictions. The Vacancies Reform Act was a response to that chaos, meant to close off those outside options and limit the Executive's appointment discretion. It makes no sense to believe that Congress would find such intervention necessary to take away the President's "option" to appoint lower-level DOJ employees, and yet invite many times the chaos by creating a new "option" for the President to do so for the Attorney General, the most important and powerful Senate-confirmed employee in the Department. Indeed, that illogical premise finds no support in the statute, its legislative history, or prior case law. Rather, each of these sources confirms that the Vacancies Reform Act did nothing to break Congress's 150-year practice regarding succession to the office of Attorney General. That makes the President's appointment of Matthew Whittaker, who falls outside the congressionally mandated line of succession, unlawful and invalid.

## ARGUMENT

**The Vacancies Reform Act gives the President no discretion to evade the AG Act's mandatory and independent scheme for choosing an Acting Attorney General.**

The Vacancies Reform Act provides that it is the "exclusive means" for temporarily authorizing an acting official to perform the functions of virtually all Senate-confirmed executive offices "unless" an exception applies. 5 U.S.C. § 3347(a). One exception is if "a statutory provision expressly . . . designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1). There is no question that § 508 of the AG Act qualifies under that exception. It provides a scheme for "designating" a successor that Congress requires to be followed when an Attorney General leaves office, so long as the officers the statute identifies are available. Yet the district court did not read § 3347 as preserving that century-and-a-half-old independent and mandatory scheme. Instead, the district court read the statute as ending that scheme—by making it independent and mandatory no longer.

The lynchpin of the district court's opinion is § 3347's use of the word "exclusive." The district court imagined that if the the Vacancies Reform Act was "exclusive" when a succession statute for a particular office did not exist,

7

then it simply became "non-exclusive" when such an office-specific statute did exist. That, to the district court, gave the President an implied authority to choose between the two statutes. The President could allow the designee specified in § 508 to take office. Or the President could choose a successor himself, so long as the replacement met the qualifications of 5 U.S.C. § 3345(a)(2) or (a)(3)—the latter of which would leave him free to appoint a non-Senate-confirmed employee.

The Firearms Policy Coalition has already explained why the district court's opinion provides a bad grammatical and structural reading of the statute (FPC Br. 8-9), and why it also raises serious constitutional questions. (FPC Br. 31-42). Its interpretation is also flatly inconsistent with the entire thrust of the Vacancies Reform Act's legislative overhaul, which meant to preserve, not destroy, historic limits on Presidents' temporary appointment powers like the AG Act. And it likewise ignores the very reason Congress chose the term "exclusive" in the first place.

### A.   The Vacancy Reform Act's whole purpose is to confine, rather than expand, presidential appointment discretion.

The Federal Vacancies Reform Act of 1998 emerged out of fires from the Watergate scandal that smoldered for decades. President Nixon's Saturday Night Massacre had decimated Department's ranks and brought

8

renewed attention to the need for principal officers within the federal government to be accountable to the people, not just the President—especially one threatening to become a law unto himself. Brannon P. Denning, *Article II, the Vacancies Act and the Appointment of "Acting" Executive Branch Officials*, 76 Wash. U. L.Q. 1039, 1061 (1998). That resulted in a heightened politicization of the political appointment process, making the "vetting process for potential officeholders . . . more complex, difficult and protracted" (*Rosenberg Memo II* at 8), which left the federal government with far more Senate-confirmed offices than acceptable candidates to fill them. To prevent these offices from becoming inoperable for want of an agency head, the Office of Legal Counsel in 1973 began seeking ways to stretch temporary acting appointments past the Vacancies Act's strict time limits. It claimed to find an option in agencies' enabling statutes, like the Justice Department's located in 28 U.S.C. §§ 509-10, which usually contained provisions empowering agency heads to delegate functions to subordinates. *Rosenberg Memo II* at 1. The DOJ argued that these delegating provisions gave "the head of an executive agency . . . independent authority apart from the Vacancies Act" to fill vacant offices. *N.L.R.B.* v. *SW General, Inc.*, 137 S. Ct. 929, 935 (2017).

