Oral Argument Scheduled for March 22, 2019
**No. 19-5042**
Consolidated with 19-5043, 5044

███████████████████████████████████

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

DAMIEN GUEDES, *et al.*,

*Plaintiff-Appellants,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al.*,

*Defendant-Appellees.*

————————————

On Appeal From The United States District Court
For the District of Columbia

————————————

**BRIEF OF *AMICUS CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANT-APPELLEES**

————————————

March 13, 2019

*Counsel listed on inside cover*

Ian Simmons
Matt Schock
Allison B. Smith
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
(202) 383-5300
isimmons@omm.com

Anthony G. Beasley
O'MELVENY & MYERS LLP
400 S. Hope St., 18th Floor
Los Angeles, CA 90071
(213) 430-6000
tbeasley@omm.com

Counsel for *Amicus Curiae* Giffords
Law Center to Prevent Gun Violence

J. Adam Skaggs
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
225 W. 38th Street #90
New York, NY 10018
(917) 680-3473
askaggs@giffords.org

Hannah Shearer
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 443-2062
hshearer@giffords.org

Of Counsel for *Amicus Curiae* Giffords
Law Center to Prevent Gun Violence

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* Giffords Law Center to Prevent Gun Violence hereby certifies as follows:  Except for the following *amici*, All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the proof brief of Appellants:  Cato Institute; Constitutional Scholars; Morton Rosenberg; Former Government Ethics Officials and Citizens for Responsibility and Ethics in Washington; New Civil Liberties Alliance; and Giffords Law Center to Prevent Gun Violence.  Counsel is not aware of any other intervenors or *amici* in this Court at this time.  The rulings at issue and related cases appear in the proof brief of Appellants.

## CERTIFICATE OF COUNSEL

Pursuant to D.C. Circuit Rule 29(d), *amicus curiae* Giffords Law Center to Prevent Gun Violence hereby certifies that the filing of this brief separate from other *amici* is necessary because (i) *amicus* Giffords Law Center's brief focuses specifically on firearms policy and the plain meanings of statutory terms, which no other *amicus* discusses, and (ii) in light of the expedited briefing schedule, it was not practicable to coordinate with other *amici*.

Dated:  March 13, 2019                    /s/ Ian Simmons_____
                                          Ian Simmons

## CORPORATE DISCLOSURE STATEMENT

Giffords Law Center to Prevent Gun Violence states that it has no parent corporations.  It has no stock, and therefore no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................. 1

SUMMARY ........................................................................................... 2

ARGUMENT ......................................................................................... 3

    I.    The Plain Meaning of "Machinegun" Encompasses Bump
        Stocks ........................................................................................ 3

        A.    The Terms "Automatically" and "Single Function of the
              Trigger" Should Be Construed According to Their
              Ordinary, Plain Meanings ................................................. 4

              1.    Ordinary and Plain Meaning of "Automatically" ........... 7

              2.    Ordinary and Plain Meaning of "Single Function
                    of the Trigger" ................................................. 8

        C.    Bump Stocks Fall Within The Plain Meanings of
              "Automatically" and "Single Function of the Trigger" .......... 10

    II.    The Final Rule is Neither Arbitrary Nor Capricious ......................... 13

        A.    Political Involvement in Rulemaking Does Not Render
              the Final Rule Arbitrary and Capricious ................................. 14

        B.    The Final Rule is reasonable and connected to the facts. ........ 16

              1.    Evidence of the public safety risks posed by bump
                    stocks supports the Final Rule. ...................................... 16

              2.    Evidence that bump stocks are cheap and
                    accessible substitutes for automatic weapons
                    supports the Final Rule. ................................................. 17

              3.    Evidence that there is no need for private
                    ownership of bump stocks supports the Final Rule. ....... 19

              4.    Evidence of the costs of mass shootings supports
                    the Final Rule ................................................................. 22

CONCLUSION ...................................................................................... 24

CERTIFICATE OF COMPLIANCE ....................................................... 26

CERTIFICATE OF SERVICE ............................................................... 27

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Akins v. United States*,
  312 F. App'x 197 (11th Cir. 2009) ...............................................8, 9

*Asgrow Seed Co. v. Winterboer*,
  513 U.S. 179 (1995)........................................................................5

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................1

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)..................................................................14

*FDIC v. Meyer*,
  510 U.S. 471 (1994)........................................................................5

*ITT World Commc'ns, Inc. v. FCC*,
  725 F.2d 732 (D.C. Cir. 1984)........................................................5

*King v. Burwell*,
  135 S. Ct. 2480 (2015)....................................................................4

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) ..........................................................2

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)........................................................................1

*MCI Telecomms. Corp. v. AT&T Co.*,
  512 U.S. 218 (1994)........................................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)........................................................................13

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009)........................................................................6

*People v. Brown*,
  235 N.W. 245 (Mich. 1931)...........................................................21

