**ORAL ARGUMENT SCHEDULED FOR MARCH 22, 2019**
**CONSOLIDATED CASE NOS. 19-5042, 19-5043, 19-5044**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAMIEN GUEDES, et al.,

Plaintiffs-Appellants,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al.

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLEES

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MATTHEW J. GLOVER
  *Counsel to the Assistant Attorney General*

SCOTT R. MCINTOSH
MICHAEL S. RAAB
ABBY C. WRIGHT
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 27(a)(4) and 28(a)(1), undersigned counsel hereby certifies as follows:

### A.     Parties and Amici

The defendants in district court in these consolidated appeals, and appellees here, are William Barr, in his official capacity; the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives; Thomas E. Brandon, in his official capacity; and the United States of America. The plaintiffs in district court, and appellants here, are Damien Guedes; Firearms Policy Coalition, Inc.; Firearms Policy Foundation; Madison Society Foundation, Inc.; Shane Roden; Florida Carry, Inc.; David Codrea, Owen Monroe, and Scott Heuman.

There were no amici in district court.  Amici or prospective amici in this Court are the Cato Institute; Citizens for Responsibility and Ethics in Washington, Virginia Canter, Don Fox, Marilyn Glenn, Karen Kucik, Richard Painter, Lawrence Reynolds, and Trip Rothschild; the Giffords Law Center to Prevent Gun Violence; the New Civil Liberties Alliance and W. Clark Aposhian; Morton Rosenberg; and law professors Erwin Chemerinsky, Alan B. Morrison, Victoria Nourse, Peter M. Shane, and Jed Shugerman.

### B.     Rulings Under Review

The rulings under review are an order and memorandum entered on February 25, 2019, by Judge Dabney L. Friedrich, in the U.S. District Court for the District of

Columbia, No. 1:18-cv-02988-DLF, Dkt Nos. 26 and 27.  The memorandum opinion

will be reported in the F. Supp. 3d, and is available on Westlaw at 2019 WL 922594.

## C.    Related Cases

The consolidated cases on review were not previously before this Court.  There

are no related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*s/ Brad Hinshelwood*
Brad Hinshelwood

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ..................................................................2

STATEMENT OF THE ISSUES........................................................................2

PERTINENT STATUTES AND REGULATIONS .........................................2

STATEMENT OF THE CASE............................................................................3

    A.    Regulatory Background...........................................................3

    B.    Appointments Clause and FVRA...............................................10

    C.    Procedural History....................................................................14

SUMMARY OF ARGUMENT..........................................................................18

STANDARD OF REVIEW ...............................................................................21

ARGUMENT .......................................................................................................21

I.    The Rule Adopts The Plain Meaning Of The Terms "Single Function of the Trigger" And "Automatically" And Correctly Concludes That Bump Stocks Meet The Definition Of "Machinegun".....................................................21

    A.    A "Single Function of the Trigger" Is a "Single Pull of the Trigger" for a Weapon Equipped With a Standard Trigger......................24

    B.    A Rifle Equipped With a Bump Stock Fires "Automatically" Because it Fires "As the Result of a Self-Acting or Self-Regulating Mechanism"..................................................................................32

    C.    Plaintiffs' Remaining Arguments Are Without Merit ...............................36

II.    The Rule Has Been Validly Promulgated By The Acting Attorney General And Validly Ratified By The Attorney General......................................40

A.   The FVRA Authorized the President to Designate Mr. Whitaker to Serve as Acting Attorney General ...........................................................41

1.   The FVRA's plain text applies to the Attorney General's vacancy........................................................................................41

2.   The President's authority under the FVRA is not displaced by 28 U.S.C. § 508. ...........................................................43

B.   The Canon of Constitutional Avoidance is Inapposite for Multiple Reasons ..................................................................................56

1.   The FVRA is not reasonably amenable to a narrowing construction that would avoid the constitutional question. ..........57

2.   The President's selection of Mr. Whitaker under the FVRA does not raise a substantial question under the Appointments Clause. ..............................................................58

C.   In Any Event, Attorney General Barr Has Validly Ratified the Rule ...............................................................................................69

1.   Attorney General Barr's ratification of the Rule cures any asserted defect in Acting Attorney General Whitaker's authority..............................................................................70

2.   Given Attorney General Barr's ratification of the Rule, this Court need not and should not address Acting Attorney General Whitaker's Authority to Issue the Rule. ...........................74

CONCLUSION ........................................................................... 77

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

iv

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Advanced Disposal Servs. E., Inc. v. NLRB,*
  820 F.3d 592 (3d Cir. 2016) ................................................................70

*Akins v. United States,*
  312 F. App'x 197 (11th Cir. 2009) ...........................................6, 28, 29

*Alden v. Maine,*
  527 U.S. 706 (1999) .................................................................... 60, 66

*American Library Ass'n v. Barr,*
  956 F.2d 1178 (D.C. Cir. 1992) ........................................................39

*Calder v. Bull,*
  3 U.S. 386 (1798) .............................................................................39

*Callanan v. United States,*
  364 U.S. 587 (1961) .........................................................................38

*CFPB v. Gordon,*
  819 F.3d 1179 (9th Cir. 2016) .................................................... 70, 72

*Chevron v. Natural Res. Def. Council,*
  467 U.S. 837 (1984) .................................................................... 15, 36

*City of Las Vegas v. Lujan,*
  891 F.2d 927 (D.C. Cir. 1989) .........................................................21

*Clark v. Martinez,*
  543 U.S. 371 (2005) .........................................................................58

*Cohen v. Board of Trs. of Univ. of Dist. of Columbia,*
  819 F.3d 476 (D.C. Cir. 2016) .........................................................74

*Doolin Sec. Sav. Bank, FSB v. Office of Thrift Supervision,*
  139 F.3d 203 (D.C. Cir. 1998) ...........................70, 71, 72, 74, 75

*Edmond v. United States,*
  520 U.S. 651 (1997) .........................................................................64

*English v. Trump,*
    279 F. Supp. 3d 307 (D.D.C. 2018) ................................................47

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) .........................................................................57

*FEC v. Legi-Tech,*
    75 F.3d 704 (D.C. Cir 1996) .....................................................70, 72

*FEC v. NRA Political Victory Fund,*
    513 U.S. 88 (1994) ......................................................................71, 72

*Free Enterprise Fund v. PCACB,*
    561 U.S. 477 (2010) .........................................................................66

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) .........................................................................76

*Hollis v. Lynch,*
    827 F.3d 436 (5th Cir. 2016) ..........................................................31

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) ............................................................40

*Hooks v. Kitsap Tenant Support Servs.,*
    816 F.3d 550 (9th Cir. 2016) ..........................................................47

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    796 F.3d 111 (D.C. Cir. 2015) ..............................................70, 72, 75

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) .......................................................................57

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) ..........................................................31

*Landry v. FDIC,*
    204 F.3d 1125 (D.C.Cir. 2000) ......................................................75

*Lucia v. SEC,*
    138 S. Ct. 2044 (2018) ...............................................................10, 65

*Maracich v. Spears,*
    570 U.S. 48 (2013) ......................................................................37, 38

*Morrison v. Olson*,
    487 U.S. 654 (1988) ........................................................................64

*National Mining Ass'n v. Mine Safety & Health Admin.*,
    116 F.3d 520 (D.C. Cir. 1997) .......................................................40

*New York v. EPA*,
    443 F.3d 880 (D.C. Cir. 2006) .......................................................34

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) ..........................................................41, 60, 67

*Pharmachemie B.V. v. Barr Labs., Inc.*,
    276 F.3d 627 (D.C. Cir. 2002) .......................................................76

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) .......................................................37

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) ........................................................................57

*Reno v. Flores*,
    507 U.S. 292 (1993) ........................................................................59

*Rivers v. Roadway Express*,
    511 U.S. 298 (1994) ........................................................................39

*Stand Up for California! v. U.S. Dep't of Interior*,
    879 F.3d 1177 (D.C. Cir. 2018) .....................................................59

*Staples v. United States*,
    511 U.S. 600 (1994) ..................................................................27, 31

*State Nat'l Bank of Big Spring v. Lew*,
    197 F. Supp. 3d 177 (D.D.C. 2016) ..............................................73

*United States v. Camp*,
    343 F.3d 743 (5th Cir. 2003) .........................................................27

*United States v. Carter*,
    465 F.3d 658 (6th Cir. 2006) .........................................................24

*United States v. Eaton*,
    169 U.S. 331 (1898) ..............................................62, 63, 64, 66, 68

*United States v. Evans,*
 978 F.2d 1112 (9th Cir. 1992) ..................................................................24, 25, 30

*United States v. Fleischli,*
 305 F.3d 643 (7th Cir. 2002) ..................................................................... 25, 30

*United States v. Germaine,*
 99 U.S. 508 (1879) ...............................................................................................65

*United States v. Jokel,*
 969 F.2d 132 (5th Cir. 1992) ...........................................................................24

*United States v. Lucido,*
 373 F. Supp. 1142 (E.D. Mich. 1974)..............................................................51

*United States v. Oakes,*
 564 F.2d 384 (10th Cir. 1977) ...........................................................................27

*United States v. Olofson,*
 563 F.3d 652 (7th Cir. 2009) ................................................... 15, 24, 33, 34

*Weiss v. United States,*
 510 U.S. 163 (1994) ...............................................................................................67

*Wilkes-Barre Hosp. Co. v. NLRB,*
 857 F.3d 364 (D.C. Cir. 2017) ................................................................... 70, 72

*Zevallos v. Obama,*
 793 F.3d 106 (D.C. Cir. 2015) ...........................................................................38

## Constitution and Statutes:

U.S. Const. art. II, § 2, cl. 2 (Appointments Clause)............................10, 64, 67

Act of May 8, 1792, 1 Stat. 279 ..................................................................... 10, 65

Act of Feb.. 13, 1795, 1 Stat. 415..................................................................... 10, 65

Federal Vacancies Reform Act, 5 U.S.C. §§ 3345–3349d ................................. 1, 12

Firearm Owners' Protection Act, Pub. L. No. 99-308,
 100 Stat. 449 ........................................................................................................4

Gun Control Act of 1968, Pub. L. No. 90-618,
  82 Stat. 1213 ...........................................................................................3

National Firearms Act of 1934, 26 U.S.C. ch. 53 .................................3
  26 U.S.C. § 5841(c) ................................................................................3
  26 U.S.C. § 5845(b) ...........................................3, 5, 7, 21, 23, 25, 27, 29, 33

Presidential Transitions Effectiveness Act,
  Pub. L. No. 100-398, 102 Stat. 985 (1988) ..................................11

Public Safety and Recreational Firearm Use Protection Act,
  18 U.S.C. § 921(a)(30) ...........................................................................5

Rev. Stat. § 179 (1874) ...........................................................................11

Rev. Stat. § 347 (1874) ...........................................................................11

Vacancies Act of 1868, 15 Stat. 168 .........................................11, 13, 51

5 U.S.C. § 101 ...........................................................................................41

5 U.S.C. § 105 ...........................................................................................41

5 U.S.C. § 3345 ...............................................................................13, 42, 50

5 U.S.C. § 3345(a) ..................................................................................12, 41

5 U.S.C. § 3345(a)(1) ...........................................................................12, 53, 54

5 U.S.C. § 3345(a)(2) ............................................................................12, 48

5 U.S.C. § 3345(a)(2)-(3) ........................................................................67

5 U.S.C. § 3345(a)(3) .................................................12, 41, 48, 58, 68

5 U.S.C. § 3345(b) ....................................................................................54

5 U.S.C. § 3345(b)(1) ...............................................................................41

5 U.S.C. § 3346 ..................................................................................13, 53

5 U.S.C. § 3347 (1994) ...................................................................13, 42, 51

5 U.S.C. § 3347 ...............................................................................45, 50, 51

5 U.S.C. § 3347(a) ................................................13, 16, 45, 44, 48, 49, 50, 52

5 U.S.C. § 3347(a)(1) ................................................................................55

5 U.S.C. § 3347(a)(1)-(2) ...........................................................................13

5 U.S.C. § 3347(a)(1)(A) ....................................................................... 49, 50

5 U.S.C. § 3347(a)(1)(B) .................................................. 13, 45, 49, 50

5 U.S.C. § 3347(a)(2) ................................................................................50

5 U.S.C. § 3347(a)(2)(A)-(B) ......................................................................55

5 U.S.C. § 3348 (1994) ..............................................................................51

5 U.S.C. § 3348 ........................................................................................74

5 U.S.C. § 3348(a)(2)(A)-(B) ......................................................................73

5 U.S.C. § 3348(b) ....................................................................................42

5 U.S.C. § 3348(b)(2) .................................................................................12

5 U.S.C. § 3348(d)(1)-(2) ...........................................................................73

5 U.S.C. § 3348(e) ............................................................................. 42, 45

5 U.S.C. § 3349(c) ............................................................................. 42, 45

10 U.S.C. § 8017 ......................................................................................52

18 U.S.C. § 921(a)(23) ................................................................................4

18 U.S.C. § 922(o) ............................................................................. 4, 21

18 U.S.C. § 926 ........................................................................................73

18 U.S.C. § 926(a) ............................................................................. 4, 71

22 U.S.C. § 2651a(a) .................................................................................43

22 U.S.C. § 2778 ......................................................................................73

26 U.S.C. § 7801(a)(2) ....................................................................... 4, 73

26 U.S.C. § 7801(a)(2)(A) ....................................................................... 4, 72

26 U.S.C. § 7805(a) ..................................................................................... 4

28 U.S.C. § 508 (Attorney General Act) .......................... 11, 13, 40, 42, 43, 44, 45, 46, 47
49, 51, 52, 53, 54
    28 U.S.C. § 508(a) ...................................................... 11, 13, 43, 53
    28 U.S.C. § 508(b) ............................................................ 12, 44, 47

28 U.S.C. § 510 ........................................................................................... 73

28 U.S.C. § 1292(a)(1) ................................................................................. 2

28 U.S.C. § 1331 ......................................................................................... 2

29 U.S.C. § 552 ........................................................................................... 43

40 U.S.C. § 302 ........................................................................................... 52

## Regulations:

27 C.F.R. § 447.11 ....................................................................................... 8

27 C.F.R. § 478.11 ....................................................................................... 8

27 C.F.R. § 479.11 ....................................................................................... 8

## Legislative Materials:

H.R. 9741, 73d Cong. (1934) ..................................................................... 26

H.R. Rep. No. 73-1780 (1934) ............................................................... 23, 26

H.R. Rep. No. 90-1956 (1968) (Conf. Rep.) ............................................... 3

H.R. Rep. No. 99-495 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327 ................... 4

S. Rep. No. 73-1444 (1934) ........................................................................ 26

S. Rep. No. 105-250 (1998) ................................................................. 13, 46, 55

## Other Authorities:

*Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 Fed. Reg. 60,929 (Dec. 26, 2017) .........................................7

*Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208 (2007).................................................................................47

*Bump-Stock-Type Devices*, 83 Fed. Reg. 13,442 (Mar. 29, 2018) ...................................................................8

*Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018)........................................ 1, 4, 5, 6, 7, 8, 9, 15, 18, 21, 22, 24, 25, 28, 29, 30, 32, 33, 35, 36, 37, 39, 40

*Bump-Stock-Type Devices* (Mar. 11, 2019), https://go.usa.gov/xEsRD (to be published in the Federal Register Mar. 14, 2019)....................................14, 69, 70

*Definition of Machinegun*, 83 Fed. Reg. 7949 (Feb. 20, 2018) .................................................7

*Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121 (2003)...............................................................................68

*DOJ Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018), https://go.usa.gov/xEDrx (last visited March 12, 2019) ...................................8

Exec. Order No. 13,637, 78 Fed. Reg. 16,129 (Mar. 8, 2013) ......................73

1 Op. Att'y Gen. 65 (1796) ..........................................................................66

7 Op. Att'y Gen. 186 (1855) .......................................................................66

1 *Oxford English Dictionary* (1933) .....................................................32, 35

Restatement (Second) of Agency (1958)......................................................72

Restatement (Third) of Agency (2006).........................................................72

Lucy M. Salmon, *History of the Appointing Power of the President* (1886) ............................66

*Webster's New International Dictionary* (2d ed. 1934) .........................32, 35

# GLOSSARY

| | |
|---|---|
| Addendum | Add. |
| Bureau of Alcohol, Tobacco, Firearms and Explosives | ATF |
| Department of Justice | DOJ |
| Federal Vacancies Reform Act | FVRA |
| Joint Appendix | JA |

## INTRODUCTION

In 2017, a gunman killed 58 people and wounded 500 more using legally obtained semiautomatic rifles he turned into automatic weapons with commercially available devices known as bump stocks.  Although the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) had long interpreted the National Firearms Act to ban a subset of such devices as "machineguns," ATF had provided approval for certain bump stocks to be sold to the public.  In the wake of that shooting, ATF revisited its prior interpretations of the "machinegun" definition, and determined that it had been erroneously interpreting the term "automatically."  In order to provide the public with notice of its new interpretation and to provide guidance on how to proceed for individuals currently possessing bump stocks, the agency engaged in a rulemaking that culminated in the challenged rule, *Bump-Stock Type Devices*, 83 Fed. Reg. 66,514 (Dec. 26, 2018) (Rule).

Plaintiffs put forth a variety of arguments to support a preliminary injunction against the Rule, but as the district court correctly held, none succeed.  Plaintiffs contend that the agency's interpretation conflicts with the statutory text, but in so doing they ignore the statute's plain meaning, its legislative history, and long-standing interpretations of its terms.  Plaintiffs fare no better in challenging the authority of then-Acting Attorney General Whitaker to promulgate the Rule.  The President's designation of Mr. Whitaker to serve as Acting Attorney General was expressly authorized by the Federal Vacancies Reform Act (FVRA), and was not foreclosed by

the Attorney General succession statute.  The designation also was consistent with the Appointments Clause's text and history as reflected in the established precedent of all three branches of government—and as confirmed by plaintiffs' abandonment on appeal of their primary constitutional objection below.  Moreover, the rule has now been formally ratified by Attorney General Barr, thereby validating the rule regardless of whether the Acting Attorney General had authority to promulgate it.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction over their federal statutory and constitutional claims under 28 U.S.C. § 1331.  The district court denied motions for a preliminary injunction on February 25, 2019.  JA 16-17.  Plaintiffs filed notices of appeal the same day.  JA 7, 15.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1) Whether the Rule sets forth the correct reading of the definition of "machinegun" in the National Firearms Act and whether the Rule is otherwise lawful;

2) Whether the Rule was validly promulgated by Acting Attorney General Whitaker or validly ratified by Attorney General Barr.

## PERTINENT STATUTES AND REGULATIONS

Relevant excerpts from the pertinent statutes are reproduced in the addendum to this brief.

2

# STATEMENT OF THE CASE

## A.    Regulatory Background

**1.** Over the last century, Congress has imposed increasingly strict regulations on the manufacture, sale, and possession of machine guns. The National Firearms Act of 1934, 26 U.S.C. Chapter 53, the first major federal statute to regulate guns, imposed various requirements on persons possessing or engaged in the business of selling particular "firearms" (including machine guns), such as requiring that each maker of a regulated firearm shall "obtain authorization" before manufacture. 26 U.S.C. § 5841(c).

The National Firearms Act defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Since 1968, the statute has also applied to parts that can be used to convert a weapon into a "machinegun." *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1231; H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.) (noting that the bill expands the definition of "machinegun"). The definition thus includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).

3

In 1986, Congress again turned its attention to the dangers posed by machine guns and largely banned such firearms as part of the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449; *see also* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun restrictions as "benefits for law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns"); *id.* at 4, 1986 U.S.C.C.A.N. at 1330 (describing machine guns as "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime"). Under 18 U.S.C. § 922(o) it is "unlawful for any person to transfer or possess a machinegun" unless a governmental entity is involved in the transfer or possession. This prohibition does not apply, however, to machine guns that were lawfully possessed at the time Congress enacted the ban. *Id.* Congress continued to rely on the definition of "machinegun" found in the National Firearms Act. *See id.* § 921(a)(23).