The result was a scandal. Providing Presidents with "options" outside of

the Vacancies Act's mandatory scheme for temporary appointments routinized the evasion of specific conditions Congress had set on those appointments. And the situation only worsened over time. By 1998, 20% of the 320 positions requiring Senate-confirmed appointees (and 25% of such positions within the Justice Department) were staffed by temporary appointees, most of whom had served long beyond the then-120-day period allowed under the Vacancies Act. *Rosenberg Memo II* at 1. The situation also created interbranch conflict between the Justice Department and the Comptroller General, who objected that that agency enabling statutes lacked the requisite specificity to provide an alternate path for appointments. Comptroller General's Decision B-220522, June 9, 1986, 65 Comp. Gen. 626 (1986); *see also Rosenberg Memo I* at 4-5, 19.

Things came to a head in 1997, after the Senate Judiciary Committee refused to refer Bill Lann Lee, President Clinton's nominee to head the Office of Civil Rights, to a floor vote.[1] The President responded by directing the Attorney General to appoint Mr. Lee as "Acting" Assistant Attorney General

---

[1] See *Democrat Wants New Hearing for Embattled Nominee*, AP, Nov. 8, 1997, 1997 WL 4891645; Naftali Bendavid, *Democrats Delay Panel's Vote on Civil Rights Nominee*, Chi. Trib., Nov. 7, 1997, § 1, at 3.

for Civil Rights by delegating those responsibilities to him, with plans that he would serve beyond the Vacancies Act's time limits. That produced public outcry and calls to have the Vacancies Act amended to explicitly prohibit such presidential end-arounds. Stewart M. Powell, *Lee Wins Civil Rights Job Despite GOP Block: President Dodges Senate Opposition and Names L.A. Lawyer to Post on an Acting Basis*, S.F. Examiner, Dec. 15, 1997, at A1.

Congress requested that CRS provide a report on the issue, and the Service responded by noting that historically, "[t]he Vacancies Act was intended by Congress to be the exclusive vehicle for temporarily filling vacant advice and consent positions," and that use of agency enabling statutes was an impermissible alternative. *Rosenberg Memo I* at 3. Indeed, the Vacancies Act's predecessors were exclusive as written.[2] The Service thus recommended new legislation to make clear that the Vacancies Act is, and always was, "meant to be the exclusive vehicle for temporarily filling advice and consent positions in

---

[2]  The first modern Vacancies Act in 1868 provided that "no appointment . . . otherwise than as is herein provided . . . shall be made." Act of July 28, 1868, ch. 227, § 2, 15 Stat. 168. The 1874 codified version retained that language, R.S. § 181 (1874), as did the 1966 codification, 80 Stat. 378, 425-26 (codified at 5 U.S.C. § 3345 (1966)). Even the 1988 Vacancies Act amendments, made before the Vacancy Reform Act's complete overhaul, had intended to "make clear that the Vacancies Act is the exclusive authority of the temporary appointment." S. Rep. No. 105-250, at 4 (1998) (citing S. Rep. No. 100-317, at 14 (1988)).

11

all departments and agencies in the government," *id.* at 33, and "cannot be overcome by the general authority of an agency head to assign functions . . . within an agency," *id.* at 34-35. The report also recognized that office-specific statutes had historically been controlling where they existed, and thus the Vacancies Act was "exclusive" only to the extent Congress had not provided in "express[] and specific statutory language" (*id.* at 3) that another statute would control a particular office's temporary appointment process, *id.* at 27.

Congress responded with the Vacancies Reform Act. Adopting CRS's recommendations, the Vacancies Reform Act reasserted the boundaries Congress had long imposed on the President's authority to appoint temporary appointees. It made the Vacancies Reform Act "the exclusive means for temporarily authorizing an acting official to perform the functions and duties" of any Senate-confirmable office in any "Executive agency," 5 U.S.C. § 3347(a), and disallowed the use of "statutory provision[s] providing general authority to the head of an Executive agency" for such appointments, *id.* § 3347(c). These changes channeled the President's discretion back into the provisions Congress had always intended to govern most vacancies, ensuring that the President would not be permitted to use temporary appointments to evade the Vacancies Acts' time limits on temporary appointments and the Senate's

12

advise-and-consent approval power.