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Perrin v. United States*,
    444 U.S. 37 (1979)..................................................................6

*Rinzler v. Carson*,
    262 So.2d 661 (Fla. 1972) ...................................................21

*SAS Inst. Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)..........................................................6

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    563 U.S. 401 (2011)...............................................................6

*Staples v. United States*,
    511 U.S. 600 (1994)...............................................................9

*United States v. Fleischli*,
    305 F.3d 643 (7th Cir. 2002) ................................................9

*United States v. Olofson*,
    563 F.3d 652 (7th Cir. 2009) .............................................7, 8

*United States v. Palmer*,
    854 F.3d 39 (D.C. Cir. 2017)................................................5

*Woollard v. Gallagher*,
    712 F.3d 865 (4th Cir. 2013) ................................................1

*Wrenn v. District of Columbia*,
    864 F.3d 650 (D.C. Cir. 2017)..............................................1

**Statutes**

5 U.S.C. § 706 ............................................................................13

18 U.S.C. ch. 44 .......................................................................3, 4

18 U.S.C. § 922 .........................................................................3

26 U.S.C. ch. 53 .......................................................................2, 4

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

26 U.S.C. § 5845(b) ...................................................................5, 10

Pub. L. 99-308, 100 Stat. 449 (1986).....................................3, 4

**Regulations**

58 Fed. Reg. 190 (Oct. 4, 1993) ................................................16

83 Fed. Reg. 7949 (Feb. 20, 2018) ...........................................14

83 Fed. Reg. 13442 (Mar. 29, 2018).........................................15

83 Fed. Reg. 66514 (Dec. 26, 2018) ..................................*passim*

**Other Authorities**

1 *Oxford English Dictionary* 574 (1933) ....................................7

4 *Oxford English Dictionary* 602 (1933) ....................................8

Cong. Res. Serv., *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process* (Dec. 9, 2014)............................16

Corrine Peek-Asa, et al., *Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the United States*, Injury Epidemiology (July 19, 2017) .............................23

Debbie Lord, et al., *Remembering the deadliest mass shooting in modern American history*, Atlanta Journal-Constitution (Feb. 14, 2018) ..............................................................17

Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News (Dec. 22, 2011) ...............................................................18

Ed Leefeldt, *Stephen Paddock used a "bump stock" to make his guns even deadlier*, CBS News (Oct. 4, 2017).............................19

Everytown for Gun Safety, A Nation of Survivors: The Toll of Gun Violence in America (2019) .....................................23

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Everytown for Gun Safety, *Mass Shootings in the United States* (2018) ..............20

H.R. Rep. No. 83-1337 (1995), *reprinted in* 1954 U.S.C.C.A.N. 4017 ...................4

John Haltiwanger, *Las Vegas Shooting Recovery Will Cost at Least
    $600 Million*, Newsweek (Oct. 2, 2017)..............................................................22

Louis Klarevas, RAMPAGE NATION: SECURING AMERICA FROM MASS
    SHOOTINGS (2016)................................................................................................20

Martin Kaste, *The Politics of Bump Stocks, 1 Year After the Las Vegas
    Shooting*, NPR (Sept. 26, 2018).....................................................................19, 20

Phaedra S. Corso, Phd., et al., *Medical costs and productivity losses
    due to interpersonal and self-directed violence in the United
    States*, 32 Am. J. Prev. Med. (Sixth Issue) (June 2007) ....................................23

Philip J. Cook & Jens Ludwig, *The benefits of reducing gun
    ownership: evidence from contingent-valuation survey data*, 22 J.
    Risk & Uncertainty (Third Issue) (May 2001). ..................................................23

Philip J. Cook, et al., *The medical costs of gunshot injuries in the
    United States*, 282 J. Am. Med. Ass'n (Fifth Issue) (Aug. 1999) .....................24

Polly Mosendz & Kim Bhasin, *Bump-Fire Stock Prices Double,
    Thanks to the NRA*, Bloomberg (Oct. 5, 2017)..................................................18

Scott Wong, *Top conservative calls for ban on device used by Vegas
    shooter*, The Hill (Oct. 4, 2017) ........................................................................18

*Webster's New International Dictionary* (1933) .......................................................8

*Webster's New International Dictionary* (2d ed. 1934) ...........................................7

## STATEMENT OF INTEREST[1]

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives.  The organization was founded in 1993 after a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.

Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to make their communities safer from gun violence.  Its attorneys track and analyze firearm legislation, evaluate gun violence prevention research and policy proposals, and participate in Second Amendment litigation nationwide. Giffords Law Center has provided analysis as an *amicus* in numerous important firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017); *Woollard v. Gallagher*, 712 F.3d 865

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel or party, and no person other than *amici* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.  The parties have consented to the filing of this *amicus* brief.

(4th Cir. 2013); and *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017).