The Attorney General has authority to prescribe rules and regulations to enforce the National Firearms Act and subsequent legislation. 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a); *see id.* § 7801(a)(2)(A).

**2.** Since Congress enacted the Firearm Owners Protection Act, the value of machine guns that were grandfathered under the statute has steadily increased. 83 Fed. Reg. at 66,515. The resulting spike in prices "has spurred inventors and manufacturers to develop firearms, triggers, and other devices that permit shooters to

use semiautomatic rifles to replicate automatic fire without converting these rifles into 'machineguns.'" *Id.* at 66,515-16.  ATF has seen "a significant increase" in requests for classification of such devices since the 2004 expiration of the Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. § 921(a)(30), commonly known as the federal assault weapons ban.  83 Fed. Reg. at 66,516.

This litigation involves "bump-stock-type" devices—which "[s]hooters use . . . with semiautomatic firearms to accelerate the firearm's cyclic firing rate to mimic automatic fire," 83 Fed. Reg. 66,516—and ATF's interpretation of the terms "automatically" and "single function of the trigger" as used in the definition of "machinegun," 26 U.S.C. § 5845(b).  ATF first encountered this type of device in 2002, when it received a classification request for the "Akins Accelerator."  83 Fed. Reg. at 66,517.  The Akins Accelerator, which attached to a standard semiautomatic rifle, used a spring to harness the recoil energy of each shot, causing "the firearm to cycle back and forth, impacting the trigger finger" repeatedly after the first pull of the trigger.  *Id.*  Thus, by pulling the trigger once, the shooter "initiated an automatic firing sequence" that was advertised as firing "approximately 650 rounds per minute." *Id.*  ATF initially determined that the Akins Accelerator was not a machine gun because it "interpreted the statutory term 'single function of the trigger' to refer to a single movement of the trigger.'"  *Id.*

In 2006, ATF revisited this determination, concluding that "the best interpretation of the phrase 'single function of the trigger' includes a 'single pull of the

trigger.'" 83 Fed. Reg. 66,517. Because the Akins Accelerator created "a weapon that '[with] a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted,'" ATF reclassified the device as a machine gun under the statute. *Id.* (quoting *Akins v. United States*, No. 8:08-cv-988, slip op. at 5 (M.D. Fla. Sept. 23, 2008)). Expecting further classification requests for devices designed to increase the firing rate of semiautomatic weapons, ATF also published a public ruling announcing its interpretation of "single function of the trigger," reviewing the National Firearms Act and its legislative history to explain that the term was best understood as "single pull of the trigger." Add. 2-4.

The inventor of the Akins Accelerator challenged ATF's determination in court, but the Eleventh Circuit affirmed, holding that interpreting "single function of the trigger" as "'single pull of the trigger' is consonant with the statute and its legislative history." *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam).

When it reclassified the Akins Accelerator, ATF advised that "removal and disposal of the internal spring . . . would render the device a non-machinegun under the statutory definition," because the device would no longer operate "automatically." 83 Fed. Reg. 66,517. ATF soon received classification requests for other bump-stock-type devices that did not include internal springs. In a series of classification decisions between 2008 and 2017, ATF concluded that such devices were not machine guns

6

based on an erroneous belief that in the absence of internal springs or similar mechanical parts that would channel recoil energy, the bump stocks did not enable a gun to fire "automatically." *See id.*

**3.**  In 2017, a shooter armed with semiautomatic weapons and bump stock devices killed 58 people and wounded 500 more in Las Vegas.  83 Fed. Reg. at 66,516. "The call for action in the wake of the 2017 mass shooting in Las Vegas, Nevada was immediate and widespread."  JA 25.  At the urging of members of Congress and other non-governmental organizations, the Department of Justice (DOJ) decided to revisit its prior analysis of the terms used to define "machinegun" in 26 U.S.C. § 5845(b).  As an initial step, DOJ published an advance notice of proposed rulemaking in the Federal Register.  *Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 Fed. Reg. 60,929 (Dec. 26, 2017).  Public comment on the advance notice concluded on January 25, 2018.  *Id.* at 60,929.

On February 20, 2018, the President issued a memorandum concerning bump stocks to then-Attorney General Jefferson B. Sessions III.  *See Definition of Machinegun*, 83 Fed. Reg. 7949 (Feb. 20, 2018).  The memorandum instructed the Department of Justice, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the advanced notice], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  *Id.*

7

On March 29, 2018, DOJ published a notice of proposed rulemaking, proposing changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 that would interpret the meaning of the terms "single function of the trigger" and "automatically." *See Bump-Stock-Type Devices*, 83 Fed. Reg. 13,442 (Mar. 29, 2018). Between the publication of the notice and the closing date for comments, June 27, 2018, DOJ received over 186,000 comments. *See* 83 Fed. Reg. 66,519. On December 18, 2018, then-Acting Attorney General Whitaker promulgated the Rule, which was published in the Federal Register on December 26, 2018. *DOJ Announces Bump-Stock-Type Devices Final Rule* (Dec. 18, 2018).[1]

The Rule sets forth DOJ's interpretations of the terms "single function of the trigger" and "automatically," clarifies for members of the public that bump stocks are machine guns, and overrules ATF's prior, erroneous classification decisions treating certain bump stocks as unregulated firearms parts. *See* 83 Fed. Reg. at 66,514, 66,516, 66,531. The Rule further instructs "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office" by the Rule's effective date. *Id.* at 66,549. Current owners of bump stocks therefore have until March 26, 2019 to comply with the Rule in order to "avoid criminal liability." *Id.* at 66,530.

---

[1] https://go.usa.gov/xEDrx (last visited March 12, 2019)

The Rule reaffirms DOJ's interpretation of the phrase "single function of the trigger" to mean a "single pull of the trigger" and clarifies that the term also includes "analogous motions." 83 Fed. Reg. at 66,515. In addition, the Rule clarifies that the term "automatically," in the context of the statutory definition of machine gun, means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger." *Id.* at 66,554. The Rule explains that these definitions "represent the best interpretation of the statute." *Id.* at 66,521.

Relying on these definitions, the agency concluded in the Rule that "[t]he term 'machine gun' includes a [bump stock]." 83 Fed. Reg. at 66,553. This is because, the agency explained, bump stocks enable a user to engage in a firing sequence that is "automatic," *id.* at 66,531; specifically, the agency observed that as long as the user's trigger finger remains stationary on the ledge provided by the design of the device; the user maintains constant rearward pressure on the trigger; and the user engages in constant forward pressure with the non-trigger hand on the rifle, the firearm's recoil energy is harnessed in a continuous back-and-forth cycle. *Id.* at 66,532. In this way, a bump stock constitutes a "self-regulating" or "self-acting" mechanism that allows the shooter to attain continuous firing after a single pull of the trigger, and is therefore a machine gun. *Id.*; *see also id.* at 66,514, 66,516.

9

### B.     Appointments Clause and FVRA

**1.** The Appointments Clause of Article II prescribes the method of appointment for all "Officers of the United States" whose appointments are not otherwise provided for in the Constitution. U.S. Const. art. II, § 2, cl. 2. "Officers" are those persons who hold a "continuing and permanent" federal position and exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). Principal officers, such as the Attorney General, are nominated by the President and appointed with the advice and consent of the Senate. Congress may vest the power to select inferior officers "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Neither the Appointments Clause nor any other provision of the Constitution expressly addresses whether and in what circumstances an individual may serve in an acting capacity for a principal officer.

**2.** Since 1792, Congress has provided for the designation of individuals to serve temporarily as acting principal officers in the event of vacancies. *See, e.g.*, 1 Stat. 279, 281 (1792) (authorizing "any person or persons" to fill certain vacancies in the Departments of State, Treasury, and War, including vacancies in the position of Secretary); 1 Stat. 415, 415 (1795) (extending the 1792 Act to all vacancies in the covered offices, but limiting tenure to six months). In the Vacancies Act of 1868, Congress provided as a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . .

10

perform the duties of such head," but it also authorized the President to bypass the

"first assistant" default rule and designate a different Senate-confirmed official.  15

Stat. 168, 168 (1868).  The Vacancies Act further imposed a time limit on acting

service, and it repealed all prior vacancies legislation.  *See id.*  After the Department of

Justice was established in 1870, the President's authority to bypass the Vacancies Act's

default rule was expressly made inapplicable to "the death, resignation, absence, or

sickness of the Attorney General."  *See* Rev. Stat. § 179 (1874).  Between 1868 and

1988, Congress amended the Vacancies Act to extend the time limits for permissible

acting service and include the vast majority of executive offices within its scope of

coverage.  *See, e.g.*, Presidential Transitions Effectiveness Act, Pub. L. No. 100-398,

§ 7(b), 102 Stat. 985, 988 (1988).

In addition to the Vacancies Act, Congress also enacted numerous office-

specific vacancy statutes.  The legislation establishing the Department of Justice

initially provided that the Solicitor General would exercise the duties of the Attorney

General in the event of a vacancy.  See Rev. Stat. § 347 (1874).  The current version of

the Attorney General succession statute (which was also in place when Congress

enacted the Federal Vacancies Reform Act in 1998) is 28 U.S.C. § 508 ("AG Act").

Section 508(a) provides that in the case of a vacancy in the office of Attorney

General, "the Deputy Attorney General may exercise all the duties of that office, and

for the purpose of section 3345 of title 5 [then the Vacancies Act and now the FVRA]

the Deputy Attorney General is the first assistant to the Attorney General."  Section

11

508(b) further provides that, if the offices of Attorney General and Deputy Attorney General are both vacant, "the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General."

In 1998, Congress enacted the FVRA, 5 U.S.C. §§ 3345–3349d, to replace the Vacancies Act and provide comprehensive procedures for the President to designate an acting official to perform the duties of an executive officer whose appointment is subject to Senate confirmation whenever the incumbent "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). The FVRA provides three options. First, absent any other presidential designation, the "first assistant" to the vacant office shall perform its functions and duties. *Id.* § 3345(a)(1). Second, the President may depart from that default course by designating another Senate-confirmed presidential appointee to perform the vacant office's functions and duties. *Id.* § 3345(a)(2). And third, the President may designate an officer or employee within the same agency to perform the vacant office's functions and duties, provided that he or she has been in the agency for at least 90 days in the 365 days preceding the vacancy, in a position for which the rate of pay is equal to or greater than the minimum rate for GS-15 of the General Schedule. *Id.* § 3345(a)(3). The second and third options are available even where the vacant office is the agency head. *See id.* § 3348(b)(2) (recognizing that the FVRA generally applies to

12

agency heads).  An acting official designated under the FVRA can generally serve no longer than 210 days, subject to certain extensions depending on the Senate calendar and the status of nominations to fill the position.  *See id.* § 3346.

The FVRA also contains a list of specific offices to which it does not apply.  5 U.S.C. § 3349c.  The office of Attorney General is not one of those offices.  To the contrary, in enacting the FVRA, Congress eliminated the previous exclusion for the office of Attorney General in the Vacancies Act, *see* 5 U.S.C. § 3347 (1994), while retaining section 508's preexisting "first assistant" designation for purposes of section 3345, *see* 28 U.S.C. § 508(a).

The FVRA provides that its provisions for filling vacancies are generally the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office [requiring Senate confirmation] of an Executive agency," unless specified statutory exceptions apply.  5 U.S.C. § 3347(a).  The exceptions to this exclusivity rule appear in § 3347(a)(1)-(2).  One of the exceptions is for office-specific vacancy statutes, such as section 508.  *Id.* § 3347(a)(1)(B).  Consistent with the fact that such office-specific vacancy statutes render the FVRA non-exclusive rather than non-applicable, the FVRA's legislative history confirms that the FVRA "continue[s] to provide an alternative procedure for temporarily occupying the office" when an office-specific vacancy statute is applicable.  S. Rep. No. 105-250, at 15, 17 (1998).

**3.**  On November 7, 2018, Attorney General Jefferson B. Sessions resigned.  JA

29.  The President, relying on his authority under the FVRA, then expressly

designated Matthew Whitaker, the Attorney General's Chief of Staff, to perform the

functions and duties of the Office of Attorney General.  *Id.*  Whitaker served as

Acting Attorney General until William Barr was appointed, with the Senate's consent,

as Attorney General on February 15, 2019.  JA 29-30.  On March 11, 2019, Attorney

General Barr ratified the Rule.  *See Bump-Stock-Type Devices* (Mar. 11, 2019),

https://go.usa.gov/xEsRD (to be published in the Federal Register Mar. 14, 2019).

### C.    Procedural History

**1.**  Three sets of plaintiffs filed suit challenging the Rule on multiple grounds.

*See* JA 21-23. Specifically, plaintiffs challenged the rule under the Administrative

Procedure Act (APA) as contrary to law and arbitrary and capricious.  JA 21.

Plaintiffs also argued that the Rule was invalid because it was promulgated by Acting

Attorney General Whitaker.  JA 21-22.  All plaintiffs sought preliminary injunctive

relief.

**2.**  On February 25, 2019, the district court denied plaintiffs' request for a

preliminary injunction.

**a.**  The district court rejected plaintiffs' APA challenges to the Rule, explaining

that defendants were likely to prevail on the merits.  JA 33.

The district court first held that the Rule's interpretations of "single function of

the trigger" and "automatically" were reasonable, applying the two-step framework of

*Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984). JA 36-41. The court observed that although the term was ambiguous, DOJ "acted reasonably in defining the phrase 'single function of the trigger' to mean a 'single pull of the trigger and analogous motions'" in light of "contemporaneous dictionary definitions and court decisions." JA 38 (quoting 83 Fed. Reg. at 66,553). The court also concluded that DOJ "correctly defined 'automatically' to mean 'functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger'" based on "contemporaneous dictionary definitions" and *United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009). JA 38-39.

The court further concluded that DOJ's determination that bump stocks met the statutory and regulatory definition of "machine gun" was not arbitrary and capricious. JA 39-42. The court observed that "a bump stock operates with a single 'pull' of the trigger because a bump stock permits the shooter to discharge multiple rounds by, among other things, 'maintaining the trigger finger on the device's extension ledge with constant rearward pressure.'" JA 40 (quoting 83 Fed. Reg. at 66,532). The court also recognized that "it was reasonable for ATF to determine that a bump stock relieves a shooter of enough of the otherwise necessary manual inputs to warrant the 'automatic' label," because a bump stock "controls the distance the firearm recoils and ensures that the firearm moves linearly—two tasks the shooter would normally have to perform manually." JA 40-41.

15

The district court also held that the agency adequately responded to comments regarding the breadth of the Rule, noting that DOJ explained in the rule that bump firing using a rubber band or belt loop does not involve automatic fire because "no device is present to capture and direct the recoil energy; rather, the shooter must do so." JA 45-46 (quoting 83 Fed. Reg. at 66,533).

**b.** The district court next rejected plaintiffs' claims that the President's designation of Acting Attorney General Whitaker violated the FVRA, the AG Act, and the Appointments Clause.

First, the court concluded that the appointment did not violate the FVRA or the AG Act. JA 52. The court noted that "[t]he parties do not dispute that Whitaker satisfied the eligibility criteria in the FVRA and that both the FVRA and the AG Act apply." JA 51. The court explained that the central question was whether the AG Act "displaces the FVRA unless and until the line of succession set forth in the AG Act has been exhausted." JA 52.

Beginning "as it must, with the text of the FVRA," the district court explained that "the plain language of the FVRA, and its exclusivity provision in particular, substantially undercuts the [plaintiffs'] exhaustion theory." JA 52. By providing that the FVRA is the "exclusive means" of temporarily filling a vacancy "unless" an agency-specific statute designates a successor, § 3347(a) does not render the FVRA unavailable when such a statute applies, but instead merely renders it not "exclusive." *Id.*; *see also id.* at 57-61 (further refuting plaintiffs' arguments based on text, legislative

16

history, and policy). By contrast, Congress expressly excluded certain offices from the reach of the FVRA, but did not do so with respect to the Office of the Attorney General, *id.* at 54, and, indeed, Congress in the FVRA eliminated the Vacancy Act's exclusion of the Office of the Attorney General, JA 55.

Second, the district court rejected plaintiffs' argument that the designation of Whitaker to temporarily serve as Acting Attorney General violated the Appointments Clause. JA 63-80. The court noted that "the Supreme Court has repeatedly embraced the government's view that it is the temporary nature of acting duties," rather than factors such as supervision and exigency, "that permits an individual to perform them without becoming a principal officer under the Appointments Clause." JA 64.

The court refuted plaintiffs' argument that the only individuals who may temporarily serve as an acting principal officer are another Senate-confirmed officer or a non-Senate-confirmed first assistant whose job responsibilities include stepping in for their supervisors in cases of vacancies. The court explained that plaintiffs' position was inconsistent with Supreme Court precedent and longstanding legislative and executive practice. JA 64-74. And the court also rejected plaintiffs' alternative claim that Presidents may not select an employee, as opposed to an officer, to serve as an acting principal officer. JA 78-81. The court held that, "[a]ssuming without deciding that Whitaker was an employee before his designation and that an employee's service as Acting Attorney General first requires an appointment [as an

17

officer], the FVRA authorized such an appointment and the President carried it out." JA 79.

## SUMMARY OF ARGUMENT

The district court correctly denied plaintiffs' request to preliminarily enjoin a rule explaining DOJ's interpretation that the definition of "machinegun" in the National Firearms Act includes bump stocks. Plaintiffs have demonstrated no likelihood of success on the merits.

Plaintiffs first challenge the agency's interpretation of "single function of the trigger." But the agency's longstanding interpretation of that term as a "single pull of the trigger" for firearms with a standard pull trigger is the best reading in light of the plain text of the statute, the legislative history surrounding its enactment, and the decisions of courts interpreting the National Firearms Act. In contrast to the agency's interpretation, plaintiffs' interpretation is underinclusive, fixating on the mechanics of a trigger function that is not found in every machine gun at the time of the statute or now. Recognizing the wide variety of machine guns, the Congress that enacted the National Firearms Act used the broader term "function" of the trigger in order to capture the pull of a trigger for the most common triggers and to include differing functions.

The agency's interpretation of "automatically" also represents the best reading of the statute. A bump stock allows the user to automatically—meaning by "a self-acting or self-regulating mechanism,'" 83 Fed. Reg. at 66,519—fire multiple shots

with one pull of a trigger.  Plaintiffs' contrary reading of the term "automatically"
collapses entirely into their understanding of "single function of the trigger," thereby
reading the term out of the statutory definition.  And equally meritless is plaintiffs'
contention that "automatically" means that a user is not permitted to engage in any
activities as part of the automatic process.  As the district court correctly recognized,
this flies in the face of the ordinary definition of "automatically."

Plaintiffs' additional arguments similarly miss the mark.  Plaintiffs' objection to
*Chevron* deference fails to advance their claim: this Court's review is de novo, the Rule
properly interprets the statute, and the government has not relied on *Chevron*
deference.  Plaintiffs' assertion—not advanced in the district court—that the Rule
constitutes impermissible retroactive rulemaking likewise ignores that the Rule simply
states the proper interpretation of the statute.  Finally, the agency did not violate the
APA by failing to respond to comments regarding the reliance interests of bump
stock owners.  No amount of reliance interest could make lawful a prohibited
machine gun.

Plaintiffs' challenges to the authority of then-Acting Attorney General
Whitaker to promulgate the Rule are likewise misconceived.  As a statutory matter, the
Federal Vacancies Reform Act expressly authorizes the President to designate senior
agency employees to fill any vacant Senate-confirmed office in the agency, including
the office of the agency head.  Contrary to plaintiffs' argument, the office-specific
statute that establishes an order of succession for the Attorney General's office does

19

not divest the President of his authority under the FVRA. The FVRA itself prescribes the relationship between the two statutes, providing not that an office-specific succession statute renders the FVRA's procedures inapplicable, but merely that they are not "exclusive." The district court correctly found that the text, structure, and legislative history of the FVRA all foreclose plaintiffs' theory that the President is powerless to designate an Acting Attorney General under the FVRA until and unless the order of succession in the office-specific statute has been exhausted.