The Vacancies Reform Act's exceptions for office-specific statutes in § 3347(a)(1)(A) & (B) played an equally important role in reasserting these historic boundaries. These exceptions preserved previous Congresses' "wisdom" and "specific judgments" that certain positions should be taken "out of the Vacancies Act" *entirely* to limit the President's appointment discretion and ensure those select offices maintained a measure of independence. Stephen Migala, *The Vacancies Act and an Acting Attorney General* 34-35, App.76 (Nov. 15, 2018) (submitted for publication), https://ssrn.com/abstract=3285940 (Migala) (quoting Senator Lieberman in Transcript of Proceedings, *U.S. Senate Committee on Governmental Affairs Business Meeting June 17, 1998*, at 33-35 (1998)).

The district court's conclusion that the Vacancies Reform Act should provide an alternative procedure outside these office-specific statutes thus turns the Vacancies Reform Act on its head. That Act meant to *eliminate* the Justice Department's position that DOJ's enabling statutes provided alternatives to the Vacancies Act's appointment provisions. Congress rejected that argument and made the Vacancies Act exclusive where it applies. And it did so to constrain the President's temporary appointment powers for *all*

13

appointees—including even for run-of-the mill sub-Cabinet positions and underling DOJ officers. It would be odd indeed to read that same statute to produce the exact opposite result with respect to the Attorney General personally—the head of the federal government's most powerful and consequential agency. It would likewise be odd to assume that Congress would observe the mischief resulting when the President had options to evade Congress's mandated scheme for filling vacancies, decide to take away those options for lower positions within the Justice Department, yet turn around and provide the President with an option to evade the mandatory scheme for appointment of an Acting Attorney General, magnifying the potential for presidential mischief in temporary appointments many times over. Even still odder to assume that, in a statute meant to reassert traditional limits on the President's appointment power, Congress would silently overturn a 150-year practice in temporary Attorney General appointments—a practice that provided a separate layer of protection against candidate incompetence and presidential interference. Yet the district court's decision indulges each of these fictions.

14

**B.    The Vacancies Reform Act's history confirms that it preserves, not overturns, mandatory office-specific provisions like the AG Act.**

Not only does the district court's decision thus cut against the Vacancies Reform Act's entire reason for being, it also disregards the important reasons why Congress chose the particular language it did in fashioning § 3347. Congress never intended that provision to expand the President's temporary appointment authority, or to allow end-arounds to evade mandatory office-specific statutes like the AG Act. To the contrary, it acted to constrict that authority, as § 3347's drafting history shows.

Take, for example, the very lynchpin of the district court's decision, § 3347(a)(1)'s use of the term "exclusive." The original draft of that language was different. In the original version, which appeared in Senate Bill 2176, the Vacancies Reform Act's appointment scheme was not made "exclusive" outside of an office-specific statute. It was simply made "applicable to" any office absent an office-specific alternative. That language was good in that it was invulnerable even to the district court's ungrammatical, discretion-creating read of § 3347. A statute that is only "applicable" when no office-specific statute exists is plainly "inapplicable" when one does.

Yet members of the Government Affairs Committee, which handled the

15

drafting of the Vacancies Reform Act, developed concerns that the term "applicable" did not do enough to prevent the DOJ from engaging in future shenanigans like its previous use of enabling statutes, even though Senate Bill 2176 contained a specific provision outlawing the practice. Migala 46-49. After all, if the Vacancies Reform Act were merely "applicable," and not "exclusive," then another law might be "applicable" too.

Committee members therefore recommended the language be changed to make the act "so air-tight" that "no department can find a crack or crevice anywhere through which to creep." *Oversight of the Implementation of the Vacancies Act: Hearing on S. 1764 Before the S. Committee on Governmental Affairs*, 105th Cong., at 48 (1998) (S. Hrg. 105-495); *see also* Migala 47 (outlining discussions among Democratic staff members regarding the issue); S. Rep. No. 105-250, at 9 (1998). And the committee did so by hewing more closely to the language that CRS had originally proposed. The final version of 5 U.S.C. § 3347(a) changed the word "applicable" to "exclusive"—a term plucked right out of CRS's report. *Rosenberg Memo I* at 33.