## SUMMARY

On October 1, 2017, a lone gunman, equipped with a number of semiautomatic weapons fitted with bump stocks, fired hundreds of rounds of ammunition into a crowd of Las Vegas concertgoers, killing 58 and wounding hundreds more. The shooting was the deadliest in modern U.S. history and took place over approximately 11 minutes. In the aftermath of this carnage, members of the public urged the federal government to ban bump stocks,[2] which are technologically simple devices that convert otherwise legal weapons into illegal (and deadly) machine guns.

On December 26, 2018, the United States Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") finalized a rule, 83 Fed. Reg. 66514 (the "Final Rule"), stating that bump stocks are "machineguns," as defined in the National Firearms Act of 1934 ("NFA"), 26 U.S.C. ch. 53; (2) the Gun Control Act of 1968

---

[2] "A bump stock replaces a semiautomatic rifle's standard stock—the part of the rifle that rests against the shooter's shoulder—and enables the shooter to achieve a faster firing rate." JA024. Importantly, there is no dispute regarding what bump stocks are or how they work. The district court correctly noted that "[t]his case does not turn on any factual dispute; the parties agree about how a bump stock operates." JA044. The dispute, rather, is whether that operation constitutes automatic gunfire from a single trigger pull.

("GCA"), 18 U.S.C. ch. 44; and (3) the Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (1986).[3]  As a result, bump stocks were outlawed as devices that convert semiautomatic firearms into machine guns under 18 U.S.C. § 922.  On December 18, 2018, Appellants filed suit[4] to enjoin enforcement of the Final Rule, claiming, among other things, that the Final Rule contradicts the statutory definition of "machinegun" in the NFA, GCA, and FOPA, and is arbitrary and capricious.  The trial court denied Appellants' request for injunctive relief on February 25, 2019.

That opinion should be affirmed.  ATF's interpretation that bump stocks convert a semiautomatic firearm into a "machinegun" comports with the ordinary, plain meaning of "machinegun" and its component terms, and it is substantively reasonable, consistent with Congressional purposes, and rationally connected to the facts before ATF.

## ARGUMENT

## I.    The Plain Meaning of "Machinegun" Encompasses Bump Stocks

When presented with questions of statutory interpretation, courts must begin their analysis with the plain meaning of the statute's text.  "If the statutory

---

[3] All applicable statutes and regulations are contained in the brief for Appellants.

[4] The district court's opinion recounts the full procedural history of Plaintiffs' pleadings.  JA021-23.

language is plain, the Court must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2483 (2015). The text at issue here pertains to the term "machinegun"—which is defined identically in three relevant statutes—and two of its component terms: "automatically" and "single function of the trigger." These component terms do not have statutory definitions, nor do they require them: they are unambiguous and, as used in the statutory definition of "machinegun," plainly encompass bump stocks.

## A. The Terms "Automatically" and "Single Function of the Trigger" Should Be Construed According to Their Ordinary, Plain Meanings

Three federal statutes regulate the interstate firearms market: (1) the NFA; (2) the GCA; and (3) the FOPA. The NFA, in particular, was enacted by Congress to target "lethal weapons . . . [that] could be used readily and efficiently by criminals or gangsters." H.R. Rep. No. 83-1337 (1995), at A395, *as reprinted in* 1954 U.S.C.C.A.N. 4017, 4542. The NFA, the GCA, and FOPA define "machinegun" identically as follows:

> [A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, ***automatically*** more than one shot, without manual reloading, by a ***single function of the trigger***. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a

4

> machinegun can be assembled if such parts are in the
> possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added).

The terms "automatically" and "single function of the trigger" are not expressly defined in any of the three statutes. Nor has Congress otherwise indicated any intent to ascribe a specific or special meaning to them. Consistent with well accepted principles of statutory construction, these terms therefore should be construed according to their ordinary and plain meanings, as ATF has done.

The Supreme Court has made abundantly clear that "[w]hen terms used in a statute are undefined," they are to be given "their ordinary meaning." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) (citing *FDIC v. Meyer,* 510 U.S. 471, 476 (1994)). This Court has done the same, holding that "Congress is presumed, absent indication to the contrary . . . , to use words in their ordinary meaning." *United States v. Palmer*, 854 F.3d 39, 47 (D.C. Cir. 2017); *see also ITT World Commc'ns, Inc. v. FCC*, 725 F.2d 732, 743 (D.C. Cir. 1984) ("The most basic rule of statutory construction requires that courts attribute to the words of a statute their plain meaning.")

Ordinary or plain meaning often is derived from dictionary definitions, and courts frequently examine dictionaries to inform the interpretative process. *See*

5

*SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) (relying on Oxford English Dictionary to determine the ordinary meaning of the word "any"); *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407-08 (2011) (citing five dictionaries to determine the ordinary meaning of the word "report"); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009) (citing Black's Law Dictionary to determine the ordinary meaning of the phrase "political subdivision"). "[T]he most relevant time for determining a statutory term's meaning" is the year of the provision's enactment. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994) (citing *Perrin v. United States*, 444 U.S. 37, 42-45 (1979)). For the terms at issue here, that year is 1934—the year Congress enacted the NFA.