Plaintiffs argue that the designation of Mr. Whitaker raises substantial constitutional questions under the Appointments Clause and that the Court should adopt their exhaustion interpretation in order to avoid those questions. But the text of the FVRA leaves no room for plaintiffs' interpretation, and even if it did, that interpretation would not actually avoid their asserted constitutional concerns with the FVRA, which in any event are insubstantial. Plaintiffs have abandoned their argument that only Senate-confirmed officers or first assistants may serve as acting principal officers, and their remaining argument that the President may not designate a federal employee to serve is baseless.

In any event, acting out of an abundance of caution, Attorney General Barr has now ratified the Rule. This Court's precedents make clear that ratification of allegedly unauthorized agency action by an official who has the authority to take the action cures any deficiency in the original authority. For that reason, plaintiffs can no longer

20

prevail even if their challenges to Mr. Whitaker's authority had merit, and this Court

therefore should dispose of this appeal without resolving those challenges.

## STANDARD OF REVIEW

This Court reviews questions of law underlying a district court's denial of a

preliminary injunction motion de novo.  *See City of Las Vegas v. Lujan*, 891 F.2d 927,

931 (D.C. Cir. 1989).

## ARGUMENT

**I.    The Rule Adopts The Plain Meaning Of The Terms "Single Function of the Trigger" And "Automatically" And Correctly Concludes That Bump Stocks Meet The Definition Of "Machinegun"**

Federal law bans the possession and transfer of "machineguns," 18 U.S.C.

§ 922(o), defined in the National Firearms Act as "any weapon which shoots, is

designed to shoot, or can be readily restored to shoot, automatically more than one

shot, without manual reloading, by a single function of the trigger." 26 U.S.C.

§ 5845(b).  The definition also includes "any part designed and intended solely and

exclusively . . . for use in converting a weapon into a machinegun, and any

combination of parts from which a machinegun can be assembled if such parts are in

the possession or under the control of a person."  *Id.*

A bump stock is an apparatus used to replace the standard stock on an

ordinary semiautomatic firearm that is designed "for the express purpose of allowing

'rapid fire' operation of the semiautomatic firearm to which [it is] affixed," 83 Fed.

21

Reg. at 66,518, and converts an ordinary semiautomatic rifle into a weapon capable of firing hundreds of bullets per minute with a single pull of the trigger. Unlike a regular stock, a bump stock channels the recoil from the first shot into a defined path, allowing the contained weapon to slide back a short distance—approximately an inch and a half—and shifting the trigger away from the shooter's trigger finger. 83 Fed. Reg. at 66,532. This separation allows the firing mechanism to reset. *Id.* When the shooter maintains constant forward pressure on the weapon's barrel-shroud or fore-grip, the weapon slides back along the bump stock, causing the trigger to "bump" the shooter's stationary finger and fire another bullet. *Id.* Each successive shot generates its own recoil, which in turn causes the weapon to slide along the bump stock in conjunction with forward pressure, returning to "bump" the shooter's trigger finger each time, initiating another cycle in turn. To assist the shooter in holding a stationary position with the trigger finger and sustain the firing process, bump stocks are fitted with an "extension ledge." *Id.* at 66,516, 66,532. The shooter maintains constant rearward pressure on the extension ledge, ensuring that the trigger finger is positioned to be "bumped" with each successive cycle. *Id.* at 66,532. This continuous cycle of fire-recoil-bump-fire lasts until the shooter releases the trigger, the weapon malfunctions, or the ammunition is exhausted. *Id.* at 66,518.

Although the parties agree on the basic mechanical functioning of a bump stock, they disagree on whether a bump stock converts a semiautomatic firearm into a "machinegun" by enabling a shooter to initiate and maintain a continuous process

that "automatically" fires hundreds of rounds per minute by a "single function of the trigger." 26 U.S.C. § 5845(b).

It does. When Congress enacted the National Firearms Act, it described the Act as including "the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." H.R. Rep. No. 73-1780, at 2 (1934). Consistent with this understanding, ATF has recognized since 2006 that the statutory phrase "single function of the trigger" is most naturally read to mean a "single pull of the trigger," at least where a weapon is equipped with a standard trigger. *See* Add. 3. And after a shooter used AR-15 semiautomatic rifles equipped with bump stocks to rapidly fire hundreds of bullets into a crowd of concertgoers in Las Vegas, Nevada, killing fifty people and wounding hundreds more, *see* JA 18, 25, DOJ revisited its previously inconsistent definitions of "automatically" and determined that the best reading of that term includes a device which allows a single function of the trigger to initiate a self-regulating cycle of continuous fire.

Because the Rule provides the correct reading of the terms "automatically" and "single function of the trigger," plaintiffs have no likelihood of success on their claims, and the district court's order denying a preliminary injunction should be affirmed.

### A.    A "Single Function of the Trigger" Is a "Single Pull of the Trigger" for a Weapon Equipped With a Standard Trigger

**1. a.**  For over a decade, ATF has recognized that the phrase "single function of the trigger" means a "single pull of the trigger" for a weapon equipped with a standard trigger.  *See* 83 Fed. Reg. at 66,517; Add. 2-4.  The function of a trigger is "to initiate the firing sequence" of a weapon.  *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam).  Read in its full context, the phrase "'by a single function of the trigger' describes the action that enables the weapon to 'shoot . . . automatically . . . without manual reloading,' not the 'trigger' mechanism."  *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992); *accord United States v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009) (noting that "a single function of the trigger" "set[s] in motion" the automatic firing of more than one shot); *United States v. Carter*, 465 F.3d 658, 664-65 (6th Cir. 2006).  With a normal trigger, the "action" that initiates this process is the shooter's pull on the trigger.  On a standard semiautomatic weapon, that single pull results in the firing of a single shot.  For a subsequent shot, the shooter must release his pull on the trigger so that the hammer can reset.  But on a fully automatic weapon—and on a weapon equipped with a bump stock—that same pull of the trigger initiates a continuous process that fires bullets until the trigger is released or ammunition is exhausted, without requiring that the shooter release his pull.  Once the trigger has performed its function of initiating the firing sequence, the weapon

fires "automatically more than one shot, without manual reloading," 26 U.S.C.

§ 5845(b), until the shooter releases the trigger.

Because not all firearms use a traditional pull trigger, Congress in the National

Firearms Act and DOJ in the Rule used language designed to capture the full range of

possible trigger devices. By employing the term "single *function* of the trigger,"

Congress ensured that it could cover weapons that use triggers activated by pushing a

paddle, pressing a button, flipping a switch, or otherwise initiating the firing sequence

without pulling a traditional trigger. *See, e.g., United States v. Fleischli*, 305 F.3d 643, 655-

56 (7th Cir. 2002) (holding that a minigun fired by "an electronic switch" was a

machine gun). Indeed, at the time of the enactment of the National Firearms Act,

many machine guns used push triggers to fire. *See* 83 Fed. Reg. at 66,519 n.5 (listing

examples of machine guns that "operate through a trigger activated by a push,"

including Maxim and Vickers machine guns). By focusing on whether the shooter's

"single function of the trigger" initiates an automatic process that discharges multiple

bullets, Congress ensured that individuals could not "avoid the [National Firearms

Act] simply by using weapons that employ a button or switch mechanism for firing."

*Evans*, 978 F.2d at 1113 n.2. For the same reasons, the Rule states that a "single

function of the trigger" encompasses "a single pull of the trigger and analogous

motions," 83 Fed. Reg. at 66,533, recognizing "that there are other methods of

initiating an automatic firing sequence that do not require a pull," *id.* at 66,515; *accord*

*id.* at 66,534.

25

**b.** Legislative history confirms that the Congress that enacted the National Firearms Act understood that in the normal course, a machine gun would be fired by a traditional pull trigger, and that for such weapons, a "single function of the trigger" equated to the shooter's single pull of the trigger.  In explaining the definition of "machinegun" in the bill that ultimately became the National Firearms Act, *see* H.R. 9741, 73rd Cong. (1934), the House Committee on Ways and Means report stated that bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and *by a single pull of the trigger*."  H.R. Rep. No. 73-1780, at 2 (emphasis added); *see* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions, including the quoted language).

This understanding was also reflected in testimony Congress heard before enacting the legislation.  A month before the bill that ultimately became the National Firearms Act was introduced, the House held hearings on an earlier version of the legislation.  That version proposed a definition of "machine gun" that turned on the number of shots that a weapon could fire automatically.  *See* JA 107.  The then-president of the National Rifle Association objected in his testimony to this "wholly inadequate and unsatisfactory" definition, JA 144, and proposed defining a machine gun as a weapon "which shoots automatically more than one shot without manual reloading, by a single function of the trigger," JA 145.  Explaining this proposal, he stated that "[t]he distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition."  *Id.*  Thus, he

26

continued, any weapon "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun," while "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." *Id.*

**c.**  Subsequent judicial interpretations of the phrase "single function of the trigger" further confirm that, when a standard trigger is involved, the ordinary meaning of the phrase looks to the shooter's action in pulling the trigger.  The Supreme Court has observed that the National Firearms Act treats a weapon that "fires repeatedly with a single pull of the trigger" as a machine gun, in contrast to "a weapon that fires only one shot with each pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).  Similarly, the Tenth Circuit recognized that a weapon qualified as a machine gun where it could be fired automatically "by fully pulling the trigger." *United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977).  And the Fifth Circuit held that a modified rifle was a machine gun because it "required only one action—pulling the switch [the defendant] installed—to fire multiple shots" instead of requiring the shooter "to separately pull . . . each time the weapon is fired." *United States v. Camp*, 343 F.3d 743, 745 (5th Cir. 2003).  The court held that § 5845(b) "expressly contemplate[s]" this distinction by focusing on "a single function of the trigger." *Id.* (emphasis in original).

**d.**  The same understanding of "single function of the trigger" informed ATF's reclassification of the "Akins Accelerator" in 2006.  Like the bump stocks at issue

27

here, the Akins Accelerator enabled the weapon to recoil within the stock, "permitting the trigger to lose contact with the finger and manually reset. Springs in the Akins Accelerator then forced the rifle forward, forcing the trigger against the finger" in a back-and-forth cycle that enabled continuous firing. 83 Fed. Reg. at 66,517. The Akins Accelerator "was advertised as able to fire approximately 650 rounds per minute." *Id.*

After reviewing the device "based on how it actually functioned when sold," ATF corrected its erroneous earlier decision classifying the device as not a machine gun. In doing so, it relied in part on the legislative history of the National Firearms Act to conclude "that the phrase 'single function of the trigger' . . . was best interpreted to mean a 'single pull of the trigger.'" 83 Fed. Reg. at 66,517; *see* Add. 2-4. The agency concluded that installing the Akins Accelerator on a semiautomatic rifle "resulted in a weapon that '[w]ith a single pull of the trigger initiates an automatic firing cycle that continues until the finger is released, the weapon malfunctions, or the ammunition supply is exhausted.'" 83 Fed. Reg. at 66,517 (quoting *Akins v. United States*, No. 8:08-cv-988, slip op. at 5 (M.D. Fla. Sept. 23, 2008)). In rejecting a subsequent challenge by the inventor of the Akins Accelerator to ATF's reclassification of the device, the Eleventh Circuit held that interpreting "single function of the trigger" as "'single pull of the trigger' is consonant with the statute and its legislative history." *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (per curiam). And on multiple occasions since 2006, ATF has applied its "single pull

28

of the trigger" interpretation to bump-stock-type devices, and on other occasions to "other trigger actuators, two-stage triggers, and other devices."  83 Fed. Reg. at 66,517; *see id.* 66,518 n.4 (listing examples of other ATF classifications using the definition).

**2.**  Plaintiffs largely ignore the ordinary meaning of the term "single function of the trigger," 26 U.S.C. § 5845(b), and the interpretation of that language by Congress, the courts, and ATF.  Without citation, they chiefly insist that only "the mechanical operation of the 'trigger'" matters, not "the mechanism by which the shooter acts to move the trigger," such that the "function of the trigger is to release the hammer in response to an external or manual input."  Guedes Br. 12.  On plaintiffs' definition, a "single function of the trigger" is thus a single "release [of] the hammer in response to an external or manual input."  *Id.*  Moreover, plaintiffs contend, each time the trigger releases, "uncoupl[ing] the disconnector from the hammer," a second, separate function occurs.  *Id.*; *accord id.* 15-16.

This cramped definition defies statutory text and common sense.  Plaintiffs' theory is that no aftermarket device could ever convert an AR-15 or similar semiautomatic rifle into a "machinegun," because no matter what work the device performs, a separate release of the hammer by the trigger must occur for each shot fired.  A rifle equipped with the Akins Accelerator, for example, would no longer qualify as a machine gun, despite the Eleventh Circuit's contrary ruling. *Akins*, 312 F. App'x at 200.  And even a device that mechanically and automatically pulled and

released the trigger on an AR-15 rifle on the shooter's behalf at the flip of a switch would not qualify as a machine gun, because each bullet fired required a distinct "function of the trigger" to release the hammer. That the shooter produces a continuous firing cycle by taking only one step—flipping the switch—is entirely irrelevant under plaintiffs' theory.

"Function" is therefore not constrained to the precise mechanical operation of a specific type of trigger. On the contrary, given the range of possible trigger mechanisms and devices, the broad term "function" ensures that ingenious individuals cannot engineer around the restrictions of the National Firearms Act "simply by using weapons that employ a button or switch mechanism for firing." *Fleischli*, 305 F.3d at 655 (quoting *Evans*, 978 F.2d at 1113 n.2). Nor are such concerns hypothetical. As the Rule notes, ATF has applied the "single pull of the trigger" understanding to a host of devices that assist shooters in creating and sustaining a continuous firing cycle. 83 Fed. Reg. at 66,517-18. For example, in 2016, ATF classified "LV-15 Trigger Reset Devices" as machine gun parts. *Id.* at 66,518 n.4; *see* Add. 11-21. These devices attached to an AR-15 rifle and used a battery-operated "piston that projected through the lower rear portion of the trigger guard" to push the trigger forward, enabling the shooter to pull the trigger once and "initiate and maintain a firing sequence" by continuing the pressure while the piston rapidly reset the trigger. 83 Fed. Reg. at 66,518 n.4. ATF took the same approach to another device—a "positive reset trigger"—that used the recoil energy of each shot to push

30

the shooter's trigger finger forward. *See id.*; Add. 5-10. Yet another example is the "AutoGlove," a glove with a battery-operated piston attached to the index finger that pulled and released the trigger on the shooter's behalf when the shooter held down a plunger to activate the motor. Add. 22-28. Under plaintiffs' definition, such devices would not qualify as machine guns despite operating, from the user's perspective, identically to a fully automatic weapon and producing the same results.

Plaintiffs provide no support, textual or otherwise, for their attempt to read out of the statute the shooter's act of pulling the trigger. They rely on a single page of legislative history, *see* Guedes Br. at 13, but that page—reporting a discussion between Representative Hill and then-Assistant Attorney General Joseph Keenan about the definition of machine gun—underscores that the defining characteristic of a machine gun is that it fires "without pulling the trigger more than once." JA 202; *see also id.* (distinguishing other guns where "you have to pull the trigger each time to fire them" and "they do not automatically fire again unless you pull the trigger"). And the cases plaintiffs cite likewise reflect this basic understanding. *See Staples*, 511 U.S. at 602 n.1 (contrasting a machine gun, which "fires repeatedly with a single pull of the trigger," with "a weapon that fires only one shot with each pull of the trigger"); *Kolbe v. Hogan*, 849 F.3d 114, 158 (4th Cir. 2017) (Traxler, J., dissenting) (noting that machine guns "do not require a pull of the trigger for each shot" while "semiautomatic firearms require that the shooter pull the trigger for each shot fired"); *Hollis v. Lynch*, 827 F.3d 436, 440 n.2 (5th Cir. 2016) (noting that machine guns fire "more than one round per

trigger-action" while semi-automatic weapons do not, without defining "trigger-action").

Plaintiffs point to ATF's decision not to classify binary triggers as machine gun parts to argue that the Rule's definition is not workable (Guedes Br. 14; Codrea Br. 15-16), but this argument only underscores plaintiffs' fundamental misunderstanding of the term "single function of the trigger." A binary trigger fires one round when the shooter pulls the trigger and another when the shooter releases the trigger. The Rule—like the National Firearms Act—recognizes that a trigger may "function" by a means other than a pull, such as a push or a release. 83 Fed. Reg. 66,515, 66,534-35. And as DOJ explained in the Rule, a binary trigger requires two separate functions of the trigger by the shooter to fire each shot: the shooter's pull of the trigger, followed by the shooter's release. 83 Fed. Reg. at 66,534. By contrast, a bump stock involves only a single function of the trigger by the shooter—the initial pull—"to create an automatic firing sequence." *Id.*

### B.     A Rifle Equipped With a Bump Stock Fires "Automatically" Because it Fires "As the Result of a Self-Acting or Self-Regulating Mechanism"

**1.** The Rule gives the term "automatically" its ordinary meaning. As the Rule explains, "'automatically' is the adverbial form of 'automatic,' meaning '[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation.'" 83 Fed. Reg. at 66,519 (quoting *Webster's New International Dictionary* 187 (2d ed. 1934); citing 1 *Oxford English Dictionary* 574 (1933) (defining

32

"automatic" as "[s]elf-acting under conditions fixed for it, going of itself."))  And the Rule straightforwardly adopts this definition, stating that a weapon fires "automatically" when it fires "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds."  83 Fed. Reg. at 66,554; *see Olofson*, 563 F.3d at 658 ("automatically" in § 5845(b) means "as the result of a self-acting mechanism").  As the district court held, the Rule's definition of "automatically" "correctly" defines the term and is "[c]onsistent with these contemporaneous dictionary definitions and the Seventh Circuit's decision in *Olofson*."  JA 38-39.

As the Rule explains, a rifle equipped with a bump stock fits comfortably within the ordinary meaning of "automatically."  The bump stock "performs a required act at a predetermined point" in the firing sequence by "directing the recoil energy of the discharged rounds into the space created by the sliding stock," ensuring that the rifle moves in a "constrained linear rearward and forward path[]" to enable continuous fire.  83 Fed. Reg. at 66,532.  This process is also "[s]elf-acting under conditions fixed for it."  The shooter's maintenance of continuous pressure on the extension ledge with the trigger finger and on the barrel-shroud or fore-stock with the other hand provide the conditions necessary for the bump stock to repeatedly perform its basic purpose: "to eliminate the need for the shooter to manually capture, harness, or otherwise utilize th[e] [recoil] energy to fire additional rounds."  *Id.* at 66,532.

33

**2.** In arguing that DOJ's interpretation of "automatically" is erroneous, plaintiffs fail to engage with the dictionary definitions and other sources relied on by the Rule, the Seventh Circuit in *Olofson*, and the district court. JA 39. Instead, plaintiffs assert that the term "automatically" means "without further manual or volitional input by the shooter beyond maintaining the trigger in the depressed or rearward position," and that an "'automatic[]' discharge necessarily must occur before or without a second function of the trigger." Guedes Br. 15; *accord* Codrea Br. 14. But under this reading, the term "automatically" serves no purpose in the statute: the only relevant question would be whether a gun fires "more than one shot" by "a single function of the trigger"—on plaintiffs' view, a single "release [of] the hammer in response to an external or manual input." Guedes Br. 12. By conflating "automatically" with their erroneous definition of "single function of the trigger," plaintiffs render "automatically" superfluous. *See New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006) ("[C]ourts must give effect to each word of a statute.").