The change to "exclusive" served only one purpose: to make the "exclusivity" of the Vacancies Reform Act "more authoritative." Migala 48 (quoting *Memorandum from Fred Ansell, Chief Counsel of the Senate*

*Committee on Governmental Affairs, to Senator Fred Thompson, Committee Chairman, re: Vacancies Act—Managers Amendment* (Sept. 24, 1998)).  It had no other purpose, and otherwise retained the import of the original term "applicable." Indeed, during drafting, the term "exclusive" was treated as largely the equivalent of the original language. *See* Migala 24. Accordingly, the language that emerged from the drafting process contained the best of both worlds, ensuring that "the Vacancies Act provides the sole means by which temporary officers may be appointed," but making an "explicit exception" to that appointment mechanism when an office-specific statute existed. 144 Cong. Rec. S12823 (Oct. 21, 1998) (statement of Sen. Thompson).

Another change made during the drafting of § 3347 confirms Congress's intent to preserve office-specific statutes as-is, without allowing the Vacancies Reform Act to become an alternative option. Ironically, this is because one of the earliest issues with Senate Bill 2176 was that, as originally written, *it did not* preserve previously existing office-specific statutes. It discarded them completely. The original draft of Senate Bill 2176 would have allowed office-specific statutes to stand outside the Vacancy Reform Act's "applicable" (and later "exclusive") scheme laid out in sections 3345 and 3346 only under the narrowest of circumstances: when they contained specific language "cite[ing]"

17

those provisions directly, and "expressly provide[ing]" that the office-specific statute was meant to "supercede[]" them. Migala 24 (citing staff draft of S.2176). That left room only for *future* office-specific statutes, leaving all preexisting statutes in the dust.

This proposed demand for magic language produced immediate bipartisan concern. Democrats on the Government Affairs Committee and their staff saw the value in retaining these office-specific schemes: "We want the Act to have exclusive authority over agencies, but we have no reason to override other laws. We should accept other statutes that already provide for the filling of vacancies." Migala 25 (citing *Memorandum from David Plocher et al. to Senator Glenn re: Vacancies Act—GAC Mark-up* (May 14, 1998)). Republicans like Strom Thurmond raised concern that discarding office-specific succession schemes might have ill effects on several vital military positions, such as the Chief of Naval Operations, 10 U.S.C. § 5035. Thurmond wanted all succession schemes affecting the military "to survive any overall Vacancies Act revision." Migala 26 (quoting *Memorandum from Fred Ansell to Senator Thompson, re: Vacancies Act* (June 4, 1998)). In response to these concerns, the language of the exception was eventually expanded to exempt virtually *any* office-specific statute, whether it "authorizes the President" to

18

make the appointment, or automatically "designates an officer or employee to perform the functions and duties" of the office specifically. 5 U.S.C. § 3347(a)(1)(A) & (B).

Throughout discussions in committee, and when the Vacancies Reform Act was introduced in the Senate, senators and their staff repeatedly explained that the change was intended to "retain" and "grandfather" these provisions, making them an "exception" to the Vacancies Reform Act's temporary appointment procedures. *E.g.*, Transcript of Proceedings, *U.S. Senate Committee on Governmental Affairs Business Meeting June 17, 1998*, at 33-35 (1998) (Statement of Senator Lieberman: "The proposal before us *exempts* from [the Vacancies Reform Act's] purview" all office-specific statutes) (emphasis added); 144 Cong. Rec. S11,022-23 (daily ed. Sept. 28, 1998) (Statement of Senator Thompson: "The bill will extend the provisions of the Vacancies Act to cover all advice and consent positions in executive Agencies *except* those that are covered by express specific statutes") (emphasis added); Migala 26 (quoting *Memorandum from Peiter Kiefaber and Paul Weinberger to Senator Byrd, re: the Vacancies Act* (July 1, 1998) (The proposal to change the statute "would retain and not override the forty succession statutes."). And just a few months after § 3347 finally became law,

19

Senator Thompson, the Vacancies Reform Act's chief architect and cheerleader in the Senate, explained the law's now-settled understanding during consideration of a further amendment to § 3347. He confirmed that with respect to "statutes providing for the filling of a specific vacant position," these "the law retains *in lieu* of the procedures contained" in the Vacancies Reform Act. 145 Cong. Rec. S33 (daily ed. Jan. 6, 1999) (emphasis added).