ATF's construction of the terms "automatically" and "single function of the trigger" finds ample support in contemporaneous dictionaries and the NFA itself, and comports with how other courts have construed the same terms. A firearm equipped with a bump stock—which is designed to allow that weapon to achieve the same type of rapid-fire as an automatic firearm—allows a shooter to fire ***automatically*** more than one shot by a ***single function of the trigger*** under any reasonable, ordinary, and plain interpretation of those terms.

6

### 1.    Ordinary and Plain Meaning of "Automatically"

The Final Rule interprets the term "automatically" to mean "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger."  83 Fed. Reg. at 66519.  This reflects the ordinary meaning of the word "automatically," at the time of the NFA's enactment in 1934, as "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]"  *Id.* (citing *Webster's New International Dictionary* 187 (2d ed. 1934); 1 *Oxford English Dictionary* 574 (1933) (defining "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself.")).

Courts likewise have found the term "automatically" to be consistent with these dictionary definitions.  In *United States v. Olofson*, the Seventh Circuit interpreted the term "automatically" in the NFA as "delineat[ing] how the discharge of multiple rounds from a weapon occurs:  as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading."  563 F.3d 652, 658 (7th Cir. 2009).  Consistent with this definition, *Olofson* held that so long as a firearm is capable of discharging multiple rounds with a single pull of the trigger until the trigger finger is released, the ammunition supply is exhausted, or the firearm malfunctions, the

7

firearm shoots "automatically" irrespective of why the firing sequence ultimately ends. *Id*.

By interpreting the term "automatically" in a way that comports with both the term's 1934 plain meaning and the plain meaning acknowledged by the courts, ATF harmonizes the text of the Final Rule with a straightforward and commonly accepted interpretation of an incorporated statutory term.

### 2. Ordinary and Plain Meaning of "Single Function of the Trigger"

The Final Rule interprets "single function of the trigger" to mean "a single pull of the trigger and analogous motions." 83 Fed. Reg. at 66534. This definition fits comfortably within the expansive ordinary meaning of the word "function," at the time of the NFA's enactment in 1934, as "[t]he natural and proper action of anything." *Webster's New International Dictionary* 876 (1933); *see also* 4 *Oxford English Dictionary* 602 (1933) (defining "function" to mean "[t]he special kind of activity proper to anything; the mode of action by which it fulfills its purpose.").

This definition is also consistent with prior court decisions examining this term in light of the NFA. For example, *Akins v. United States* concerned a device marketed as the "Akins Accelerator," a "molded stock that cradles a semiautomatic rifle and uses an internal spring and the force of recoil to reposition and refire the rifle." 312 F. App'x 197, 198 (11th Cir. 2009). ATF classified the Akins

Accelerator as a "machinegun" under the NFA after conducting an investigation and finding "that a ***single pull of the trigger*** initiates an ***automatic*** firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted." *Id*. at 199 (emphasis added). The Eleventh Circuit found that "[t]he interpretation by [ATF] that the phrase 'single function of the trigger' means a 'single pull of the trigger' is consonant with the statute and its legislative history." *Id*. at 200. In support, *Akins* cited to *Staples v. United States*, in which the Supreme Court expressly defined "automatic" and "fully automatic," as used in the NFA, to describe "a weapon that fires repeatedly with a single pull of the trigger." 511 U.S. 600, 602 n.1 (1994).

Further, courts have made clear that "function" has a broader definition than "pull," and can encompass a variety of other actions, such as flipping a switch or pushing a button. *See United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002) (rejecting argument that a switch did not constitute a trigger for the purpose of classifying a gun as a machinegun under the NFA, because such an interpretation would lead to "the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing") (quotations omitted). *Fleischli* confirms that "function" is a broad term, just as its 1934 dictionary definition suggests.

9

By interpreting the term "single function of the trigger" in a way that fits the 1934 plain meaning of the term "function" and the plain meaning acknowledged by the courts, ATF again harmonizes the text of the Final Rule with an established and recognized interpretation of an incorporated statutory term.

## C. Bump Stocks Fall Within The Plain Meanings of "Automatically" and "Single Function of the Trigger"

In promulgating the Final Rule, ATF reexamined its legal position on whether bump stocks constitute "machineguns" as that term is used in the NFA, GCA, and FOPA.  ATF reviewed the history of its regulations on bump stocks and similar devices, reviewed dictionary definitions of the terms "automatically" and "single function of the trigger," and reviewed and responded to tens of thousands of comments from the public.  Central to ATF's analysis was whether and to what extent bump stocks allow a person to "automatically" fire more than one bullet by a "single function of the trigger," under the ordinary meaning of those terms.  *See* 26 U.S.C. § 5845(b).