Plaintiffs' reading is also inconsistent with the plain meaning of "automatically." They insist that firing with a bump stock cannot be done "automatically" because it necessarily involves a "manual volitional act [by] the shooter," (Guedes Br. 15-16) or "multiple human manual inputs," (Codrea Br. 14), in the form of the shooter's continued pressure on the weapon's barrel-shroud or fore-stock. But as the district court observed, a device need not "operate spontaneously without any manual input" to properly be described as operating "automatically." JA

34

41. Rather, a device is ordinarily described as operating "automatically" where it "perform[s] parts of the work formerly or usually done by hand" or "produce[s] results otherwise done by hand." JA 38 (quoting *Webster's New International Dictionary* (1933) and 1 *Oxford English Dictionary* (1933), respectively). And this understanding is reflected in ordinary usage: "[a]n automatic sewing machine, for example, still requires the user to press a pedal and direct the fabric." JA 39. Because a bump stock performs "two tasks the shooter would ordinarily have to perform manually"—"control[ing] the distance the firearm recoils and ensur[ing] that the firearm moves linearly"—a bump stock allows for an automatic continuous firing cycle. JA 41.

Plaintiffs' failure to grapple with the plain meaning of "automatically" is also reflected in their assertion that the Rule renders all semiautomatic rifles illegal because a shooter can "bump-fire[]" those weapons "with or without a bump-stock-type device." Guedes Br. 18. Bump fire with a bump stock occurs "automatically" because the bump stock relieves the shooter of much of the manual effort that would otherwise be required; that a shooter could produce similar results manually, without assistance, is irrelevant to that conclusion. Indeed, the entire purpose of the bump stock is that it "make[s] rapid fire easier" by reducing the effort required to bump fire. 83 Fed. Reg. at 66,533.

For similar reasons, plaintiffs are wrong to suggest that the Rule converts "common household items" into parts of a machine gun. Guedes Br. 18. As the Rule explains, "[a]n item like a belt loop is not a 'self-acting or self-regulating mechanism'"

35

because "[w]hen such items are used for bump firing, no device is present to capture and direct the recoil energy; rather, the shooter must do so." 83 Fed. Reg. at 66,533. Thus, a shooter must manually "harness the recoil energy" and "control the distance that the firearm recoils and the movement along the plane on which the firearm recoils." *Id.*

Finally, plaintiffs' reliance on ATF's erroneous past interpretations (Guedes Br. 17) fails to advance their claim. ATF's prior interpretations cannot change the plain meaning of the statutory term "automatically." That ATF previously applied an incorrect interpretation of the term "automatically" in classifying bump-stock-type devices is why the Department promulgated the Rule to give notice to the public, JA 38, and provide guidance to ensure consistent future classifications.

### C.    Plaintiffs' Remaining Arguments Are Without Merit

**1.** Plaintiffs' contention that the district court abused its discretion in denying their motion for preliminary relief because it applied an "incorrect legal analysis" fails to advance their claim. Codrea Br. 8. Although the district court in this context should not have afforded the agency deference under *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), that provides no basis for reversing the district court's denial of a preliminary injunction.

As plaintiffs observe (Codrea Br. 9), the government did not contend in district court—nor does it contend on appeal—that the agency is entitled to *Chevron* deference for its interpretation of the terms "single function of the trigger" and

36

"automatically" in a criminal statute.  *See also* 83 Fed. Reg. at 66,527 (explaining that

DOJ's interpretation "accord[s] with the plain meaning of [the statutory] terms").

And the district court's decision to apply such deference poses no barrier to affirming

the decision below.  On appeal of district court decisions reviewing agency action

under the APA, this Court engages in de novo review.  *See Rempfer v. Sharfstein*, 583

F.3d 860, 864–65 (D.C. Cir. 2009).  This Court may thus determine whether plaintiffs

have demonstrated a likelihood of success on the merits of their statutory claim

without regard to the district court's application of *Chevron* deference.  And for the

reasons explained *supra* pp. 21-36, the agency's interpretation of the statute is the best

reading.

Just as *Chevron* plays no role in this case, the rule of lenity (Guedes Br. 20-22)

has no bearing here.  The rule of lenity applies only if, "after considering text,

structure, history, and purpose, there remains a grievous ambiguity or uncertainty in

the statute such that the Court must simply guess as to what Congress intended."

*Maracich v. Spears*, 570 U.S. 48, 76 (2013).  Again, DOJ's interpretation of the terms

used to define "machinegun" in the National Firearms Act is correct, and there is no

ambiguity, let alone grievous ambiguity, in the statute.  Indeed, plaintiffs' position

appears to be that because they view bump stocks as borderline examples of

"machineguns," they should be permitted to own bump stocks, even if those devices

technically fall within the statutory definition.  But, as the Supreme Court has

explained, "[t]he rule [of lenity] comes into operation at the end of the process of

37

construing what Congress has expressed, not at the beginning as an overriding

consideration of being lenient to wrongdoers." *Maracich*, 570 U.S. at 76 (alteration in

original) (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)).

**2.** Advancing an argument that is both meritless and forfeited, plaintiffs also

urge that DOJ's interpretation of the definition of "machine gun" in the National

Firearms Act violates the Ex Post Facto Clause and is an act of retroactive

rulemaking. Codrea Br. 16.

In their briefs below, the plaintiffs did not raise any argument regarding the

purportedly retroactive nature of the agency's rule. *See* No. 18-3086 (D.D.C.), Dkt.

No. 5, Dkt. No. 18. Any such argument is therefore forfeited. *Zevallos v. Obama*, 793

F.3d 106, 114 (D.C. Cir. 2015). And even if the argument were not forfeited, it

reveals a fundamental misunderstanding of the nature of the Rule. The Rule is not an

act of legislative rulemaking, but rather sets forth the agency's interpretation of the

best reading of the definition of "machinegun" in the National Firearms Act.

Plaintiffs have sought judicial review of this interpretation, arguing that it conflicts

with the statute because "Congress has not made these devices illegal." Codrea Br.

18. That is precisely the question this Court will decide in determining whether

plaintiffs are likely to succeed on the merits of their claim.

Although plaintiffs recognize that "[u]nder ATF's reasoning, any bump stock

made after 1986 has *always* been a machinegun and thus has *always* been banned,"

Codrea Br. 17, they do not grapple with the significance of that fact. If this Court

accepts the agency's position, as it should, and agrees that the statute is best read to prohibit bump stocks, this will not represent a change in the law, but will be "an authoritative statement of what the statute meant before as well as after the decision." *Rivers v. Roadway Express*, 511 U.S. 298, 312-13 (1994). It is therefore not the case that the Rule "makes an action, done before [the Rule], and which was innocent when done, criminal." *Calder v. Bull*, 3 U.S. 386, 390 (1798). Rather, the purpose of the rulemaking is "to notify the public about changes in ATF's interpretation of the [National Firearms Act] and [Gun Control Act] and to help the public avoid the unlawful possession of a machinegun." 83 Fed. Reg. at 66,523.

Moreover, plaintiffs' objection is particularly meritless where the Rule will have practical effect only with respect to individuals who retain their bump stocks (or buy and sell bump stocks) after the Rule's effective date. As plaintiffs recognize (Codrea Br. 18), DOJ stated in the Rule that it would not pursue enforcement action against individuals who sold or possessed bump stocks prior to the effective date of the Rule. 83 Fed. Reg. at 66,523; *see American Library Ass'n v. Barr*, 956 F.2d 1178, 1198 (D.C. Cir. 1992) (finding no credible threat of prosecution and explaining that "it would be nothing but speculation to suppose that the Department of Justice will change its position in the foreseeable future").

**3.** Nor does it advance plaintiffs' claim to contend that DOJ failed to respond to comments submitted during the rulemaking regarding reliance interests or other similar factors. Codrea Br. 19-20. An agency is not required to respond to all

39

comments, but rather must respond to comments that are "relevant to the agency's

decision and which, if adopted, would require a change in an agency's proposed rule

[because they] cast doubt on the reasonableness of a position taken by the agency."

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); *see also National

Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (per

curiam) (not requiring a substantive response where comments were beyond the

scope of the rulemaking).  Here, as explained, the Rule addresses the purely legal

question whether the statute itself properly read prohibits bump-stock-type devices.

*See supra* pp. 21-36; *see also* JA 35-36 (explaining that the question before the district

court was whether the agency had contravened the controlling statute).  In answering

that question, there was no need to address purported "reliance interests," because no

amount of reliance interest could change whether these devices are machine guns

prohibited by statute.  In all events, DOJ plainly was aware of the monetary interests

at stake.  *See* 83 Fed. Reg. at 66,537.

## II.     The Rule Has Been Validly Promulgated By The Acting Attorney General And Validly Ratified By The Attorney General

The district court correctly held that Acting Attorney General Whitaker had the

authority to issue the Rule.  The Federal Vacancies Reform Act expressly authorized

the President to designate Mr. Whitaker as Acting Attorney General, and nothing in

28 U.S.C. § 508 or the Appointments Clause even arguably precluded that choice.  See

JA 50-81.  Moreover, Attorney General Barr was confirmed and appointed shortly

before the district court issued its decision, and he has since ratified the Rule. This Court's precedents make clear that ratification of the Rule by Attorney General Barr obviates any challenge to Mr. Whitaker's authority to promulgate the Rule, and this Court therefore should affirm the rejection of plaintiffs' claims on that ground alone.

### A. The FVRA Authorized the President to Designate Mr. Whitaker to Serve as Acting Attorney General

#### 1. The FVRA's plain text applies to the Attorney General's vacancy.

The FVRA authorizes the President to fill a vacancy in a covered Senate-confirmed position by designating, among other individuals, a senior "officer or employee" within the same agency "to perform the functions and duties of the vacant office." 5 U.S.C. § 3345(a)(3). To be eligible for designation, the officer or employee must have been in the agency for at least ninety days in the 365-day period preceding the resignation, in a position for which the rate of pay is equal to or greater than the minimum rate for GS-15 of the General Schedule, and he or she may not serve in an acting capacity if nominated by the President to fill the vacancy on a permanent basis. *See id.* §§ 3345(a)(3), 3345(b)(1); *NLRB v. SW General, Inc.*, 137 S. Ct. 929 (2017).

The FVRA on its face applies to vacancies in the office of Attorney General. The positions covered by the FVRA generally include Senate-confirmed offices at all "Executive agenc[ies]," 5 U.S.C. § 3345(a), which includes the Department of Justice, *see id.* §§ 101, 105. Moreover, the FVRA expressly contemplates that a vacant office may be the office of the agency head. For example, it distinguishes between agency

41

heads and non-agency heads with respect to the consequences of expiration of the statutory time limits, *see id.* § 3348(b), but creates no such distinction for purposes of the applicability of the designation methods in section 3345. Where Congress intended to exclude an office in an Executive agency from the FVRA's scope, it said so expressly, identifying specific offices in particular agencies to which the FVRA "shall not apply." *Id.* § 3349c. The office of Attorney General is not among those excluded offices. Congress also identified particular offices as to which specific provisions of the FVRA are inapplicable. *See id.* § 3348(e). The office of Attorney General is likewise not subject to any such more limited statutory exclusion.

The FVRA contrasts significantly in this regard with the prior terms of the Vacancies Act. The Vacancies Act expressly excluded the office of Attorney General from the President's authority to fill vacant offices with persons other than the office's first assistant. *See* 5 U.S.C. § 3347 (1994) ("This section does not apply to a vacancy in the office of Attorney General"). But the FVRA eliminated that exclusion altogether, while retaining 28 U.S.C. § 508's specification that the Deputy Attorney General is the "first assistant" under § 3345, the operative FVRA section here.

Plaintiffs object that, in enacting the FVRA, Congress could not have intended to give the President the power to fill the vacant office of an agency head with a senior employee within that agency. FPC Br. 18-19. But for the reasons discussed above, this objection is belied by the text and structure of the FVRA, which expressly and unambiguously provide that power. Moreover, the objection is inconsistent with

42

plaintiffs' own position.  As detailed below, they argue only that the FVRA is

displaced *if* there is an office-specific vacancy statute designating an acting official *and*

the individual designated is available to serve.  But there are cabinet departments that

do not have office-specific succession provisions at all (*e.g.*, 22 U.S.C. § 2651a(a)

(Department of State)) and other cabinet departments that will often have no acting

designee available because only a single individual is designated (*e.g.*, 29 U.S.C. § 552

(Department of Labor)).  Accordingly, the FVRA indisputably authorizes senior

agency employees to serve as acting agency heads in at least some circumstances.  And

we next demonstrate that those circumstances include a vacancy in the Office of

Attorney General even where the Deputy Attorney General is otherwise available to

serve.

> **2.    The President's authority under the FVRA is not
> displaced by 28 U.S.C. § 508.**

Plaintiffs contend that the President's authority under the FVRA to designate

persons to serve as Acting Attorney General is displaced by 28 U.S.C. § 508.  That

statute, which long predated the FVRA's enactment, provides that when there is "a

vacancy in the office of Attorney General . . . the Deputy Attorney General may

exercise all the duties of that office."  28 U.S.C. § 508(a).  It further provides that if

neither the Attorney General nor the Deputy Attorney General is available, "the

Associate Attorney General shall act as Attorney General," and the Attorney General

43

may designate the Solicitor General and the Assistant Attorneys General to act as Attorney General in further order of succession. *Id.* § 508(b).

According to Plaintiffs, this provision deprives the President of his authority under the FVRA to designate someone other than the Deputy Attorney General to serve as Acting Attorney General unless the Deputy Attorney General and the Associate Attorney General are unavailable, and perhaps unless all of the other officials enumerated in § 508 are unavailable as well. FPC Br. 6 & n.1. The district court properly rejected that argument.

**a.** In enacting the FVRA, Congress recognized the existence of office-specific vacancy statutes like § 508. It expressly addressed how these statutes relate to the FVRA. As the district court explained, the text and structure of the FVRA make clear that Congress intended for the FVRA and office-specific statutes to co-exist and complement each other, rather than for office-specific statutes to displace the FVRA. JA 52-55.

By default, the FVRA is the "*exclusive* means for temporarily authorizing an acting official to perform the functions and duties of any office [requiring Senate confirmation] of an Executive agency." 5 U.S.C. § 3347(a) (emphasis added). This rule of exclusivity applies "unless" one of the exceptions in § 3347(a) applies. *Id.* One of the specified exceptions is the existence of "a statutory provision [that] expressly * * * designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity," such as § 508. *Id.*

44

§ 3347(a)(1)(B).  In that case, the FVRA ceases to be "the *exclusive* means" of filling the vacancy.  But as the district court explained, the FVRA "remains *a* means of filling the vacancy."  JA 52.  In other words, § 3347(a) provides that office-specific statutes such as § 508 are exceptions to the FVRA's generally exclusive applicability, not that they supersede or displace the FVRA in whole or in part.

The structure of the statute reinforces this reading of the statutory text. Section 3347's proviso that the FVRA is not the "exclusive" means of addressing vacancies in specified circumstances stands in marked contrast with § 3349c, which provides that the FVRA "shall not apply" to specified offices.  Had Congress wanted to make the FVRA inapplicable to offices for which an office-specific statute designated an acting official, it would have listed such statutes in § 3349c, not § 3347. Section 3347(a) also stands in contrast with § 3348(e), which provides that specific provisions of the FVRA "shall not apply" to specified offices.  No offices subject to office-specific succession statutes appear in § 3349c, nor are any such offices subject to more specific inapplicability provisions like the one found in § 3348(e).  At a minimum, if Congress had actually meant to provide that the FVRA's provisions are inapplicable, in whole or in part, to offices that are subject to office-specific succession statutes, it would have employed parallel language throughout, providing in § 3347 that the FVRA "shall not apply" in whole (*cf.* § 3349c) or in part (*cf.* § 3348(e)) where office-specific statutes exist, rather than merely stating that the FVRA is not the "exclusive" means of filling vacancies when those statutes exist.

45

Plaintiffs invoke (FPC Br. 17) the interpretive canon that when two statutes apply to the same circumstances, the more specific provision prevails over the more general one. But that canon is an aid in divining the intended relationship between two statutes when Congress itself has not expressly addressed that question. Here, it has. The more specific provision does not override the more general one where, as here, the general provision addresses the relationship between the two statutes and expressly provides that they coexist with each other.

Indeed, as the district court explained (JA 59-60), the FVRA's legislative history confirms that statutes like § 508 were understood by Congress to work in conjunction with—not to displace—the FVRA. The Senate Committee Report accompanying the bill that led to the FVRA contained the list of then-existing, office-specific statutes "that expressly authorize the President  * * *  to designate an officer to perform the functions and duties of a specified officer temporarily in an acting capacity, * * * [or] that expressly provide for the temporary performance of the functions and duties of an office by a particular officer or employee." S. Rep. No. 150-250, at 15, 16-17 (1998) (Senate Report). The Report stated that the bill "retains" § 508 and the other such statutes, *id.*, but that "even with respect to the specific positions in which temporary officers may serve under the specific statutes this bill retains, the Vacancies Act would continue to provide an *alternative* procedure for temporarily occupying the office." *Id.* at 17 (emphasis added).

46

For all these reasons, the Ninth Circuit in *Hooks v. Kitsap Tenant Support Services*, 816 F.3d 550 (2016), and the District Court for the District of Columbia in *English v. Trump*, 279 F. Supp. 3d 307 (2018), have both held that office-specific vacancy and succession statutes do not preclude the President from exercising his designation authority under the FVRA.  In the proceedings below, plaintiffs attempted to distinguish *Hooks* and *English* from this case.  The district court properly dismissed those efforts (JA 53-54), and plaintiffs do not renew them here.

**b.**  Given the clarity of the FVRA's text and structure, plaintiffs concede that § 508 and similar office-specific statutes do not displace the FVRA altogether. Instead, they argue that when a vacancy is subject to an office-specific succession statute, the FVRA does not authorize the President to designate persons to fill the vacancy unless no one specified by the office-specific statute is available—in other words, unless the statutory line of succession is exhausted.

As a threshold matter, if the FVRA incorporated plaintiffs' proposed exhaustion rule, that would mean that President George W. Bush acted unlawfully in 2007 when he designated Assistant Attorney General Peter D. Keisler to serve as Acting Attorney General in place of Solicitor General Paul Clement, who was next in order of succession under the succession order promulgated by the Attorney General pursuant to § 508(b).  *See Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208 (2007).  Plaintiffs' theory would also mean—*contra* the district court decision in *English*—that President Trump acted unlawfully when he designated the

47

Director of the Office of Management and Budget to serve as the Acting Director of the Consumer Financial Protection Bureau rather than the Deputy Director.

More fundamentally, plaintiffs' proposed exhaustion rule suffers from the fatal problem that it has no basis in the FVRA. It does not appear in § 3345(a)(2) and § 3345(a)(3), the provisions that authorize the President to designate persons other than the first assistant to serve in an acting capacity. Nor does it appear in § 3347(a). Again, § 3347(a) provides only that the FVRA is the exclusive means unless an office-specific statute exists, *not* that the FVRA is inapplicable unless an office-specific statute is exhausted, or that an office-specific statute is exclusive unless it is exhausted.

Plaintiffs attempt to manufacture a textual hook for their exhaustion theory by suggesting (FPC Br. 9) that when § 3347(a) provides that the FVRA is "the exclusive means" for temporarily filling vacant offices "unless" one of the specified exceptions applies, "unless" does not modify "exclusive means," but instead modifies only the word "means" in isolation. Thus, plaintiffs argue, when the exceptions in § 3347(a) apply, the FVRA is not a "means" of filling the vacancy at all. But that argument fails as a grammatical matter. The operative language in § 3347(a) does not say that the FVRA is "a means" of filling vacant offices. It says that the FVRA is "the exclusive means" of doing so. The "unless" clause necessarily modifies the entire phrase, not the noun arbitrarily divorced from the adjective that Congress used to modify the noun's meaning and scope.