This statutory history makes clear that the committee that drafted the Vacancies Reform Act and the Congress that made it law understood office-specific statutes to be preserved and stand apart from the appointment regime that the Vacancies Reform Act created—to be used "in lieu" of the scheme provided in §§ 3345 and 3346. As a consequence, office-specific statutes like the AG Act that had been independent and mandatory before the Vacancies Reform Act, remained just as independent and mandatory afterward. This history thus knocks out the very lynchpin of the district court's opinion, and its context-blind interpretation of § 3347.

### C.    Case law does not make the Vacancies Reform Act an alternative to the AG Act.

The district court is likewise incorrect to suggest that case law dictates that the Attorney General Succession Act and the Vacancies Act be treated as dual-track, non-excusive options for presidential appointments of the Acting

20

Attorney General. The Office of Legal Counsel relies on two cases, *English* v. *Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018) and *Hooks* v. *Kitsap Tenant Support Services*, 816 F.3d 550 (9th Cir. 2016). but neither dealt with the Attorney General Succession Act, and each is readily distinguishable.

*Hooks* dealt with the office-specific provision for appointing an Acting General Counsel for the National Labor Relations Board. The court briefly noted that the statute was "non-exclusive." *Id.* at 559. But that office-specific statute didn't designate a particular person to fill the office, it simply left things up to the President, and thus dealt with § 3347(a)(1)(A), not § 3347(a)(1)(B). It is only in subparagraph (B) that the statute actually "designates" the acting official, rather than allowing the President or someone else to designate them. And it is far much more sensible that the President could pick someone under the Vacancies Reform Act when the appointment leads to basically the same place as the office-specific statute. That is perhaps why *Hooks* passed on the issue without much discussion.

Yet, even if, as the district court assumed, JA 53, the Vacancies Reform Act means to give the same treatment to statutes falling under (B) as to those falling under (A), *Hooks* still sheds little light on what that treatment should be. *Hooks*'s analysis was nothing more than dicta, which was, in the end,

21

incorrect. It was misled by the same errant Senate Report that led the district court (and the Government) astray in this case.

*English* actually builds off *Hooks*'s erroneous premise, 279 F. Supp.3d at 320, and adds to it a highly unusual factual situation, and a unique statutory scheme. The circumstances were extremely unusual because the Director the Consumer Financial Protection Board (CPFB) named a second in command on the day he resigned precisely to prevent the President from designating a successor. The office-specific statute at issue, governing the appointment of a temporary Director to the CPFB, was also unique because it was a part of the Dodd–Frank Wall Street Reform and Consumer Protection Act (the "Dodd–Frank Act" or "Dodd–Frank"), Pub. L. No. 111–203, 124 Stat. 1376 (2010). That statute specifies that "[e]xcept as otherwise provided expressly by law, all Federal laws dealing with public or Federal . . . officers [or] employees . . . shall apply to the exercise of the powers of the CFPB." 12 U.S.C. § 5491(a). Accordingly, as a matter of Dodd-Frank's own text, *English* properly concluded that the Vacancies Reform Act "applies to the CPFB" because nothing in Dodd-Frank "'expressly' displaces it." 279 F. Supp. 3d at 321. That unique clear statement rule in Dodd-Frank was not irrelevant to its analysis, as the district court assumed. JA 54. It was the key assumption

behind that analysis—the "textual background" upon which all else depends. 279 F. Supp. 3d at 321. And the court specifically identified the Attorney General Succession Act as a statute that *would* have displaced the Vacancies Reform act in similar circumstances. *Id*. Accordingly, the potential availability of the Vacancies Act as an option in *English* or *Hooks* says nothing about its availability as an option in this case.

## CONCLUSION

The Court should reverse the district court's judgment.

Respectfully submitted,

/s/ *J. Carl Cecere*

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, Texas  75206
(469) 600-9455
ccecere@cecerepc.com

*Counsel for Amicus Curiae*

23

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 29(d) of the Federal Rules of Appellate Procedure because this brief contains 4,643 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2).

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because the brief has been prepared using Microsoft Word 2013 in 14-point Century Expanded BT font, which is a proportionately spaced typeface.

*/s/ J. Carl Cecere*

**J. Carl Cecere**

24

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

*/s/ J. Carl Cecere*

**J. Carl Cecere**