ATF ultimately found that bump stock devices—including but not limited to the ones used in the October 1, 2017 Las Vegas mass shooting—are generally "designed to be affixed to a semiautomatic long gun (most commonly an AR-type rifle or an AK-type rifle) in place of a standard, stationary rifle stock, for the

10

express purpose of allowing 'rapid fire' operation of the semiautomatic firearm to which they are affixed."  83 Fed. Reg. at 66516.

Next, ATF analyzed whether bump stocks fall within the plain meaning of "automatically."  It first observed that a bump stock is "designed to channel recoil energy to increase the rate of fire of a semiautomatic firearm *from a single trigger pull*" and "harnesses and directs the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by 'bumping' the shooter's stationary finger *without additional physical manipulation of the trigger by the shooter*."  83 Fed. Reg. at 66516 (emphasis added).  It further noted that "[t]he device itself . . . *provid[es] the primary impetus for automatic fire*."  *Id*. at 66518 (emphasis added).  ATF thus concluded that bump stocks "convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that, after a single pull of the trigger, harnesses the recoil energy of the semiautomatic firearm in a manner that *allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter*."  *Id*.  (emphasis added).

In response to public comments, ATF further explained in detail how bump stocks allow a single pull of the trigger, and no further manipulation of the trigger, to fire multiple rounds.  Specifically:

11

> [T]he shooter 'pulls' the trigger once and allows the firearm and attached bump-stock-type device to operate **until the shooter releases the trigger finger or the constant forward pressure with the non-trigger hand**. The non-trigger hand never comes in contact with the trigger and does not actuate, function, or pull it. By maintaining constant forward pressure, a shooter **relies on the device** to capture and direct recoil energy for each subsequent round and **requires no further manipulation** of the trigger itself.

*Id*. at 66532 (emphasis added). As this analysis concludes, bump stocks satisfy the ordinary meanings of "automatically" and "single function of the trigger" because, stated most simply, a single pull while using a bump stock produces multiple rounds of fire.

In ATF's reasoned analysis of whether bump stocks allow "automatic" fire from a "single pull of the trigger," it was important to consider the intent of the shooter. Indeed, ATF concluded that even if the trigger technically loses contact with the shooter's finger, the shooter must intend to continue to pull on the trigger by maintaining constant exertion on the trigger, permitting the trigger's movements to be classified properly as a "single pull." *See id.* at 66533 (recognizing that a bump stock "automatically re-engages the trigger finger" and thus acts on its own to move the trigger after the shooter intentionally engages in a single pull). Bump stocks are therefore "self-acting" or "self-regulating" mechanisms, *id.*, consistent with the plain meaning of "automatic," because they allow the process of shooting,

12

consistent with the shooter's intent, to be automatic. Even though the shooter's finger is neither perfectly still nor in continuous contact with the trigger, the shooter must intentionally engage in constant forward and rearward pressure, resulting in an automatic process of repeat fire by a single pull of the trigger.

The meanings of the terms "automatically" and "single function of the trigger" ultimately make clear that bump stocks turn semi-automatic firearms into "machineguns." Bump stocks allow one intentional trigger pull by the shooter to discharge as many rounds of ammunition as a gun's magazine holds without any further effort. ATF therefore correctly examined the ordinary and plain meanings of the terms "automatically" and "single function of the trigger" to conclude that bump stocks fall within the definition of "machinegun."

## II.    The Final Rule is Neither Arbitrary Nor Capricious

As the district court noted, "all final agency actions must . . . survive review under the APA's arbitrary and capricious standard." JA041; *see also* 5 U.S.C. § 706. To pass APA muster, an agency decision must be substantively reasonable and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotations omitted). Agencies are also "free to change their existing policies as long as they provide a reasoned explanation for the change" and "show that there are good

13

reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) (quotations omitted).

ATF conducted an extensive and well-reasoned fact-finding process in considering the classification of bump stocks. The "impetus" of this investigation, as noted by the district court, was the tragic, October 1, 2017 massacre of over 50 people in Las Vegas—not political strong-arming. ATF also made clear that the reason for the Final Rule was "a desired outcome" of "increased public safety." 83 Fed. Reg. at 66515. The Final Rule reflects careful consideration and indeed, the best interpretation of the definition of "machinegun." It is far from arbitrary or capricious.

### A.    Political Involvement in Rulemaking Does Not Render the Final Rule Arbitrary and Capricious

Appellants and *amicus* Cato Institute claim that the Final Rule was politically compelled and thus arbitrary and capricious. That contention finds little support in the record. As the district court noted, President Trump directed the Attorney General to "propose for notice and comment" regulations that would ban bump stocks. 83 Fed. Reg. at 66516-17 (quoting Application of the Definition of Machinegun to 'Bump Fire' Stocks and Other Similar Devices, 83 Fed. Reg. 7949 (Feb. 20, 2018)). But there is no indication that the President compelled ATF's ***conclusion*** in the Final Rule or otherwise influenced ATF's analysis. A better

14

view—and the view the district court adopted—is that "[t]he Las Vegas attack served as the impetus for ATF's decision" to initiate the process the led ultimately to the Final Rule.  JA044; *see also* 83 Fed. Reg. at 66516; *id*. at 66520 (noting that "the NPRM stated that the Las Vegas tragedy made 'individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious'" (quoting 83 Fed. Reg. 13442, 13447 (Mar. 29, 2018)).  Simply put, the Final Rule is the result of sound reasoning against the tragic backdrop of innocent lives taken by a gunman using bump stocks.