48

Tellingly, plaintiffs themselves are unwilling to embrace the implications of their proffered reading. If, as plaintiffs suggest, the FVRA "is not a 'means' to authorize an acting official" when an exception in § 3347(a) applies (FPC Br. 9), then a provision like § 508, which "expressly * * * designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity" (§ 3347(a)(1)(B)), would render the FVRA inapplicable to the office of Attorney General altogether. As noted, plaintiffs disclaim that outcome because the Attorney General's office is not contained in the FVRA's applicability exceptions in § 3349c. But there is no way to read the language of § 3347(a) to embody the more limited exhaustion rule advocated by plaintiffs.

Plaintiffs try to justify the exhaustion rule by arguing (FPC Br. 6, 17) that, because the FVRA exclusivity exception for office-specific succession statutes in § 3347(a)(1)(B) applies only where a statute "expressly * * * designates" an acting officer, the exception purportedly does not apply where the designated individual is not available to serve. But as the district court pointed out (JA 57), that is not what the provision says: whether or not the designated individual is available to serve, the statute still "expressly * * * designates" that individual to serve. Plaintiffs' reading thus would render the FVRA inapplicable even where the office-specific statute is exhausted, which is untenable, as they themselves recognize.

The flaw in plaintiffs' reading is underscored by the related exception to the FVRA's exclusivity in § 3347(a)(1)(A). That provision states that the FVRA is not

49

exclusive when another statute expressly "authorizes the President, a court, or the head of an Executive department, to designate an officer or employee" to serve on an acting basis. The provision thus clearly turns solely on whether the statute *authorizes* certain people to designate particular individuals—not on whether the potential designees are available. Given that § 3347(a)(1)(A) cannot plausibly be read as displacing the FVRA if and only if the potential designees are available, that is yet another reason why the parallel provision in § 3347(a)(1)(B) cannot be read as displacing the FVRA if and only if the specified designee is available.

**c.** Plaintiffs make a scattershot of other textual and contextual arguments in support of their position. They all fail.

Contrary to plaintiffs' suggestion (FPC Br. 9), the recess-appointment exception in § 3347(a)(2) offers no support for their interpretation that the § 3347 exceptions render the FVRA inapplicable rather than non-exclusive. As plaintiffs themselves acknowledge, once the President makes a recess appointment, there is no longer any vacancy and thus § 3345's acting-designation authority for vacancies ceases to apply by its own terms. Section 3347(a)(2) merely confirms that the FVRA does not purport to restrict the President's exercise of his constitutional authority under the Recess Appointments Clause.

Similarly, plaintiffs derive no support from the exception in § 3347(a) for the Government Accountability Office (FPC Br. 9). The FVRA applies only to officers of an "Executive agency," and § 3345 itself excludes the GAO from that term.

50

Accordingly, § 3347 merely repeats that threshold description of the FVRA's scope, rather than exempting an office that otherwise would be covered.

Plaintiffs also assert that the "whole purpose" of office-specific designation statutes such as § 508 is to "exempt the office from the general vacancies statute," in order "to prevent the President from displacing the officer's deputy with someone else." FPC Br. 10. Plaintiffs cite no authority for this *ipse dixit*. Virtually all office-specific vacancy statutes were enacted under the backdrop of the pre-FVRA Vacancies Act, which expressly provided the President with the authority to designate *any Senate-confirmed officer* in lieu of the first assistant to the vacant office, but *only subject to certain time limits*. *See* 15 Stat. 168, 168 (1868); 5 U.S.C. §§ 3347, 3348 (1994). Plaintiffs provide no basis for their assumption that the purpose of office-specific vacancy statutes was to prevent the President from selecting most Senate-confirmed officers, rather than to enable specific officers to serve beyond the Vacancies Act's time limits. *See United States v. Lucido*, 373 F. Supp. 1142, 1150-51 (E.D. Mich. 1974) (recognizing that Deputy Attorney General could continue to serve as Acting Attorney General under § 508 after time limit in Vacancies Act had expired). Indeed, plaintiffs' assumption is belied by the Vacancies Act itself: it is precisely because office-specific statutes did *not* exempt those offices from the President's general authority under the Vacancies Act to select other Senate-confirmed officials that it was necessary for the same section to provide that "[t]his section does not apply to a vacancy in the office of Attorney General." 5 U.S.C. § 3347 (1994). And as explained

51

above, Congress eliminated that restriction on the President's authority when it enacted the FVRA, which confirms that Congress no longer wished to exclude the Attorney General's office from the general scope of the President's authority to designate acting officers.

For that reason, the hypothetical provisions devised by plaintiffs (FPC Br. 10-11) offer no insight into the meaning of § 3347(a). A legislature certainly *could* choose, for example, to make a general venue statute inapplicable when another statute creating a cause of action contains a more specific (and presumably inconsistent) venue provision. But it is abundantly clear from the text, structure, and legislative history of the FVRA that Congress made a fundamentally different choice with respect to the relationship between the FVRA and office-specific vacancy statutes like § 508. Whether language like that found in § 3347(a) could be given a different construction in an entirely different statutory context is irrelevant.

Plaintiffs further argue (FPC Br. 15) that when Congress intends to authorize the President to depart from an office-specific order of succession, it says so expressly in the succession statute itself. But the provisions cited by plaintiffs are all distinguishable. The civilian statutes authorize the President to designate *any* "officer of the Federal Government," not just officers who may be designated under the FVRA, and therefore require express language to accomplish that result. *See, e.g.*, 40 U.S.C. § 302. And the military service statutes cited by plaintiffs cross-reference the FVRA, but the cross-references do not authorize the President to proceed under that

52

statute; they merely take account of the existence of that independent statutory authority and thereby confirm that the FVRA co-exists with such office-specific statutes. *See*, *e.g.*, 10 U.S.C. § 8017.

Notably, Section 508 contains its own express cross-reference to the FVRA, for which plaintiffs have no satisfactory explanation. Section 508(a) provides that, "for the purpose of section 3345 of title 5[,] the Deputy Attorney General is the first assistant to the Attorney General." This provision avoids potential uncertainty about the identity of the Attorney General's first assistant under the FVRA. But plaintiffs' underlying theory is that § 508 displaces the FVRA unless and until the Deputy Attorney General is unavailable. As a result, under plaintiffs' theory, there is no need for § 508 to prescribe who qualifies as first assistant for purposes of the FVRA when the Deputy Attorney General *is* available, and no purpose would be served by doing so. Remarkably, plaintiffs suggest that the cross-reference was intended to have "no substantive effect" (FPC Br. 27)—a suggestion that simply highlights their inability to explain why Congress included it.

Conversely, the FVRA's application to the office of the Attorney General does not render § 508 superfluous, as plaintiffs appear to suggest. Rather, as the district court noted (JA 58), § 508 serves several purposes not served by § 3345(a)(1) of the FVRA. First, as previously discussed, it allows the Deputy Attorney General (and others in the line of succession) to serve as Acting Attorney General beyond the FVRA's general time limitations. *See* 5 U.S.C. § 3346. Second, it allows those

53

individuals to fill a vacancy in situations where the FVRA's additional restrictions on acting service would not authorize it. *See id.* § 3345(b). Third, as noted above, it eliminates potential confusion over who the "first assistant" is in DOJ for purposes of the FVRA's default rule in § 3345(a)(1).

Plaintiffs thus likewise err in arguing (FPC Br. 13-14) that the district court's interpretation of the FVRA flouts the presumption against implied repeals. Rather than construing the FVRA to impliedly repeal § 508, the decision below gives effect to both statutes, permitting officers specified in § 508 to serve as Acting Attorney General in circumstances where they would not be allowed to serve under the FVRA, and vice versa. Plaintiffs argue the presumption against implied repeals still applies because § 508 was meant to eliminate the President's discretion under the general vacancy statutes. But as discussed, what originally restricted the President's discretion was not § 508 itself, but instead the provision in the pre-FVRA Vacancies Act that excluded the Attorney General from the operation of that Act's designation provision. Congress repealed that provision when it enacted the FVRA. The presumption against implied repeals is irrelevant to an express repeal.

Finally, in response to the FVRA's legislative history confirming that it would co-exist with office-specific vacancy statutes, *supra* p. 46, plaintiffs suggest (FPC Br. 24 n.2) that the Senate Report was instead discussing how the Vacancies Act would operate if the office-specific statutes were repealed. That is incorrect, as the district court noted (JA 59-60). Although the Senate Report suggested that other committees

54

might wish to consider repealing such statutes in the future, it went on to say that, "*[i]n any event*, even with respect to the specific positions" covered by "the specific statutes this bill retains," the Vacancies Act would continue to provide an "alternative procedure." Senate Report 17 (emphasis added). The Report thus was clearly addressing how the FVRA would operate if the office-specific statutes were "retain[ed]," not how it would operate if they were repealed.

Plaintiffs also note (FPC Br. 23) that the version of the bill addressed in the Senate Report contained a provision that the Vacancies Act would be "applicable" unless another statutory provision "expressly provides that the such [*sic*] provision supersedes sections 3345 and 3346." Senate Report 26 (proposed § 3347(a)(1)). Although that provision was omitted from the enacted statute, the legislative discussion quoted above, contrary to plaintiffs' suggestion, was *not* directed at that provision. Instead, the Senate Report was discussing a different provision in the bill, one that is nearly identical to the enacted language in § 3347(a)(1). *Compare* Senate Report 16-17 (discussion), with *id.* at 26 (proposed § 3347(a)(2)(A)-(B)). The only difference between the version of *that* provision in the bill and § 3347(a)(1)(A)-(B) as it now stands is that the version in the bill said that the Vacancy Act would be "applicable" unless office-specific statutes existed. *Id.* at 26. And that difference cuts strongly against plaintiffs. Even an exception to "applicab[ility]" was treated by the Senate as consistent with the Vacancies Act continuing to "provide an alternative procedure" for filling vacancies in such offices. *Id.* at 17. *A fortiori*, the language

55

ultimately enacted by Congress in § 3347(a)(1), which merely creates an exception to the FVRA's "exclusiv[ity]" rather than its applicability, confirms that office-specific statutes co-exist with the FVRA rather than displacing it in whole or in part.

### B. The Canon of Constitutional Avoidance is Inapposite for Multiple Reasons

In the proceedings below, plaintiffs argued that the President's selection of Mr. Whitaker to serve temporarily as Acting Attorney General violated the Appointments Clause. The district court analyzed that constitutional claim at length and correctly held it to be without merit. JA 61-81.

On appeal, plaintiffs have abandoned their freestanding constitutional claim. They do not ask this Court to hold that the President's designation of Mr. Whitaker violated the Appointments Clause if it was authorized by the FVRA. Instead, they argue only that this Court should adopt their narrow construction of the FVRA in order to avoid the supposedly "substantial" constitutional question presented by the designation. FPC Br. 31-41.

Plaintiffs' Appointments Clause arguments fare no better under the rubric of constitutional avoidance than they did as a freestanding constitutional claim. The constitutional avoidance canon requires two things before it comes into play: an ambiguous statute that is reasonably amenable to a narrowing construction that would avoid a constitutional question, and a constitutional question that is sufficiently

substantial that adopting a second-best interpretation of the statute is warranted.

Neither is present here.

> **1.    The FVRA is not reasonably amenable to a narrowing construction that would avoid the constitutional question.**

The canon of constitutional avoidance "is an interpretive tool, [which] counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). However, "a court relying on that canon still must *interpret* the statute, not rewrite it." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Courts therefore "may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997).

Here, the FVRA is not "readily susceptible" to the construction urged by plaintiffs. To the contrary, as the district court explained and for the reasons detailed above, plaintiffs' "interpretation is foreclosed by 'ordinary textual analysis.'" JA 61 (quoting *Jennings*, 138 S. Ct. at 842).

Moreover, plaintiffs' proposed reading of the FVRA would not actually avoid their asserted constitutional concerns with the district court's reading of the FVRA. As discussed below, plaintiffs argue that it is constitutionally impermissible for the President to direct an employee, rather than an officer, to perform the duties of a principal officer on an acting basis. But as discussed above, the FVRA expressly authorizes the President to designate senior employees to serve as acting agency

heads, *see* 5 U.S.C. § 3345(a)(3), and plaintiffs themselves concede that it so applies

where there is no Senate-confirmed official designated and available to serve under an

office-specific succession statute.  Accordingly, although plaintiffs' narrowing

construction of the FVRA might evade the asserted constitutional concerns in this

particular case, it would not eliminate the asserted constitutional doubts about the

FVRA.

The canon of constitutional avoidance is inapposite in such circumstances.

The canon rests in part on the interpretive presumption that Congress did not intend

to press the constitutional envelope, and in part on the principle of judicial restraint

that difficult constitutional questions should not be decided unnecessarily.  *See Clark v.*

*Martinez*, 543 U.S. 371, 381 (2005).  Neither of those justifications for adopting a

second-best interpretation of the statute applies where, as here, the statute will

nevertheless continue to unambiguously present the constitutional question.  In short,

the canon requires constitutional avoidance, not constitutional procrastination.

**2.    The President's selection of Mr. Whitaker under the FVRA does not raise a substantial question under the Appointments Clause.**

In addition to abandoning their freestanding constitutional claim, plaintiffs

have significantly narrowed their constitutional arguments.  In the proceedings below,

plaintiffs primarily contended that, under the Appointments Clause, a non-Senate-

confirmed individual may serve as an acting principal officer, if at all, only if he is that

officer's first assistant—such that temporary acting service is purportedly part of his

58

own office's job responsibilities.  *See* JA 63-64.  On appeal, plaintiffs no longer

advance that contention, and have thereby forfeited it.  *See, e.g.*, *Stand Up for California!*

*v. U.S. Dep't of Interior*, 879 F.3d 1177, 1186 (D.C. Cir. 2018).  Instead, plaintiffs rely

solely on their alternative, and much more limited, argument below: that the

Appointments Clause precludes the President from directing an employee, rather than

an officer, to perform temporarily the duties of a vacant principal office in an acting

capacity under the FVRA.  FPC Br. 31-41.  But that narrower argument, like the

abandoned broader argument, does not present the "serious doubt" required to

invoke the constitutional avoidance canon.  *Reno v. Flores*, 507 U.S. 292, 314 n.9

(1993).

    **a.**  Plaintiffs' decision to abandon their broader Appointments Clause argument

is understandable.  As the district court's meticulous opinion demonstrates, two

hundred years of precedent from all three branches of government make clear that the

Appointments Clause does not confine the President to choosing Senate-confirmed

officers or first assistants to serve as acting agency heads.  *See* JA 63-78.  We briefly

summarize this precedent because it is relevant to why the district court correctly

rejected the narrower argument that plaintiffs continue to press (under the guise of

the avoidance canon).

    To begin with legislative practice, "from the time of the founding to today,

Congress has continuously authorized the President to direct persons who are not

first assistants and who lack any constitutionally relevant Senate confirmation to

perform the duties of a principal office temporarily on an acting basis." JA 71. The

district court's opinion surveys this "unbroken legislative practice" (*id.*) in detail. *See*

JA 68-71.

As early as 1792, Congress authorized the President to choose "any person" to

serve as an acting Secretary of State, Treasury, or War in the event of death, illness, or

absence from the seat of government. *See SW General*, 137 S. Ct. at 935. In 1795,

Congress expanded the President's authority by authorizing him to choose any person

to serve as Acting Secretary *regardless* of the reason for the vacancy, while "impos[ing]

a six-month limit on acting service." *Id.* Congress easily could have limited the

President's authority under these statutes by: (1) designating as acting the "first

assistant" in each department; (2) requiring the President to choose among Senate-

confirmed officials or at least among federal officers; or (3) authorizing the President

to choose otherwise only if none of the prior categories of individuals were available

or if there were some other type of emergency. But Congress did none of these

things. The 1792 and 1795 Acts are of special importance, as "early congressional

practice . . . provides contemporaneous and weighty evidence of the Constitution's

meaning." *Alden v. Maine*, 527 U.S. 706, 743-44 (1999) (quotation marks omitted).

In the 1860s, Congress replaced these statutes with more general vacancy laws.

JA 69-70. The Vacancies Act of 1868 imposed short time limits on acting service and

limited the President's choice of persons to fill vacant offices, but it did not confine

the role of acting agency head to first assistants, as it allowed the President to choose

any Senate-confirmed officer (even if the officer's duties were entirely unrelated to the duties of the vacant office and the officer had been confirmed before the Vacancies Act was enacted). JA 70. Congress gradually liberalized the terms of the Vacancies Act over the intervening years, then substantially expanded the law by enacting the FVRA, which expressly authorizes the President to direct non-Senate-confirmed senior officers and employees of an agency to serve as acting agency head. Just like the early congressional statutes, the FVRA authorizes the President to fill vacancies, including for agency heads, for a temporary period of at least several months without regard to whether there is a "first assistant" or Senate-confirmed officer available to serve or any form of exigency.

This legislative "understanding is further confirmed by the longstanding practice of the Executive Branch." JA 71. As the district court explained in detail, Presidents historically have chosen non-Senate-confirmed individuals to assume temporarily the duties of principal offices in the event of vacancies or absences, even though such individuals were *not* first assistants in the sense that their pre-existing job responsibilities included serving as acting agency head when needed. Most significantly, in over one hundred instances, Presidents exercised their discretion to designate non-Senate-confirmed chief clerks to serve as Acting or *ad interim* Secretaries—a distinct role for which they sometimes obtained additional compensation. JA 71-73. Presidents also frequently designated as acting principal officers the heads of other Departments, even when the functions of their Senate-

61

confirmed offices were not germane to the duties of the vacant offices and thus the Appointments Clause would have required additional Senate confirmation for them to fill those offices on a permanent basis. JA 73-74. Indeed, on at least three occasions, President Jackson designated persons with no other government position to serve as an acting principal officer. JA 74.

And here too, the historical executive practice continues to modern times: Presidents George W. Bush and Barack Obama used their FVRA authority to place chiefs of staff in the lines of succession for executive agencies, including sometimes above a Senate-confirmed officer within the same agency. *See* No. 18-cv-2988, Dkt. No. 16, at 67 & nn.38-39. That should not be surprising, because a chief of staff has a particularly comprehensive understanding of the agency head's duties and the agency's operation as a whole.

This consistent and mutually reinforcing record of legislative and executive practice is confirmed by Supreme Court precedent, which "has repeatedly embraced the government's view that it is the temporary nature of acting duties that permits an individual to perform them without becoming a principal officer under the Appointments Clause." JA 64. The leading case, *United States v. Eaton*, 169 U.S. 331 (1898), is discussed at length in the district court's opinion. *See* JA 64-67.

Eaton, a missionary who was not employed by the federal government, was appointed as Vice Consul General of Siam in order to take over the consulate after the departure of the Consul General, who was terminally ill. *Eaton*, 169 U.S. at 331-

62

32.  Eaton served as acting Consul General for almost a year.  *Id.* at 332-33.  In a dispute over salary payments, the Supreme Court upheld the constitutionality of Eaton's appointment and the underlying statutory scheme providing for his appointment.  *Id.* at 334-35, 343-44, 352.  *Eaton* held that a subordinate "charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions," is not "thereby transformed into the superior and permanent official" for purposes of the Appointments Clause and may serve without Senate confirmation.  *Id.* at 343-44.

As the district court explained, "to the extent *Eaton* involved a first assistant at all, it involved one only in the most superficial and formalistic sense": Eaton was a clergyman with no connection to the government, who upon the Consul General's imminent departure was appointed to the office of Vice Consul, an office the sole function of which was to assume the Consul General's duties in the event of absence or vacancy.  JA 66.  The core feature of the Vice Consul's role that distinguished it from that of the Consul General for constitutional purposes, and that permitted Eaton to serve as Acting Consul General without Presidential selection and Senate confirmation, was the fact that Congress had confined Vice Consuls to a statutorily limited period of service "and thereby * * * deprive[d] them of the character of 'consuls.'"  *Eaton*, 169 U.S. at 343.  The "special and temporary conditions" referred to in *Eaton* were not any particular exigency, but the limits of the then-regulatory

63

scheme, which permitted service during "the absence or the temporary inability of the consul," whatever the cause. *Id.* at 342-43.