ATF began its rulemaking process on December 26, 2017, less than two months after the Las Vegas massacre, intending to "determine whether bump-stock-type devices available on the market constitute machineguns under the statutory definition."  83 Fed. Reg. at 66516.  President Trump's directive was issued in February of the following year and concerned generally the same objective.  *Id*. at 66516-17.  That directive thus is more appropriately characterized as a continuation of ATF's already-begun rulemaking process, rather than the instigation of a new endeavor.  That the President asked the Attorney General to propose specific regulations merely highlights the Final Rule's priorities; it does not render it "a *fait accompli*," as Appellants and *amicus* Cato Institute suggest.

15

**B.    The Final Rule is reasonable and connected to the facts.**

By clarifying that bump stocks are "machineguns" under the relevant statutory framework, the Final Rule prohibits the possession of bump stocks in the United States.  This action is rationally connected to extensive evidence and comments grounded in concerns for public security—concerns that ATF clearly considered in formulating the Final Rule.  Indeed, the Rule's intent is "increased public safety," consistent with the NFA's purpose in banning machineguns.  83 Fed. Reg. at 66515.

**1.    Evidence of the public safety risks posed by bump stocks supports the Final Rule.**

Executive Order 12866 requires agencies engaged in rulemaking—including ATF—to "select those approaches that maximize net benefits . . . including . . . public health and safety[.]"[5]  ATF received over 36,000 comments in support of the proposed rule that expressed concern for public safety as the reason for their support.  83 Fed. Reg. at 66520.  Some commenters cited "saving lives (or specifically children's lives), reducing gun deaths and future mass shootings, or protecting law enforcement" as justification for restricting the possession of bump

---

[5] Exec. Order No. 12866 of Sept. 30, 1993, 58 Fed. Reg. 190 (Oct. 4, 1993): *see also* Cong. Res. Serv., *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process* (Dec. 9, 2014), https://fas.org/sgp/crs/misc/R41974.pdf.

stocks.  *Id*.  Others were more incredulous, "express[ing] disbelief as to how such devices were legal and that it seemed to be a 'no brainer,' especially after Las Vegas, to prevent anyone from possessing an item that allows the shooter to inflict mass carnage."  *Id*.

These public health and safety concerns sadly are both familiar and sobering.  Bump stocks featured prominently in the October 1, 2017 mass shooting in Las Vegas, the deadliest in modern U.S. history.[6]  It is no wonder that this stunning tragedy sparked the ATF to revisit its interpretation of "machinegun," especially as applied to bump stocks.  The Final Rule notes that that impetus remained central to ATF's analysis, "acknowledg[ing] that a bump-stock-type device combined with a semiautomatic firearm can empower a single individual to take many lives in a single incident," and that bump stock regulation must "reflect[] the public safety goals of [the NFA and GCA]."  83 Fed. Reg. at 66520.

### 2.    Evidence that bump stocks are cheap and accessible substitutes for automatic weapons supports the Final Rule.

The Final Rule reflects ATF's consideration of comments asserting that bump stocks pose a particularly serious risk to society because they are relatively

---

[6] Debbie Lord, et al., *Remembering the deadliest mass shooting in modern American history*, Atlanta Journal-Constitution (Feb. 14, 2018), https://www.ajc.com/news/national/remembering-the-deadliest-mass-shooting-modern-american-history/SPLRqIvmy904AKN0phFdyI/.

cheap and easy to purchase, *id*., and thus create a "loophole" allowing the

acquisition of affordable and passable alternatives to traditional automatic

weapons, *id*. at 66521.[7]  This concern goes to the very inception of modern bump

stocks, which were in some cases ***intended*** to be less expensive substitutes for

automatic weapons.  Jeremiah Cottle, the founder and president of now-defunct

Slide Fire Solutions and the inventor of the bump stock devices used in the Las

Vegas shooting, said in a 2011 interview that he was inspired by thrift:  "A friend

and I were out shooting one day . . . .  We couldn't afford what we wanted—a fully

automatic rifle—so I started to think about how I could make something that would

work and be affordable."[8]  Cottle's sales exceeded $10 million in his first year of

business.[9]  And it is no wonder—bump stocks, which generally cost around $200,[10]

---

[7] *Cf*. Scott Wong, *Top conservative calls for ban on device used by Vegas shooter*, The Hill (Oct. 4, 2017), https://thehill.com/homenews/house/353881-top-conservative-calls-for-ban-on-device-used-by-vegas-shooter (acknowledging a bump stock "converts a semi-automatic to something that behaves like an automatic").