Finally, as the district court noted, the Supreme Court has cited *Eaton* on multiple occasions, and each time it has characterized the holding based on the limited duration of Eaton's service, without limiting it to first assistants or particular exigencies. JA 67-68, 68 n.12. In *Morrison v. Olson*, 487 U.S. 654, 670-73 (1988), the Court affirmatively relied on the temporary nature of the Vice Consul's acting service in *Eaton* to support the Court's holding that the independent counsel was an inferior rather than principal officer. And in *Edmond v. United States*, 520 U.S. 651, 661 (1997), the Court cited *Eaton* with approval and described it as holding that "a vice consul charged temporarily with the duties of the consul" was an inferior officer.

**b.** Plaintiffs cannot evade these established precedents and principles by limiting their Appointments Clause objection to the argument that federal employees, as opposed to inferior officers, may not be directed by the President to temporarily serve as acting principal officers. The district court rightly rejected that narrower argument too. *See* JA 78-81.

Although plaintiffs emphasize (FPC Br. 35-36) that the Appointments Clause specifies the process for selecting all "Officers" whose positions are "established by Law," U.S. Const. art. II, § 2, cl. 2, plaintiffs fail to grapple with the fact that the Clause's text does not expressly address whether non-officer employees may temporarily perform the functions of a vacant office. In particular, the Clause neither

64

says that the functions of an office must *always be performed* by an officer nor says that an individual temporarily performing such functions *necessarily becomes* an officer. To the contrary, as plaintiffs acknowledge (FPC Br. 35), the Supreme Court has treated individuals as "mere employees" rather than constitutional "officers" when "their duties were 'occasional or temporary' rather than 'continuing and permanent.'" *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1879)).

Again, plaintiffs' argument is not just unsupported by the Appointments Clause's text, but foreclosed by historical practice. As noted above, the 1792 and 1795 vacancy acts provided that the President may "authorize any person * * * to perform the duties" of the Secretaries of State, Treasury, and War in the event of vacancies or absences. 1 Stat. at 281; 1 Stat. at 415. The statutes thus unambiguously gave Presidents plenary discretion to designate employees (as well as private citizens) to serve. Plaintiffs' primary response (FPC Br. 40) is to speculate that the early Congresses simply disregarded the requirements of the Appointments Clause when they enacted these statutes. That speculation is both unsupported and inconsistent with the views of the Supreme Court, which has consistently treated "early

65

congressional practice" as "provid[ing] 'contemporaneous and weighty evidence of the Constitution's meaning.'" *Alden*, 527 U.S. at 743-44.[2]

Plaintiffs also argue (FPC Br. 36-37) that *Eaton* supports their position because Eaton was technically appointed to the inferior office of Vice Consul. But again, as the district court noted, that was an appointment to an inferior office "only in the most superficial and formalistic sense," JA 66, because the sole duty of Vice Consul was to perform the functions of the Consul General in his absence, and Eaton was a private missionary before he was chosen to serve upon the Consul General's imminent departure. To the extent there is any meaningful difference between the "appointment" to the "office" in *Eaton* and the President's direction here that the

---

[2] Plaintiffs mischaracterize (FPC Br. 40) two Attorney General opinions as suggesting that early Congresses "did not account for" the requirements of the Appointments Clause. Neither opinion identified a statute that purported to authorize a manner of selection for government service that would have violated the Appointments Clause. *See* 1 Op. Att'y Gen. 65 (1796) (explaining that a statute was properly interpreted to require treaty negotiators to be validly appointed officers); 7 Op. Att'y Gen. 186, 194-95 (1855) (observing that a statute had mentioned only a subset of the diplomatic officers the President is constitutionally authorized to appoint). Plaintiffs also cite a treatise discussing an early act of Congress that, in plaintiffs' words (FPC Br. 40), "omitted [the] President's removal power" in connection with the appointment of cabinet secretaries. But as the treatise explains, the act omitted an express removal authorization precisely because Congress recognized that the Constitution itself conferred the removal power on the President. *See* Lucy M. Salmon, *History of the Appointing Power of the President* 16-17 (1886). Far from disregarding the Constitution's requirements, this congressional decision has been recognized by the Supreme Court as "contemporaneous and weighty evidence of the Constitution's meaning." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010).

Attorney General's *own Chief of Staff* should temporarily serve as Acting Attorney General given the Attorney General's resignation, it cuts decisively against plaintiffs.

In any event, even if the Constitution did require employees to be appointed as inferior officers before they could perform the duties of a vacant principal office on an acting basis, the President's designation of Mr. Whitaker pursuant to the FVRA would satisfy the Appointments Clause, which authorizes Congress "by Law [to] vest the Appointment" of inferior officers "in the President alone." U.S. Const. art. II, § 2, cl. 2. As the district court recognized (JA 79-80), the fact that the FVRA does not use the "magic word[]" "appoint" and instead uses the word "direct," 5 U.S.C. § 3345(a)(2)-(3), is of no constitutional or statutory significance. If necessary, an FVRA direction may be treated as a constitutional appointment, because, at the Founding, "the verb 'appoint' meant 'to establish anything by decree' or 'to allot, assign, or designate.'" *SW General*, 137 S. Ct. at 946 (Thomas, J., concurring) (cleaned up); *see also* JA 79-80 (distinguishing *Weiss v. United States*, 510 U.S. 163 (1994), which held only that a statute using terms like "detail" and "assign" did not require an "appointment" as a statutory matter, not that it foreclosed interpreting the statute as authorizing an appointment even if necessary to avoid a constitutional problem). The OLC opinion invoked by plaintiffs (FPC Br. 34) itself concluded that "understanding the President's 'direct[ion]' under 5 U.S.C. § 3345(a)(3) to involve an appointment of an employee as an inferior officer" would avoid any constitutional question that might be presented by an employee's temporary performance of the duties of a vacant

office. *Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121, 125 (2003).

Indeed, if Congress had enacted a statute that created the "office" of "acting agency head" and authorized the President to "appoint" to that office an employee covered by 5 U.S.C. § 3345(a)(3), that would be materially indistinguishable from both the statutory scheme in *Eaton* and the FVRA itself. This dooms plaintiffs' invocation of the canon of constitutional avoidance for two related reasons. First, it means, ironically, that they are improperly urging this Court to adopt a technical reading of the FVRA that manufactures rather than avoids a constitutional question. Second, it demonstrates that their asserted objection to the President's designation of Mr. Whitaker is ultimately grounded, not in the Appointment Clause's substance, but rather on a misreading of the FVRA's form.[3]

Finally, plaintiffs warn that if the President is allowed to designate employees to serve temporarily as acting agency heads, the Senate's role under the Appointments Clause will be eviscerated and the Appointments Clause itself will become a nullity. FPC Br. 32-34. Plaintiffs' concerns are misplaced. Presidents were authorized by

---

[3] Plaintiffs argue in passing (FPC Br. 41 n.3) that if the President's designation of Mr. Whitaker did amount to an appointment as an officer, the absence of supervision during his temporary service rendered him a principal officer rather than an inferior one, and therefore required Senate confirmation. Again, *Eaton* forecloses that argument, as does the longstanding legislative and executive practice authorizing individuals to serve as acting agency heads without Senate confirmation for that service.

Congress to designate employees to serve as acting cabinet secretaries for nearly seventy years after the founding of the Republic, and the apocalyptic scenarios sketched out by plaintiffs never materialized. Nor have they materialized in the additional two decades that the FVRA has been in effect and has indisputably authorized such designations in at least some circumstances. Moreover, the President's authority under the FVRA is under the control of Congress itself. If Congress ever determines that the FVRA gives the President undue latitude, it may pare back on the President's statutory authority, as it did when it enacted the Vacancies Act in 1868. In all events, the President's designation of the former Attorney General's Chief of Staff for the few months necessary for Senate confirmation of the replacement Attorney General falls well within the authority contemplated by both the FVRA and the 1795 vacancy statute.

### C.    In Any Event, Attorney General Barr Has Validly Ratified the Rule

Attorney General Barr was confirmed and sworn in on February 14, 2019, shortly before the district court ruled below. Although he agreed that the President's designation of Mr. Whitaker was valid, he has now formally ratified the Rule in order to pretermit needless further litigation over the question. *See Bump-Stock-Type Devices*, https://go.usa.gov/xEsRD (Mar. 11, 2019) (to be published in the Federal Register Mar. 14, 2019). Before doing so, the Attorney General "familiarized [him]self with the rulemaking record that was before the Acting Attorney General and * * *

69

reevaluated those materials without any deference to his earlier decision." *Id.* Having "independently reevaluate[d] the above-mentioned rule and the underlying rulemaking record," the Attorney General "personally c[a]me to the conclusion that it is appropriate to ratify and affirm the final rule as it was published at 83 FR 66514," and he did so. *Id.* Accordingly, the Attorney General's ratification is sufficient authority for the Rule and obviates plaintiffs' objections to Acting Attorney General Whitaker's authority.

### 1.  Attorney General Barr's ratification of the Rule cures any asserted defect in Acting Attorney General Whitaker's authority.

It is well settled that agency actions taken by an invalidly appointed official are subject to ratification by an official who has been properly appointed. *See, e.g.*, *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 370-72 (D.C. Cir. 2017); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117-21 (D.C. Cir. 2015); *Doolin Sec. Sav. Bank, FSB v. Office of Thrift Supervision*, 139 F.3d 203, 212 (D.C. Cir. 1998); *FEC v. Legi-Tech*, 75 F.3d 704, 708-709 (D.C. Cir 1996). It is equally well settled that when an action by an improperly appointed official is properly ratified, the ratification cures the original defect in authority. *See Wilkes-Barre*, 857 F.3d at 371 ("Ratification can remedy defects arising from the decisions of improperly appointed officials"); *Intercollegiate Broadcasting System*, 796 F.3d at 117-21; *Doolin*, 139 F.3d at 212-14; *Legi-Tech*, 75 F.3d at 708-09; *see also CFPB v. Gordon*, 819 F.3d 1179, 1190-91 (9th Cir. 2016); *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 603 (3d Cir. 2016).

70

For example, in *Doolin*, an Acting Director of the Office of Thrift Supervision brought charges against a bank. Following that official's resignation, another Acting Director ratified the charges in the course of issuing a final administrative decision against the bank. 139 F.3d at 212-14. This Court held that the ratification "cured any deficiency caused by [the first Acting Director's] [alleged] lack of lawful authority." *Id.* at 212. The Court noted that the ratifying officer had the authority to take the same underlying action himself at the time of the ratification; that the ratification was the product of "a detached and considered judgment" on the part of the ratifying officer; and that requiring the agency to conduct the administrative process all over again "would bring about the same outcome" and "would do nothing but give the Bank the benefit of delay." *Id.* at 213-14.

In order for an agency to validly ratify a previously unauthorized decision, the ratifying officer must have authority to perform the ratified action at the time that the ratification is made. *See FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994); *Doolin*, 139 F.3d at 213. That requirement is readily satisfied here. The Attorney General has authority to prescribe rules and regulations to enforce the National Firearms Act and subsequent legislation. 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a); *see*

*id.* § 7801(a)(2)(A). If the Rule had not already been issued, Attorney General Barr would have been free to issue the same Rule himself.[4]

The Court's precedents "establish that ratification can remedy a defect arising from the decision of 'an improperly appointed official * * * when * * * a properly appointed official has the power to conduct an independent evaluation of the merits and does so.'" *Wilkes-Barre*, 857 F.3d at 371 (omissions in original) (quoting *Intercollegiate Broad.*, 796 F.3d at 117); *see also Doolin*, 139 F.3d at 213 (sustaining ratification based on "a detached and considered judgment" regarding the merits of the ratified action). It is not entirely clear whether an "independent evaluation of the merits" and a "detached and considered judgment" are prerequisites to ratification. *See Intercollegiate Broad.*, 796 F.3d at 118 & n.1 (discussing Court's acceptance of possibly "rubberstamped" ratification decisions in *Legi-Tech* and other cases). But to the extent that they are, those requirements are amply satisfied here by the Attorney

---

[4] The Restatement (Second) of Agency suggests that the principal must also have had authority to perform the ratified act at the time the act was originally taken. *See NRA Political Victory Fund*, 513 U.S. at 98. Under the more recent Restatement (Third) of Agency, in contrast, "a ratification is valid even if the principal did not have capacity to act at the time, so long as the person ratifying has the capacity to act at the time of ratification." *Gordon*, 819 F.3d at 1191 (citing Restatement (Third) § 4.04(1)). The Court need not choose between these two approaches, because it is unquestioned that authority to promulgate the Rule was vested in the Attorney General's office at the time that the Rule was issued. Ratification does not require a further showing that the person performing the Attorney General's functions at that time was properly appointed. *See, e.g., Doolin*, 139 F.3d at 214 (holding that action by Acting Director of Office of Thrift Supervision was validly ratified by his successor even if Acting Director himself had not "lawfully occupied the position of Director" at the time that he acted); *Intercollegiate Broadcasting*, 796 F.3d at 119 n.3 (discussing *Doolin*).

72

General's informed, de novo reconsideration.  *See supra* pp. 69-70; *State Nat'l Bank of Big Spring v. Lew*, 197 F. Supp. 3d 177, 184-86 (D.D.C. 2016) (sustaining ratification of previously issued regulations and noting that "nothing in [this Court's agency ratification cases] implies that the particular form of administrative action at issue is dispositive").

Finally, the FVRA does not preclude ratification in these circumstances. Although the FVRA precludes ratification of certain actions by officers who were not designated in accordance with its requirements, that prohibition applies only to actions "taken * * * in the performance of a[] function or duty of a vacant office."  5 U.S.C. § 3348(d)(1)-(2).  And for purposes of that prohibition, the FVRA narrowly defines "function or duty" as limited to non-delegable actions that are "required" by statute or regulation to be performed "by the applicable officer (*and only that officer*)." *Id.* § 3348(a)(2)(A)-(B) (emphasis added).  Here, no statute or regulation provides that only the Attorney General may issue rules regarding the meaning of "machinegun." To the contrary, Congress has provided that "*any* function of the Attorney General" may be delegated by him to "any other officer, employee, or agency of the Department of Justice."  28 U.S.C. § 510 (emphasis added).  And none of the statutes or regulations underlying the bump stock rule prohibits the Attorney General from delegating or re-delegating his rulemaking functions under those authorities.  *See* 18 U.S.C. § 926; 26 U.S.C. §§ 7801(a)(2) and 7805(a); 22 U.S.C. § 2778; Executive Order No. 13,637, 78 Fed. Reg. 16,129, 16,130 (Mar. 8, 2013).  This rulemaking function

73

therefore does not come within the restrictive definition of a "function or duty" of the Attorney General that may not be ratified under § 3348.

> **2.    Given Attorney General Barr's ratification of the Rule, this Court need not and should not address Acting Attorney General Whitaker's Authority to Issue the Rule.**

Because the Attorney General's ratification "cure[s] any deficiency caused by [the Acting Attorney General's alleged] lack of lawful authority," *Doolin*, 139 F.3d at 212, this Court should affirm the denial of a preliminary injunction against the Rule without passing on the validity of the Acting Attorney General's designation.  That is the approach that this Court properly took in *Doolin.  Id.* at 214 (declining to decide "whether [the predecessor] lawfully occupied the position of Director").[5]  So too here, the ratification of the Rule by the Attorney General allows this Court to resolve the case without passing on the validity of the Acting Attorney General's designation, and basic principles of judicial restraint instruct that it is not appropriate to decide the statutory and constitutional issues where their resolution is not required to dispose of the case.  "[T]he cardinal principle of judicial restraint [is that] if it is not necessary to decide more, it is necessary not to decide more." *Cohen v. Board of Trustees of Univ. of Dist. of Columbia*, 819 F.3d 476, 485 (D.C. Cir. 2016) (internal quotation marks omitted).

---

[5] In this Court's ratification cases besides *Doolin*, the invalidity of the appointment at issue had already been resolved in litigation preceding the ratification.

*Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000), is not to the contrary.
There, this Court decided the merits of an Appointments Clause challenge to an
administrative law judge's appointment even though the judge's decision had been
reviewed de novo and affirmed by the agency itself. *Landry* distinguished *Doolin* on
the ground that *Doolin* involved the ratification of an invalidly appointed official's
action by the official's validly appointed successor. *Id.* The Court reasoned that
*Doolin* therefore did not involve the "special problem" presented by "Appointments
Clause analysis of purely decision recommending employees" and "did not present the
catch–22 of the present case." *Id.*; *see Intercollegiate Broad.*, 796 F.3d at 124 (discussing
*Landry*). The ratification in this case occupies the same position as the one in *Doolin*,
and is distinguishable from *Landry* on the same grounds.

Finally, contrary to plaintiffs' suggestion below, there is no basis for
considering the validity of the Acting Attorney General's designation under a
mootness exception. Plaintiffs' request for a preliminary injunction against the Rule
based on the alleged invalidity of the designation has not been mooted by the
ratification; rather, the ratification simply causes the challenge to the Rule to fail on
the merits for an additional reason and thus renders it unnecessary and inappropriate
to pass on the designation. *See Doolin*, 139 F.3d at 214. Although plaintiffs separately
sought relief below against the designation itself, the order on appeal did not pass on
such relief and plaintiffs plainly lack standing to challenge the designation
independent of its alleged effect on the Rule that concretely injures them. In any

75

event, no mootness exception would apply here because there is no reasonable

likelihood that there will be (1) another Attorney General vacancy (2) that leads to the

designation of an employee rather than an available Deputy or Associate Attorney

General to serve as Acting Attorney General and (3) that results in an action by the

Acting Attorney General that injures these particular plaintiffs themselves.  *See*, *e.g.,*

*Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (the "capable

of repetition yet evading review" exception requires "a reasonable expectation that the

same complaining party would be subjected to the same action again"); *Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (the "voluntary

cessation" exception is inapplicable where "the allegedly wrongful behavior could not

reasonably be expected to recur").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

MATTHEW J. GLOVER
*Counsel to the Assistant Attorney General*

SCOTT R. MCINTOSH
MICHAEL S. RAAB
ABBY C. WRIGHT

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

March 2019

# CERTIFICATE OF COMPLIANCE

This brief complies with the Court's order of March 1, 2019, because it contains 19,490 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

# TABLE OF CONTENTS

**Authorities Related to APA Claim:**

26 U.S.C. § 5845(b) ................................................................................A1

ATF Ruling 2006-2 ................................................................................A2

ATF Classification Letter, "Positive Reset Trigger" (Apr. 13, 2015) ............................A5

ATF Classification Letter, "LV-15 Trigger Reset Devices" (Oct. 7, 2016)................ A11

ATF Classification Letter, "AutoGlove" (Sept. 11, 2017) ........................................... A22

**Authorities Related to Appointment Claim:**

28 U.S.C. § 508................................................................................ A29

Federal Vacancies Reform Act, 5 USC. §§ 3345-3349d ............................................. A30

Vacancies Act, 5 U.S.C. §§ 3345-3349 (1994) ..................................................... A37

Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281 ...................................... A39

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415 ........................................................ A40

**26 U.S.C. § 5845(b)**

**§ 5845. Definitions**

(**b**) **Machinegun.**--The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

**18 U.S.C. 922(o):  Transfer or possession of machinegun**
**26 U.S.C. 5845(b):  Definition of machinegun**
**18 U.S.C. 921(a)(23):  Definition of machinegun**

*The definition of machinegun in the National Firearms Act and the Gun Control Act includes a part or parts that are designed and intended for use in converting a weapon into a machinegun.  This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.*

**ATF Rul. 2006-2**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has been asked by several members of the firearms industry to classify devices that are exclusively designed to increase the rate of fire of a semiautomatic firearm.  These devices, when attached to a firearm, result in the firearm discharging more than one shot with a single function of the trigger.  ATF has been asked whether these devices fall within the definition of machinegun under the National Firearms Act (NFA) and Gun Control Act of 1968 (GCA).  As explained herein, these devices, once activated by a single pull of the trigger, initiate an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted.  Accordingly, these devices are properly classified as a part "*designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*" and therefore machineguns under the NFA and GCA.