[8] Donnie A. Lucas, *Firing Up Some Simple Solutions*, Albany News, at 7A (Dec. 22, 2011), https://texashistory.unt.edu/ark:/67531/metapth601130/m1/7/?q= albany%20news.

[9] *Id*.

[10] Polly Mosendz & Kim Bhasin, *Bump-Fire Stock Prices Double, Thanks to the NRA*, Bloomberg (Oct. 5, 2017), https://www.bloomberg.com/news/articles/2017-10-05/bump-fire-stock-prices-double-thanks-to-the-nra.

are inexpensive, accessible, and in some ways nearly identical substitutes for traditional automatic weapons, which, due to their legal scarcity, can cost up to $50,000.[11]  The Final Rule acknowledges comments asserting that bump stocks, by serving as workaround replacements for automatic weapons, violate the spirit of the NFA.  *See* 83 Fed. Reg. at 66521 (bump stocks meant to "circumvent the restrictions of the NFA and GCA"; the Final Rule "'enforces machinegun laws that date back many decades'" and "'will have the same dramatic benefit originally intended by those foundational laws'").

### 3.    Evidence that there is no need for private ownership of bump stocks supports the Final Rule.

The Final Rule incorporates consideration of over 25,000 comments stating that bump stocks "have no place in civil society and are unnecessary for ordinary persons to own."  *Id*. at 66520.  The comments also asserted that bump stocks serve "no legitimate purpose" and "are not useful" for hunting, recreation, or self defense, because the devices decrease accuracy.  *Id*.  One commenter said in a later interview, "[y]ou're not going to shoot a deer 50 times in two minutes."[12]  And in

---

[11] *See* Ed Leefeldt, *Stephen Paddock used a "bump stock" to make his guns even deadlier*, CBS News (Oct. 4, 2017), https://www.cbsnews.com/news/bump-fire-stock-ar-15-stephen-paddock-guns-deadlier/.

[12] Martin Kaste, *The Politics of Bump Stocks, 1 Year After the Las Vegas Shooting*, NPR (Sept. 26, 2018), https://www.npr.org/2018/09/26/650454299/the-politics-of-bump-stocks-one-year-after-las-vegas-shooting.

general, "recreational shooters consider the devices to be gimmicks—something that burns through a small fortune in ammunition while making the rifle jump around too much to aim properly."[13]

ATF also recognized comments highlighting the disturbing reality that it is rampage shooters, not recreational shooters, who find these devices useful, noting one submission that stated: "the 'only thing bump stocks are good for is creating a kill zone.'" 83 Fed. Reg. at 66520. This comment points to a danger that bump stocks share with large capacity magazines: their propensity to increase death tolls in mass shootings. For mass shootings where the capacity of the shooter's magazine was known, those that involved large capacity magazines resulted in twice as many fatalities and 14 times as many injuries per incident on average.[14] And as discussed above, bump stocks are intended to increase the firing rates of semiautomatic firearms; the deadliest mass shooting in modern U.S. history was carried out through the use of two bump stocks, which allowed the shooter to fire over 1,000 rounds in about 11 minutes.

---

[13] *Id*.

[14] Everytown for Gun Safety, Mass Shootings in the United States 18 (2018); *see also* Louis Klarevas, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS 215-25, 257 (2016) (analyzing data from gun massacres over five decades and finding the sharpest increase in casualties was driven by access to large capacity magazines that allow shooters to hit more targets without interruption).

This contention also echoes concerns courts expressed when they allowed states to criminalize possession of automatic weapons before the passage of FOPA in 1986—namely, that there are weapons that simply serve no legitimate purpose in the possession of private citizens.  In 1931, the Supreme Court of Michigan held that a law criminalizing possession of a machine gun did not violate the Michigan Constitution because they were of a class of weapons which,

> although they have a valid use for the protection of the state by organized and instructed soldiery in times of war or riot, are too dangerous to be kept in a settled community by individuals, and, in times of peace, find their use by bands of criminals and have legitimate employment only by guards and police.

*People v. Brown*, 235 N.W. 245, 246 (Mich. 1931).  And in 1972, the Supreme Court of Florida held that a statute criminalizing possession of machine guns[15] did not violate the Florida Constitution because they were the sorts of weapons "which, in times of peace, finds [their] use by a criminal," and "were not such weapons which . . . are proper and legitimate to be kept upon private premises for the protection of persons and property."  *Rinzler v. Carson*, 262 So.2d 661, 666 (Fla. 1972).

---

[15] The statute at issue also criminalized short-barreled rifles and short-barreled shotguns.  262 So.2d at 664.