The National Firearms Act (NFA), 26 U.S.C. Chapter 53, defines the term "firearm" to include a machinegun.  Section 5845(b) of the NFA defines "machinegun" as *"any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."*  The Gun Control Act of 1968 (GCA), 18 U.S.C. Chapter 44, defines machinegun identically to the NFA.  18 U.S.C. 921(a)(23).  Pursuant to 18 U.S.C. 922(o), machineguns manufactured on or after May 19, 1986, may only be

- 2 -

transferred to or possessed by Federal, State, and local government agencies for official use.

ATF has examined several firearms accessory devices that are designed and intended to accelerate the rate of fire for semiautomatic firearms.  One such device consists of the following components:  two metal blocks; the first block replaces the original manufacturer's V-Block of a Ruger 10/22 rifle and has attached two rods approximately ¼ inch in diameter and approximately 6 inches in length; the second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, has been machined to allow the two guide rods of the first block to pass through.  The second block supports the guide rods and attaches to the stock.  Using ¼ inch rods, metal washers, rubber and metal bushings, two collars with set screws, one coiled spring, C-clamps, and a split ring, the two blocks are assembled together with the composite stock.  As attached to the firearm, the device permits the entire firearm (receiver and all its firing components) to recoil a short distance within the stock when fired.  A shooter pulls the trigger which causes the firearm to discharge.  As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock.  The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed.  Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger.  Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed.  The assembled device is advertised to fire approximately 650 rounds per minute.  Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

As noted above, a part or parts designed and intended to convert a weapon into a machinegun, *i.e.*, a weapon that will shoot automatically more than one shot, without manual reloading, by a single function of the trigger, is a machinegun under the NFA and GCA.  ATF has determined that the device constitutes a machinegun under the NFA and GCA.  This determination is consistent with the legislative history of the National Firearms Act in which the drafters equated "single function of the trigger" with "single pull of the trigger."  *See, e.g., National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066,* 73rd Cong., at 40 (1934).  Accordingly, conversion parts that, when installed in a semiautomatic rifle, result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger, are a machinegun as defined in the National Firearms Act and the Gun Control Act.

*Held*, a device (consisting of a block replacing the original manufacturer's V-Block of a Ruger 10/22 rifle with two attached rods approximately ¼ inch in diameter and approximately 6 inches in length; a second block, approximately 3 inches long, 1 ⅜ inches wide, and ¾ inch high, machined to allow the two guide rods of the first block to pass through; the second block supporting the guide rods and attached to the stock; using ¼ inch rods; metal washers; rubber and metal bushings; two collars with set screws; one coiled spring; C-clamps; a split ring; the two blocks assembled together with the

composite stock) that is designed to attach to a firearm and, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until either the finger is released or the ammunition supply is exhausted, is a machinegun under the National Firearms Act, 26 U.S.C. 5845(b), and the Gun Control Act, 18 U.S.C. 921(a)(23).

*Held further*, manufacture and distribution of any device described in this ruling must comply with all provisions of the NFA and the GCA, including 18 U.S.C. 922(o).

To the extent that previous ATF rulings are inconsistent with this determination, they are hereby overruled.

Date approved:  December 13, 2006

Michael J. Sullivan
Director

Filed: 03/13/2019    Page 100 of 135

Document #1777426

USCA Case #19-5042



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

907020:MRC
3311/302558

**APR 1 3 2015**

 Ruble

Dear Mr. Ruble:

This refers to your recent correspondence and submission of a physical sample along with a power point to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB), Martinsburg, West Virginia. Specifically, you ask FTISB to evaluate your prototype design and determine its classification under Federal law.

The Gun Control Act of 1968 (GCA), 18 U.S.C. Section 921(a)(3), defines the term "firearm" as follows: "...(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

Additionally, the National Firearms Act (NFA), 26 U.S.C. Section 5845(b), defines "machinegun" as—

"...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

You have submitted to FTISB a prototype AR-style rifle with newly designed fire control components that you describe as a "positive reset trigger." In your submission you identify the following fire control components:

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 101 of 135

- Gun support/gun stock
- Secondary trigger
- Secondary trigger link
- Pivot toggle
- Shuttle link
- Shuttle

The internal components comprising your prototype design are shown here:



You provided the prototype shown here:



The internal components are shown here as they would exist inside the prototype.

USCA Case #19-5042     Document #1777426     Filed: 03/13/2019     Page 102 of 135



The cycle of operation of your prototype is shown below.





After the trigger is pulled, a projectile is expelled and the firearm barrel and receiver recoil, moving each backward (step 1, below). The shuttle, also attached to the barrel, moves backward in concert (step 2). The backward movement of the shuttle pushes the shuttle link and the top end of the pivot

toggle (step 3). The pivot toggle rotates, pushing the secondary trigger link forward (step 5). Finally, the secondary trigger is pushed forward, moving the trigger finger forward as well. Each of these steps happens automatically as a result of the recoil energy generated from firing a projectile.



In step 6 above, the forward movement of the secondary trigger pushes the finger forward countering the constant rearward pressure applied by the shooter. The 10/22 trigger moves forward as well.



In the normal operation of the 10/22, the trigger would move forward only when the shooter releases the trigger. However, the prototype design utilizes recoil energy to move the trigger finger. In this way, the shooter can maintain constant pressure through a single pull of the trigger.

Once the recoil energy has dissipated, the shooter's constant rearward pressure pushes the secondary trigger backward (step 1, below). In turn, this moves the secondary trigger link (step 2), rotates the pivot toggle (step 3), and pushes the shuttle link and shuttle forward (step 4). The shuttle moves the receiver and barrel forward.

A8



At this point the 10/22 receiver is capable of firing a second projectile (see below). The constant rearward pressure applied by the shooter's trigger finger fires the subsequent projectile, and the process repeats itself until the shooter finally releases the rearward pressure.



As stated above, the NFA defines machinegun, in relevant part, as "any weapon which shoots…automatically more than one shot, without manual reloading, by a single function of the trigger." ATF has long held that a "single function of the trigger" is a single "pull" or, alternatively, a single "release" of the trigger. Therefore, a firearm that fires a single projectile upon a pull of the trigger, and fires a single projectile upon the release of that trigger would not be classified as a "machinegun" under Federal law.

Upon review, we find that your prototype permits a shooter to fire automatically, more than one shot, without manual reloading, by a single function of the trigger. Your design utilizes recoil energy to move the shooter's finger and permits the firearm to reset. However, your prototype actually utilizes the single pull of the trigger to accomplish this. In this way, the prototype design uses a single

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 104 of 135



function of the trigger to operate the design and causes an otherwise semiautomatic firearm to fire more than a single projectile automatically.

ATF has long held that a single function of the trigger results from a single action by the shooter to initiate the firing sequence, whether it is a push or a pull movement.

Based on our evaluation and provisions of Federal law cited above, FTISB concludes that the prototype design is a combination of parts designed and intended for use in converting a weapon into a machinegun. It is therefore a "machinegun" as defined in the above-cited § 5845(b).

We thank you for your inquiry and trust that the foregoing has been responsive.

Sincerely yours,

Max M. Kingery
Acting Chief, Firearms Technology Industry Services Branch

Page 106 of 135    Filed: 03/13/2019    Document #1777426    USCA Case #19-5042



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

907010: RKD
3311/303845

**OCT 0 7 2016**

Saint Kings Technologies, LLC.

Dear Mr. Santos-Reis:

This is in reference to your submission and accompanying correspondence to, Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry
Services Branch (FTISB), which is accompanied by two AR-15 type rifles equipped with
what is described as LV-15 Trigger Reset Devices (see enclosed photos).

As you know, the National Firearms Act (NFA), 26 U.S.C. § 5845(b), defines the term
"machinegun" as—

...any weapon which shoots, is designed to shoot, or can be readily restored to shoot,
*automatically more than one shot, without manual reloading, by a single function of the
trigger. The term shall also include the frame or receiver of any such weapon, any part
designed and intended solely and exclusively, or combination of parts designed and
intended, for use in converting a weapon into a machinegun, and any combination of
parts from which a machinegun can be assembled if such parts are in the possession or
under the control of a person.*

The submitted devices, are described as "trigger reset devices." You further describe the
design and function of the devices as "*a trigger actuating device that aids the user of an
AR type rifle in pulling the trigger faster.*" As a part of this description, you note that the
submitted device is "*an electronic device that used a rechargeable battery. The principle
of the device is as follows: After the trigger is pulled and the rifle fired, the device pushes
the trigger forward rapidly to reset the trigger, so that the user can pull the trigger
faster.*"

A11

The first sample examined by FTISB personnel consists of a Bushmaster model XM15-E2S .223-5.56 caliber AR-15 pattern rifle, serial number L476739, which is equipped with the following items:

- A self-contained trigger mechanism within an aluminum housing, being equipped with an electrical connection.
- A modified two position semiauto AR-15 type selector lever.
- An 11.1V 1200MAH rechargeable battery pack.
- A grip assembly with trigger guard having electrical connections and a piston which projects forward through the lower rear portion of the trigger guard and pushes the trigger forward as the firearm cycles.
- A grip attachment screw/bolt and straight pin.
- Several extra battery assemblies and a "Tenergy" charging assembly.
- One extra LV-15 trigger/grip/selector assembly.

The second sample, submitted at a later date, consists of an Anderson Manufacturing model AM-15, 5.56 caliber AR-15 pattern rifle, serial number 15272793, equipped with a similar "improved" version of the device. This version was noted to incorporate a three position selector rather than the two position selector featured on the first sample.

The written correspondence received with the samples provided the following statements in steps 4 thru 9, offering a description of how the device differed in function from that of a standard unmodified AR-15 pattern rifle:

4. *"The fourth step is where the process first differs from a normal AR-15 trigger group. As the hammer is reset and engaged past the disconnector, it also engages the sensor that is mounted behind the trigger group. This sends a signal to the control circuit and will continue sending that signal until it is released. For now, the control circuit, will not do anything, it waits until it stops receiving the signal."*

5. *"As the bolt-carrier starts moving forward, it reaches a point where it releases the hammer and allows the hammer to be captured by the disconnector. Around the point where the hammer is allowed to rest on the disconnector is when it disengages the sensor. Once the sensor is disengaged and stops sending the signal to the control circuit, the control circuit begins a timer which lasts about 35 milliseconds."*

6. *"With the timer still counting down, the bolt carrier group finishes travelling forward, having chambered a round, and the rifle is now in battery and ready to fire."*

7. *"The seventh step occurs when the timer finishes counting down that 25 millisecond delay. Once the count-down is over, it turns on the solenoid for 15 milliseconds. As the solenoid turns on, the solenoid rod is going to try to push forward on the trigger, pushing it back to the firing position. However, the solenoid can only exert so much force. Therefore, the trigger will only reset if the user allows it to, by not exerting more than 12 pounds of force during said 15 millisecond interval."*

USCA Case #19-5042 Document #1777426 Filed: 03/13/2019 Page 107 of 135

A12

8. *"The final step takes place once the user has allowed the trigger to move forward enough, at which time the disconnector will release the hammer and allow it to set on the main sear, again just like in any AR-15. While the user must still allow the trigger to physically move forward to reset, the only difference is that here the user is being assisted in order to reset the trigger faster."*

9. *"After the trigger has reset the rifle does not continue to shoot automatically, as the trigger is forced back into the ready/cocked position, the user, as in all mechanical reset devices, must consciously pull the trigger if he/she desires to fire another round. Each pull of the trigger represents a separate and conscious decision by the operator to fire another round. If the user does not pull the trigger again, the rifle will not fire again."*

When the trigger was pulled slowly and retained in a position at which the hammer was just release with the device actuated during manual field testing, a condition resembling automatic cycling was observed on several occasions, during field testing of the LV-15 equipped firearm. Actual test firing with live ammunition replicated this same condition.

In order to ensure that the LV-15 equipped firearm was actually firing more than one shot, without manual reloading, with a single function of the trigger, rather than firing a single shot with each function of the trigger, the following procedure was followed.

- A common 9-3/4 inch zip-tie was installed around the rear of the grip and the front of the sample's trigger.

- The zip-tie was gradually tightened until the trigger was retracted just enough to allow the hammer to fall.

- With the trigger retained in this position, the bolt assembly was retracted and retained in an open position, with the aid of the bolt catch.

- A five-round ammunition load was placed into the sample's magazine and the magazine was inserted into the firearm.

- Without touching the trigger (which was being retained in a fixed position by the plastic zip-tie), the bolt catch was depressed allowing the firearms bolt to travel forward and chamber a cartridge. Upon chambering the cartridge the weapon fired the entire five-round ammunition load automatically without the trigger being repeatedly pulled and released.

- This same test was repeated several times with a five- round ammunition load and once with a fifteen-round ammunition load. In all instances, the LV-15 equipped firearm discharged its entire ammunition load upon initiating the firing sequence by depressing the bolt release, thus allowing the bolt assembly to move forward and both chamber and fire cartridges repeatedly.

USCA Case #19-5042 Document #1777426 Filed: 03/13/2019 Page 108 of 135

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 109 of 135



First sample LV-15 equipped firearm with simple zip-tie installed, allowing firearm to fire in a fully-automatic fashion, with multiple 5-shot bursts and one 15-shot burst fired.



Still photo of LV-15 equipped rifle firing automatically with finger off trigger, which is retained in position with plastic zip-tie. Note that two ejected fired cartridge casings [highlighted in red], and the unfired cartridge still feeding [highlighted in yellow], are all visible in this photo.

FTISB testing with the trigger of the LV-15 equipped firearm pictured on the previous page, retained in the static position shown with a plastic zip-tie, revealed that the LV-15 device could allow a semiautomatic AR-15 type firearm to fire automatically more than one shot, without manual reloading, by a single function of the trigger.



First LV-15 device submission.

FTISB next proceeded with an examination of the second LV-15 equipped firearm, which was submitted on April 6, 2016. This second prototype is described as being functionally identical to the previous model pictured above, featuring "*small improvements that have come as the result of further development since the original submission.*" The LV-15 device equipped rifle initially manually field tested and appeared to operate similarly to the first version of the LV-15 examined. Shortly after testing began, the LV-15 device ceased operating. Both recharging the original battery and substituting a different recharged battery failed to return the device to operational status. Due to the aforementioned deficiency, FTISB personnel terminated testing of the submitted device.

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 110 of 135



Second LV-15 prototype.



Second LV-15 trigger mechanism.

Although testing of the second device could not be completed because of the malfunction, it is designed, and operates, in the same way as the first submitted device. As a result of the subject test weapon firing more than one shot, without manual reloading, by a single function of the trigger with the submitted device installed, the submitted LV-15 devices are classified as a combination of parts designed and intended, solely and exclusively, for use in converting a weapon into a machinegun and thus a "**machinegun**" as defined in 26 U.S.C. § 5845(b). This classification is based on an evaluation of the item as submitted and that the item converts a weapon to fire automatically, regardless of how reliably it shoots automatically more than one shot, without manual reloading, by a single function of the trigger.

As stated above, Federal law defines "machinegun," in relevant part, as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" as well as a "combination of parts designed and intended, for use in converting a weapon into a machinegun." Legislative history for the NFA indicates that the drafters equated a "single function of the trigger" with "single pull of the trigger." National Firearms Act: Hearings Before the Comm. on Ways and Means, House of Representatives, Second Session on H.R. 9066, 73rd Cong., at 40 (1934). Therefore, ATF has long held that a single function of the trigger is a "single pull" or, alternatively, a single release of a trigger. Therefore, a firearm is not a machinegun if a projectile is expelled when the trigger is pulled and a second projectile is expelled when the trigger is released.

To initiate firing using the LV-15, a shooter must simply pull the trigger (photo 1—note that the solenoid rod is inside the firearm. These photos show the approximate location of the rod in the firearm. This is done simply to explain the functioning of the device). After firing, and when the bolt has loaded a second round of ammunition (photo 2-3), the mechanical-electrical operation of the LV-15 trigger device utilizes a "solenoid rod " to push the trigger forward as if the shooter had released the trigger (photo 4). Although the trigger is pushed forward the shooter never releases the trigger. Pursuant to your explanation, the shooter must merely maintain a pull that exerts "not more than 12 pounds of force during said 15 millisecond interval." If the shooter maintains this pressure, a second shot is fired (photo 5). As stated above, firing requires so little input from the shooter—a single pull with constant pressure—that a zip tie can effectively fire a weapon utilizing the LV-15 until the ammunition source is exhausted. A shooter need only pull the trigger once to initiate firing, and the LV-15 then operates automatically to continue firing.



*Photo 1 obtained from customer supplied video of rifle utilizing CMMG .22LR conversion device.*

USCA Case #19-5042     Document #1777426     Filed: 03/13/2019     Page 112 of 135

A17

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 113 of 135



*Photo 2 obtained from customer supplied video of rifle utilizing CMMG .22LR conversion device.*



*Photo 3 obtained from customer supplied video of rifle utilizing CMMG .22LR conversion device.*

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 114 of 135



*Photo 4 obtained from customer supplied video of rifle utilizing CMMG .22LR conversion device.*



*Photo 5 obtained from customer supplied video of rifle utilizing CMMG .22LR conversion device.*

This Branch has previously approved certain devices sometimes known as "bump fire" stocks in which a shooter pulls the trigger and applies forward pressure with the non-

trigger hand to fire additional projectiles. To function as designed, the trigger must be pulled and held without release. After it fires the first projectile, the firearm recoils and pushes rearward, sliding back in the stock. Although the shooter maintains constant pull on the trigger, the backward movement of the firearm relative to the trigger causes the trigger to reset, as if the trigger had been released. The firing sequence will stop at this point unless the shooter maintains forward pressure on the firearm with his non-shooting hand. This forward pressure moves the firearm forward relative to the trigger and causes a second projectile to fire. Whereas, in the case of typical firearms, a trigger must be pulled backward to fire a projectile, in the case of bump fire stock, the second and subsequent shots operate by keeping the trigger in place and moving the firearm forward.

This Branch approved these devices, but this was in spite of the fact that the devices utilize a "single function of the trigger." As was explained in those classification letters, these items were not classified as machineguns because the stocks had no automatically functioning mechanical parts or springs and performed no automatic mechanical function when installed. A weapon is a machinegun if it shoots, is designed to shoot, or can be readily restored to shoot, *automatically* more than one shot, without manual reloading, by a single function of the trigger. Because the shooter was required to provide the forward pressure with his hand, the firearm did not function "automatically." The LV-15 does operate automatically, as it uses an electrical-mechanical device to automatically cycle the trigger forward against the initial trigger pull, thus allowing the LV-15 equipped firearm to automatically fire.

Please be aware, our Branch has also evaluated similar devices which have prevented the trigger from positively resetting and resulted in a "hammer-follow" scenario. A device designed to prevent the hammer from positively resetting could cause a firearm to shoot automatically more than one shot, without manual reloading, by a single function of the trigger, and would also be classified as a combination of parts designed and intended, solely and exclusively, for use in converting a weapon into a machinegun; thus a "**machinegun**" as defined in 26 U.S.C. § 5845(b).

FTISB finds that the host AR-type firearms, Bushmaster AR-type receiver serial number L476739, and Anderson Manufacturing AR-type receiver serial number 15272793, not having any modifications made which would cause them to fire automatically, or incorporating the frame or receiver of a machinegun, are not "machineguns" as defined in 26 U.S.C. § 5845(b).