### 4.    Evidence of the costs of mass shootings supports the Final Rule.

Although not explicitly considered in the Final Rule, the costs associated with mass shootings provide important context for the regulation of bump stocks in the United States.  Because the economic—and societal—impact of a shooting tends to grow in proportion to the number of victims, the use of a bump stock (which, for most shooters, enables a higher firing rate) can contribute significantly to increased costs.  Ted Miller, a researcher with Pacific Institute for Research and Evaluation who has studied the costs of shootings since the 1980s, estimated the total cost of the Las Vegas shooting at over $600 million.[16]  This estimate is over $200 million higher than the estimate of the cost of the 2016 shooting at the Pulse nightclub in Orlando, Florida, which is the second deadliest shooting in modern U.S. history, but in which bump stocks do not appear to have been used.  Mr. Miller called the Las Vegas estimate "beyond staggering."[17]

---

[16] *See* John Haltiwanger, *Las Vegas Shooting Recovery Will Cost at Least $600 Million*, Newsweek (Oct. 2, 2017), https://www.newsweek.com/las-vegas-mass-shooting-will-cost-least-600-million-675982.  Miller's estimates are conservative and account for death and injury due to flight from the scene, mental anguish, and other mass-shooting related factors.

[17] *Id.*

More generally, an estimated 10 million living American adults have been shot and injured.[18]  And every year, over 36,000 Americans are killed in acts of gun violence and approximately 100,000 more are shot and injured.[19]  From 2003 to 2013, the average hospital admission costs for a handgun injury were $19,175, compared to $32,237 per assault weapon injury.[20]  An individual's productivity loss during his or her recovery period is estimated at a comparable amount, an average of $28,478.[21]  And the lifetime costs of providing care following a gunshot injury are more than twice the costs of the acute care.

A study estimated the overall societal cost for *each* gun-related assault at $1.2 million.[22]  And looking in aggregate, a 1994 study in the Journal of the

---

[18] Everytown for Gun Safety, A Nation of Survivors: The Toll of Gun Violence in America 11 (2019).

[19] *Id*. at 4.

[20] Corrine Peek-Asa, et al., *Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the United States*, Injury Epidemiology (July 19, 2017), https://injepijournal.biomedcentral.com/track/pdf/10.1186/s40621-017-0120-0.

[21] Phaedra S. Corso, et al., *Medical costs and productivity losses due to interpersonal and self-directed violence in the United States*, 32 Am. J. Prev. Med. (Sixth Issue), at 474-82 (June 2007).

[22] Philip J. Cook & Jens Ludwig, *The benefits of reducing gun ownership: evidence from contingent-valuation survey data*, 22 J. Risk & Uncertainty (Third Issue), at 207-26 (May 2001).

American Medical Association put the lifetime costs of treating gunshot injuries incurred in a *single year* at $2.3 billion.[23]  Allowing widespread access to bump stocks, which dramatically increase the ability of shooters intent on harm to inflict mass carnage, would threaten to exacerbate all these costs.

## CONCLUSION

The ordinary and plain meaning of the terms "automatically" and "single function of the trigger" are sufficient to bring bump stocks within the statutory definition of "machinegun" under the GCA, NFA, and FOPA.  Moreover, ATF's Final Rule regulating bump stocks satisfies the rulemaking requirements of the APA.  Accordingly, the decision below should be affirmed.

---

[23] Philip J. Cook, et al., *The medical costs of gunshot injuries in the United States*, 282 J. Am. Med. Ass'n (Fifth Issue), at 447-54 (Aug. 1999).

Dated:  March 13, 2019

/s/ Ian Simmons
Ian Simmons
Matt Schock
Allison B. Smith
O'MELVENY & MYERS LLP
1625 Eye Street N.W.
Washington, DC 20006
(202) 383-5300
isimmons@omm.com

Anthony G. Beasley
O'MELVENY & MYERS LLP
400 S. Hope St., 18th Floor
Los Angeles, CA 90071
(213) 430-6000
tbeasley@omm.com

Counsel for *Amicus Curiae* Giffords
Law Center to Prevent Gun Violence

Respectfully submitted,

J. Adam Skaggs
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
225 W. 38th Street #90
New York, NY 10018
(917) 680-3473
askaggs@giffords.org

Hannah Shearer
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 443-2062
hshearer@giffords.org

Of Counsel for *Amicus Curiae* Giffords
Law Center to Prevent Gun Violence

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 5,339 words, excluding the parts exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 point font.

Dated:  March 13, 2019                    /s/ Ian Simmons
                                          Ian Simmons

## CERTIFICATE OF SERVICE

I hereby certify that, on March 13, 2019, a copy of the foregoing was electronically filed with the Court using the Court's CM/ECF system and I caused four true and correct copies to be delivered by hand to the Court.  Service on counsel was achieved using the CM/ECF system.


Dated:  March 13, 2019                    /s/ Ian Simmons_____
                                          Ian Simmons