The subject Bushmaster and Anderson Manufacturing firearms will be returned to you as soon as our Branch has received either a FedEx account number, or a FedEx or alternate carrier prepaid return label. Please advise our Branch within 60 days of receipt of this letter regarding the disposition of these firearms. The submitted LV-15 devices, which are classified as "machineguns" as defined in 26 U.S.C. § 5845(b), cannot be returned to you unless you are a licensed firearms manufacturer who has paid the Special Occupational Tax (SOT).

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 115 of 135

A20

We trust the foregoing has been responsive to your current evaluation request and regret that our written response was delayed due to FTISB's current workload.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Cc:



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Firearms Technology Industry Services Branch*

*Martinsburg, WV*
www.atf.gov

**SEP 1 1 2017**                    907010:DLH
                                    3311/307367



AutoGlove USA, LLC

This refers to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch (FTISB), which accompanied your submitted sample of an "AutoGlove" device. Specifically, you requested an examination and classification of this sample with regard to the amended Gun Control Act of 1968 (GCA) and the National Firearms Act (NFA).

As background, the GCA, 18 U.S.C. § 921(a)(23), defines the term "**machinegun**" as...

*"The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))."*

Further, the NFA, 26 U.S.C. § 5845(a), defines the term "**firearm**" to include *"(6) a machinegun."*

Additionally, the NFA, 26 U.S.C. § 5845(b), defines "**machinegun**" to mean:

*...any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.*

The physical characteristics and identity of the submitted sample are provided below:

**Submitted Sample:**




The submitted sample is a right-handed glove containing a "braced" pointer finger with an attached solenoid, and an "activation plunger" located on the middle finger. Included with the sample is a "simplified" battery control pack, which has only an ON/OFF setting.

**Solenoid with Actuator Arm:**



**Activator Plunger:**




The basic premise of your submitted design is what you label a patent pending "Trigger Assist Device (TAD)." The TAD uses an "activator plunger" to turn on a solenoid which pushes an "actuator arm" in and out engaging a firearm trigger.

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 119 of 135

The term "*trigger*" is a term generally applied by a manufacturer to that part of a firing mechanism which is manually operated to cause the firearm to discharge a projectile, usually by the release of a sear, hammer, firing pin, or striker. However, the "trigger" of a firearm under the GCA and NFA is defined in a context-specific manner. U.S. Courts of Appeals have defined the term "trigger" as "*anything that...cause[s] the weapon to fire. A trigger may be either a traditional small projecting tongue in the firearm that, when pressed by the finger, actuates the mechanism that discharges the weapon, any mechanism used to initiate a firing sequence, or anything that serves as a stimulus and initiates or precipitates a reaction or series of reactions.*" U.S. v Carter, 465 F.3d 658 (6th Cir 2006). In both practical and legal terms, the "trigger" of a firearm is whatever is used to initiate the firing sequence.[1]

When used in conjunction with a firearm, the AutoGlove replaces the traditional "trigger" of that weapon.



This shows the device in position and ready to fire. To fire, the shooter will move the selector to "fire," then press and hold the white activator plunger with his thumb. The firearm will fire until the thumb is released.



This shows the back side of the device when it is in position and ready to fire. Note that the traditional "trigger finger" is used merely to hold the device in place.

---

[1] See also United States v. Evans, 978 F.2d 1112 (9th Cir. 1992) (As used in § 5845(a), "by a single function of the trigger" describes the action that enables the weapon to "shoot . . . automatically . . . without manual reloading," not the "trigger" mechanism. The argument that the plain meaning of trigger in 28 U.S.C. § 5845(a)(6) is a curved metal trigger is out of context and without merit. It would lead to the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing.); United States v. Jokel, 969 F.2d 132 (5th Cir. 1992) (defined a trigger, as used in 26 U.S.C. § 5845(d) (shotguns), as any "mechanism . . . used to initiate the firing sequence"); United States v. Fleischli, 305 F.3d 643 (7th Cir. 2002) (concerning machine gun, approving of Jokel's definition).

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 120 of 135

The AutoGlove changes the shooter's interaction with the firearm's traditional trigger in that it incorporates the traditional trigger as a part of the firing sequence, but removes it as the part that initiates firing. Instead, the activator plunger acts as the actual trigger.



2. The Activator Plunger starts the motor, which continues to spin until the plunger is released.

3. The Motor Pushes the actuator out, and then releases, allowing the firearm to cycle

1. Thumb Presses and Holds the Activator Plunger—here serving as the "trigger"

The below pictures show the functioning of the Actuator Arm.




Here the actuator arm is shown fully retracted.

-5-

USCA Case #19-5042     Document #1777426     Filed: 03/13/2019     Page 121 of 135




Here the actuator arm is shown fully extended.

ATF has held a consistent position with regard to electrically-driven trigger devices, going back more than 30 years.

An excerpt from a 1982 letter reads:

> *"An electric motor attached to a firearm, in such a manner that turning the motor on causes the weapon to fire repeatedly until the motor is switched off, would be a machinegun as defined."*

Additionally, a 1988 letter reads:

> *"The Bureau of Alcohol, Tobacco and Firearms has previously determined a semiautomatic firearm having an electronic solenoid attached to the trigger and fired by means of a switch meets the definition of a machinegun as contained in the National Firearms Act (NFA)."*

A separate 1988 letter reads:

> *"Your device, an electrically powered trigger actuator would fall within the purview of the NFA....A weapon on which a device such as you describe has been affixed would fire more than one shot, without manual reloading, by a single function of the electrical switch(trigger) and therefore meets the definition of a machinegun as defined. Further, section 5845(b), Title 26, U.S.C. also states the term "machinegun" shall also included...any part designed and intended solely and exclusively, or combination of parts*

*designed and intended for use in converting a weapon into a machinegun. Therefore, a device such as you describe would meet that definition even if it were not attached to any firearm."*

Electrically-driven trigger devices are considered "**machineguns**" because they are a "combination of parts designed and intended, for use in converting a weapon into a machinegun." Because these electric devices use a switch/button to activate the drive motor to initiate the firing sequence, that switch/button is the firearm's trigger. Since the weapon fires more than one round for each single function of its trigger (a single press on the AutoGlove's Activator Plunger), it would be a "**machinegun**" as defined.

In your correspondence, you highlight two "major differences" in your AutoGlove device, which you claim should cause the device to not be classified as a "**machinegun.**" First, your primary argument is that the AutoGlove does not permanently attach to a firearm, even while being utilized. Second, you claim that the actuator arm on the solenoid does not actually engage a firearms trigger on its own because a "micro-trigger" pull is required.

FTISB will discuss this second claim first. Your correspondence states:

*"Second, although the AutoGlove has an activation plunger/switch to begin activation of the Trigger Activation Device (TAD), the TAD does not activate the trigger without additional human interaction. The person's trigger finger must still pull the TAD rearward and must use the TAD to take up slack/slop in the trigger. Then when the trigger is ready to break, and fire the gun, the person must begin making "micro-trigger pulls even with the TAD activated. Without such actions on the person's behalf, the TAD will only vibrate inside the trigger guard and possibly not even come into contact with the trigger."*

FTISB personnel test-fired a semiautomatic AR-type firearm from the National Firearms Collection (NFC), utilizing the AutoGlove, to test the validity of this statement. Trigger pull on the NFC firearm was measured before the test-fire, and found to consistently break between 2-1/2 and 2-3/4 pounds of pressure. FTISB used commercially available, Federal brand, 55-grain .223 caliber ammunition for the test-fire.

Instead of making the "micro-trigger" pulls, which you claim are necessary, the solenoid was held against the front trigger guard with *forward* pressure (away from the traditional firearm trigger) applied during the test. When the activator plunger was pressed and held, the firearm fired automatically and continuously until the ammunition supply was exhausted. The test was repeated two additional times, with the same results.

The result of the test-fire leads FTISB to conclude that your claim of needing "micro-trigger" pulls to fire a firearm using the AutoGlove is not accurate. In fact, a shooter need not move his finger at all, but only hold the AutoGlove in place because the actuator arm provides all of the movement necessary to fire the weapon.

USCA Case #19-5042    Document #1777426    Filed: 03/13/2019    Page 122 of 135

Your primary basis for reasoning that the AutoGlove should not be classified as a **"machinegun"** appears to be predicated on the belief that being "not permanently attached" excludes it from such classification. Unfortunately, the requirement that a device be "permanently attached" is found nowhere in the definition of a machinegun, and is thus not a requirement. As we stated in 1988, any part designed and intended solely and exclusively, or combination of parts designed and intended for use in converting a weapon into a machinegun <u>would meet that definition even if it were not attached to any firearm</u>." Therefore, this argument is immaterial to a final classification.

Consequently, the submitted device is a **"machinegun"** as defined in the NFA. It is also a **"firearm"** as defined in the NFA, and is subject to all NFA provisions.

Further, since May 19, 1986, the GCA permits only properly licensed manufacturers and importers to register new machineguns; private, unlicensed individuals may not do so.

An unregistered machinegun is a contraband firearm, and possession of such a weapon is unlawful. The submitted firearm is not registered in accordance with the provisions of the NFA and it cannot be returned to you.

Instead, FTISB is obliged to request forfeiture of the unregistered AutoGlove sample you have submitted.

We trust that the foregoing has been responsive to your request. If we can be of any further assistance, you may contact us at any time.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

**28 U.S.C. § 508. Vacancies**

**(a)** In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General.

**(b)** When by reason of absence, disability, or vacancy in office, neither the Attorney General nor the Deputy Attorney General is available to exercise the duties of the office of Attorney General, the Associate Attorney General shall act as Attorney General. The Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General.

**Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349d**

## § 3345. Acting officer

**(a)** If an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--

> **(1)** the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346;

> **(2)** notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity subject to the time limitations of section 3346; or

> **(3)** notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity, subject to the time limitations of section 3346, if--

>> **(A)** during the 365-day period preceding the date of death, resignation, or beginning of inability to serve of the applicable officer, the officer or employee served in a position in such agency for not less than 90 days; and

>> **(B)** the rate of pay for the position described under subparagraph (A) is equal to or greater than the minimum rate of pay payable for a position at GS-15 of the General Schedule.

**(b)(1)** Notwithstanding subsection (a)(1), a person may not serve as an acting officer for an office under this section, if--

> **(A)** during the 365-day period preceding the date of the death, resignation, or beginning of inability to serve, such person--

>> **(i)** did not serve in the position of first assistant to the office of such officer; or

>> **(ii)** served in the position of first assistant to the office of such officer for less than 90 days; and

**(B)** the President submits a nomination of such person to the Senate for appointment to such office.

**(2)** Paragraph (1) shall not apply to any person if--

**(A)** such person is serving as the first assistant to the office of an officer described under subsection (a);

**(B)** the office of such first assistant is an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate; and

**(C)** the Senate has approved the appointment of such person to such office.

**(c)(1)** Notwithstanding subsection (a)(1), the President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term to the same office in an Executive department without a break in service, to continue to serve in that office subject to the time limitations in section 3346, until such time as the Senate has acted to confirm or reject the nomination, notwithstanding adjournment sine die.

**(2)** For purposes of this section and sections 3346, 3347, 3348, 3349, 3349a, and 3349d, the expiration of a term of office is an inability to perform the functions and duties of such office.

## § 3346. Time limitation

**(a)** Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office--

**(1)** for no longer than 210 days beginning on the date the vacancy occurs; or

**(2)** subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

**(b)(1)** If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

**(2)** Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve--

**(A)** until the second nomination is confirmed; or

**(B)** for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

**(c)** If a vacancy occurs during an adjournment of the Congress sine die, the 210-day period under subsection (a) shall begin on the date that the Senate first reconvenes.

## § 3347. Exclusivity

**(a)** Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) for which appointment is required to be made by the President, by and with the advice and consent of the Senate, unless--

 **(1)** a statutory provision expressly--

  **(A)** authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or

  **(B)** designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or

 **(2)** the President makes an appointment to fill a vacancy in such office during the recess of the Senate pursuant to clause 3 of section 2 of article II of the United States Constitution.

**(b)** Any statutory provision providing general authority to the head of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(1) applies.

## § 3348. Vacant office

**(a)** In this section--

 **(1)** the term "action" includes any agency action as defined under section 551(13); and

**(2)** the term "function or duty" means any function or duty of the applicable office that--

> **(A)(i)** is established by statute; and
>
> **(ii)** is required by statute to be performed by the applicable officer (and only that officer); or
>
> **(B)(i)(I)** is established by regulation; and
>
> **(II)** is required by such regulation to be performed by the applicable officer (and only that officer); and
>
> **(ii)** includes a function or duty to which clause (i)(I) and (II) applies, and the applicable regulation is in effect at any time during the 180-day period preceding the date on which the vacancy occurs.

**(b)** Unless an officer or employee is performing the functions and duties in accordance with sections 3345, 3346, and 3347, if an officer of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--

> **(1)** the office shall remain vacant; and
>
> **(2)** in the case of an office other than the office of the head of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office), only the head of such Executive agency may perform any function or duty of such office.

**(c)** If the last day of any 210-day period under section 3346 is a day on which the Senate is not in session, the second day the Senate is next in session and receiving nominations shall be deemed to be the last day of such period.

**(d)(1)** An action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect.

> **(2)** An action that has no force or effect under paragraph (1) may not be ratified.

**(e)** This section shall not apply to--

> **(1)** the General Counsel of the National Labor Relations Board;
>
> **(2)** the General Counsel of the Federal Labor Relations Authority;

A33

**(3)** any Inspector General appointed by the President, by and with the advice and consent of the Senate;

**(4)** any Chief Financial Officer appointed by the President, by and with the advice and consent of the Senate; or

**(5)** an office of an Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) if a statutory provision expressly prohibits the head of the Executive agency from performing the functions and duties of such office.


## § 3349. Reporting of vacancies

**(a)** The head of each Executive agency (including the Executive Office of the President, and other than the Government Accountability Office) shall submit to the Comptroller General of the United States and to each House of Congress--

**(1)** notification of a vacancy in an office to which this section and sections 3345, 3346, 3347, 3348, 3349a, 3349b, 3349c, and 3349d apply and the date such vacancy occurred immediately upon the occurrence of the vacancy;

**(2)** the name of any person serving in an acting capacity and the date such service began immediately upon the designation;

**(3)** the name of any person nominated to the Senate to fill the vacancy and the date such nomination is submitted immediately upon the submission of the nomination; and

**(4)** the date of a rejection, withdrawal, or return of any nomination immediately upon such rejection, withdrawal, or return.

**(b)** If the Comptroller General of the United States makes a determination that an officer is serving longer than the 210-day period including the applicable exceptions to such period under section 3346 or section 3349a, the Comptroller General shall report such determination immediately to--

**(1)** the Committee on Governmental Affairs of the Senate;

**(2)** the Committee on Government Reform and Oversight of the House of Representatives;

**(3)** the Committees on Appropriations of the Senate and House of Representatives;

**(4)** the appropriate committees of jurisdiction of the Senate and House of Representatives;

**(5)** the President; and

**(6)** the Office of Personnel Management.

## § 3349a. Presidential inaugural transitions

**(a)** In this section, the term "transitional inauguration day" means the date on which any person swears or affirms the oath of office as President, if such person is not the President on the date preceding the date of swearing or affirming such oath of office.

**(b)** With respect to any vacancy that exists during the 60-day period beginning on a transitional inauguration day, the 210-day period under section 3346 or 3348 shall be deemed to begin on the later of the date occurring--

   **(1)** 90 days after such transitional inauguration day; or

   **(2)** 90 days after the date on which the vacancy occurs.

## § 3349b. Holdover provisions

Sections 3345 through 3349a shall not be construed to affect any statute that authorizes a person to continue to serve in any office--

   **(1)** after the expiration of the term for which such person is appointed; and

   **(2)** until a successor is appointed or a specified period of time has expired.

## § 3349c. Exclusion of certain officers

Sections 3345 through 3349b shall not apply to--

   **(1)** any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that--

      **(A)** is composed of multiple members; and

      **(B)** governs an independent establishment or Government corporation;

   **(2)** any commissioner of the Federal Energy Regulatory Commission;

   **(3)** any member of the Surface Transportation Board; or

   **(4)** any judge appointed by the President, by and with the advice and consent of the Senate, to a court constituted under article I of the United States Constitution.

### § 3349d. Notification of intent to nominate during certain recesses or adjournments

**(a)** The submission to the Senate, during a recess or adjournment of the Senate in excess of 15 days, of a written notification by the President of the President's intention to submit a nomination after the recess or adjournment shall be considered a nomination for purposes of sections 3345 through 3349c if such notification contains the name of the proposed nominee and the office for which the person is nominated.

**(b)** If the President does not submit a nomination of the person named under subsection (a) within 2 days after the end of such recess or adjournment, effective after such second day the notification considered a nomination under subsection (a) shall be treated as a withdrawn nomination for purposes of sections 3345 through 3349c.

**Vacancies Act, 5 U.S.C. §§ 3345-3349 (1994)**

**§ 3345. Details; to office of head of Executive agency or military department**

When the head of an Executive agency (other than the General Accounting Office) or military department dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

**§ 3346. Details; to subordinate offices**

When an officer of a bureau of an Executive department or military department, whose appointment is not vested in the head of the department, dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

**§ 3347. Details; Presidential authority**

Instead of a detail under section 3345 or 3346 of this title, the President may direct the head of another Executive department or military department or another officer of an Executive department or military department, whose appointment is vested in the President, by and with the advice and consent of the Senate, to perform the duties of the office until a successor is appointed or the absence or sickness stops. This section does not apply to a vacancy in the office of Attorney General.

**§ 3348. Details; limited in time**

**(a)** A vacancy caused by death or resignation may be filled temporarily under section 3345, 3346, or 3347 of this title for not more than 120 days, except that—

**(1)** if a first or second nomination to fill such vacancy has been submitted to the Senate, the position may be filled temporarily under section 3345, 3346, or 3347 of this title—

**(A)** until the Senate confirms the nomination; or

**(B)** until 120 days after the date on which either the Senate rejects the nomination or the nomination is withdrawn; or

**(2)** if the vacancy occurs during an adjournment of the Congress sine die, the position may be filled temporarily until 120 days after the Congress next convenes, subject thereafter to the provisions of paragraph (1) of this subsection.

**(b)** Any person filling a vacancy temporarily under section 3345, 3346, or 3347 of this title whose nomination to fill such vacancy has been submitted to the Senate may not serve after the end of the 120-day period referred to in paragraph (1)(B) or (2) of subsection (a) of this section, if the nomination of such person is rejected by the Senate or is withdrawn.

## § 3349. Details; to fill vacancies; restrictions

A temporary appointment, designation, or assignment of one officer to perform the duties of another under section 3345 or 3346 of this title may not be made otherwise than as provided by those sections, except to fill a vacancy occurring during a recess of the Senate.

**Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281**

*And be it further enacted*, That in case of the death, absence from the seat of government, or sickness of the Secretary of State, Secretary of the Treasury, or of the Secretary of the War department, or of any officer of either of the said departments whose appointment is not in the head thereof, whereby they cannot perform the duties of their said respective offices, it shall be lawful for the President of the U:ited States, in case he shall think it necessary, to authorize any person or persons at his discretion to perform the duties of the said respective offices until a successor be appointed, or until such absentee or inability by sickness shall cease.

**Act of Feb. 13, 1795, ch. 21, 1 Stat. 415**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in case of vacancy in the office of Secretary of State, Secretary of the Treasury, or of the Secretary of the department of War, or of any officer of either of the said departments, whose appointment is not in the head thereof, whereby they cannot perform the duties of their said respective offices; it shall be lawful for the President of the United States, in case he shall think it necessary, to authorize any person or persons, at his discretion, to perform the duties of the said respective offices, until a successor be appointed, or such vacancy be filled: *Provided,* That no one vacancy shall be supplied, in manner aforesaid, for a longer term than six months.