**ORAL ARGUMENT SCHEDULED FOR MARCH 22, 2019**

**No. 19-5042**
Consolidated with 19-5043, 19-5044

───────────────────

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────────────

DAMIEN GUEDES, *et al.,*

Appellants,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *et al*.,

Appellees.

───────────────────

On Appeal from the United States District Court
for the District of Columbia,
No. 1:18-cv-02988 (DLF)

───────────────────

**Reply Brief for Appellants Damien Guedes, Shane Roden, Firearms Policy
Foundation, Madison Society Foundation, Inc., and Florida Carry, Inc.**

───────────────────

Joshua Prince, Esq.
Adam Kraut, Esq.
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297 (t)
Joshua@princelaw.com
AKraut@princelaw.com
*Counsel for Plaintiffs-Appellants*

Erik S. Jaffe
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060 (t)
ejaffe@schaerr-jaffe.com
*Of Counsel*

i

## TABLE OF CONTENTS

GLOSSARY OF ABBREVIATIONS ................................................................ iv

SUMMARY OF ARGUMENT ........................................................................1

ARGUMENT ................................................................................................2

   I.   Likelihood of Success on the Merits ........................................2

      A.  Plain Statutory Definition of a Machinegun ....................2

      B.  Lenity ........................................................................13

   II.  Other Injunction Elements ....................................................13

CONCLUSION ..........................................................................................14

CERTIFICATE OF COMPLIANCE ..........................................................15

CERTIFICATE OF SERVICE ...................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009)......................................4

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)..........................................3

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)..........................................3

*Staples v. United States*, 511 U.S. 600 (1994)..........................................3

**Statutes**

18 U.S.C. § 921(a)(28) ..........................................3

48 Stat. 1236 ..........................................5

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| GCA | Gun Control Act |
| NFA | National Firearms Act |

## SUMMARY OF ARGUMENT

After 70 years of consistently narrow interpretation of the definition of machinegun, and Congressional narrowing of the relevant language, ATF now claims that its expansive revisionist interpretation not only is correct but is so plain that it avoids the rule of lenity. But it is frivolous to suggest that for nearly 70 years the government's understanding of the public meaning of the statutory words, as enacted in 1934 and as narrowed in 1968, were not only wrong but were incompetently blind to the supposedly contrary "plain" meaning of the language. Any current debate over the meaning of such language at best reflects a serious ambiguity that is worsened by ATF's regulatory interpretation.

ATF having conceded here that the other three elements for a preliminary injunction overwhelmingly favor Plaintiffs and that the court below abused its discretion by failing to balance those elements, even a slight chance of eventual success on the merits warrants an injunction. Plaintiffs' prospects for success in this case are beyond substantial – they are compelling. Hundreds of thousands of individuals are threatened with felonies just days from now. An injunction should issue to allow more considered adjudication of this deeply flawed Final Rule.

1

**ARGUMENT**

I.    **Likelihood of Success on the Merits**

**A. Plain Statutory Definition of a Machinegun**

ATF, at 25, agrees with Plaintiffs that "pulling" a trigger is merely one means of moving the trigger to make it function. Numerous other manual inputs – pushing, pulling, releasing, or even "bumping" it – are likewise simply *means* of actuating the trigger. Guedes Br. 2, 7, 10, 12, 14. Given this apparent agreement, the dispute over whether a "function of the trigger" is equivalent to a "pull of the trigger" is largely irrelevant.

The real issue is how to distinguish when one function of the trigger ends and a second function begins – *i.e.*, differentiating between "single" and multiple functions of the trigger, and how to determine whether a firearm "shoots" more than one round "by" a single function or "by" multiple functions – pulls, pushes, waggles, "analogous" motions – of the trigger. Whether more than one shot is fired "automatically" is a separate and distinct question from *how many* functions of the trigger are required to shoot more than one shot. And surely the latter question answers itself. For each shot to be fired when bump-firing – with or without a bump-stock-type device – the trigger must travel from the forward set position to the rearward release position, then forward again to reset and then back again to fire. Each physical traverse of the external portion of the trigger involves (or, more accurately mechanically causes) a distinct trigger function.

2

On that question, ATF's cases and history have little to say, and what they do say supports Plaintiffs. *See, e.g., Staples v. United States*, 511 U.S. 600, 601 n.1 (1994) (noting that repeat fire "with a single pull of the trigger" means "once the trigger is depressed, the weapon will automatically continue to fire *until its trigger is released*") (emphasis added); *Kolbe v. Hogan*, 849 F.3d 114, 158 (4th Cir. 2017) (machine guns "do not require a pull of the trigger for each shot and will [shoot] as long as the trigger is depressed.") (Traxler, J., dissenting) (citation omitted); *Hollis v. Lynch*, 827 F.3d 436, 440 n.2 (5th Cir. 2016) (a machinegun "fir[es] more than one round per trigger-action"). Those cases reflect the plain public meaning that a "single function of the trigger" ends upon release of the trigger and that subsequent movement of the trigger, however accomplished, involves a separate and subsequent function.

There is no dispute that a bump-stock-fitted rifle only fires a second or subsequent round if the trigger is released and then manually depressed again by the shooter. ATF Br. 22. Subsequent shots thus are fired "by" subsequent functions of the trigger, not merely by the initial movement of the trigger. That is the plain and publicly understood hallmark of a *semi*automatic firearm, not a machinegun. *Cf.* 18 U.S.C. § 921(a)(28) ("semiautomatic rifle" defined as "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired

cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge").[1]

ATF's reliance, at 6, on *Akins v. United States*, 312 F. App'x 197, 200 (11th Cir. 2009) (unpub.) (*per curiam*), to discount the single function of the trigger requirement is unpersuasive. ATF originally and correctly ruled that even a spring-loaded bump-stock, though perhaps acting "automatically," involved multiple functions of the trigger and hence was not a machinegun. Reply Addendum at 6-9; *see also* JA296 (Vasquez Declaration). Its subsequent reversal simply inserts the misleading concept that an *initial*, as opposed to a "single," pull of the trigger "initiates an automatic firing cycle" resulting in multiple shots. *See* ATF Rul. 2006-2 at 3. But that linguistic legerdemain obscures the fact that the so-called firing cycle involves multiple subsequent and manual pulls or pushes of the trigger. Unfortunately, the Eleventh Circuit was misled by ATF's linguistic contortions and, giving the bureau deference ATF here concedes it does not deserve, held that the device was a machinegun because "[a]fter a single application of the trigger … the Accelerator uses its internal spring and the force of recoil to fire continuously

---

[1] ATF's implication, at 6, 9, 22, 24-25, that holding one's finger steady on the extension ledge is equivalent to exerting constant pressure on the *trigger* is absurd and factually false. It is absurd because ATF concedes the extension ledge is not a required element of a supposedly illegal bump-stock, 83 Fed. Reg. 66536-37, and it is false because the ledge exists to *prevent* the finger from staying in contact with the trigger and thus to *prevent* the trigger from remaining depressed. ATF Br. 22 (motion of bump-stock "shift[s] the trigger away from the shooter's trigger finger").

… until the [operator] releases the trigger or the ammunition is exhausted." *Akins*, 312 F. App'x at 200. Of course, there is no dispute that a person bump-firing, with or without a bump-stock, "releases" the trigger after *every* shot so that it may reset. [2] The Eleventh Circuit thus was as much misled on the facts as it was on the law, and its unpublished opinion should not be followed by this Court.

Far more telling than ATF's recent revisionism is the legislative and regulatory history of the definition from its adoption in 1934 and, more importantly, its amendment in 1968. *See* Machinegun Definition Timeline, attached at Reply Addendum 1.

As originally adopted, the NFA definition read: "any weapon which shoots, or is designed to shoot, automatically *or semiautomatically*, more than one shot, without manual reloading, by a single function of the trigger." 48 Stat. 1236 (emphasis added). The regulations of the era viewed the language as plain and merely repeated it. By 1955, there was no suggestion that the definition was ambiguous or confusing, and the government ruled that "Gatling guns" were not machineguns. Reply Addendum 2 (Rev. Rul. 55-528, 1955-2 C.B. 482, 1955 WL 9410). Such guns used a hand crank or an *electric motor* to drive a "cam action to perform the functions of repeatedly cocking and firing the weapon." *Id*. But while

---

[2] ATF's discussion, at 32, of binary triggers also misses the point. By conceding that the release of the trigger constitutes a separate "function" it necessarily concedes the presence of multiple functions of the trigger when bump-firing.

recognizing that they were the "forerunner[s] of fully automatic machine guns," and obviously could fire at a high rate of speed, the government concluded they did not meet the statutory definition of automatically or even semiautomatically shooting "more than one shot with a single function of the trigger." *Id*.

Thirteen years later, in 1968, Congress amended the definition of machinegun, further narrowing the relevant language by removing the words "or semiautomatically," leaving the current language of the first sentence of the definition. Despite responding to concerns from court cases and filling various other perceived gaps in the statute, Congress did not question the narrow prior construction of the first sentence, did not object to the Gatling gun ruling, and hence effectively incorporated that narrow interpretation into the meaning of the statute – or at least confirmed the existing "public meaning" of the statute at the time, as amended. It was not until 2004, when ATF began its revisionist campaign, that Ruling 55-528 was ever questioned. *See* Reply Addendum 3-5 (Ruling 2004-5 (holding that electric-motor-operated firearms, including Gatling guns, are machineguns but that manual cam operated Gatling guns still are not)). Despite ATF's about-face, Congress has yet to endorse that more expansive view. And its 1968 definition still stands as the last reflection of the contemporaneous public meaning of the statute – one which recognizes the difference between single and

multiple functions of the trigger, notwithstanding whether those *separate* functions occur quickly or slowly. [3]

Apart from the number of functions of the trigger it takes to bump-fire a semiautomatic firearm, ATF also distorts the phrase "shoots … automatically" by claiming it only requires some modest and partial substitution of mechanical action for human involvement. While some general dictionaries include both "self-acting" and "self-regulating" in the definition of automatically, only the first fits the language of the statute and the context. [4]

Using the broader and amorphous concept of "self-regulating" to define "shoots … automatically" would create grotesque ambiguity, particularly when

---

[3] Better definitions for the relevant words here come from dictionaries that understand and define the words in context, as ATF used to recognize but now ignores in its outcome-driven analysis. Guedes Br. 15 n. 6 (definitions); *see also* ATF Ruling 2004-5, Reply Addendum 4 (quoting military, firearms, and other encyclopedias and dictionaries for the proposition that "automatic" fire involves continuous pressure on the trigger and that "automatically" means acting "essentially independent of external influence or control").

[4] When asking if a firearm is "self-acting," one must focus on the relevant "action" involved. Here, that action is "shoots … automatically more than one shot," and the "self" refers to the firearm. The remainder of the sentence defines the initial conditions and allowable manual input – a single pull of the trigger. While it may be that a bump-stock facilitates the reset of the trigger by stabilizing the firearm or the hand and allowing the trigger to move away from the finger, release, and reset during recoil, it is conceded that the firearm itself does not shoot the next round without further manual input from the shooter. *See Bump Stock Analytical Video*, Exhibit 28 of Exhibit A (single-handed operation of bump-stock showing that simply pulling the trigger once, without further manipulation of the trigger by manually forcing it and the forebody forward with the other hand, results only in a single shot).

combined with ATF's expansive notion that "self-regulating" processes can include substantial manual involvement beyond actuating the defined single function of the trigger. ATF Br. 33-35.

ATF's argument that relieving the shooter of the need to perform some manual tasks is sufficient to constitute shooting "automatically" is frivolous on its face. Lots of mechanical aspects of a semiautomatic firearm and its accessories aid the shooter in performing tasks that would otherwise have to be performed more actively. A sight marker on the barrel helps a shooter aim; a scope even more so. The mechanisms for ejecting the casing and reloading a round relieve the need for manually chambering the next round. A bipod for the front of the gun keeps it stable and may even assist in managing recoil distance and linearity. A simple padded vest likewise aids both recoil and linearity, as does even a normal stock for a rifle – allowing the firearm to anchor to the shoulder and thereby manage both the distance and the linearity of the recoil and provide the shooter greater control as compared to a handgun. Even the trigger housing ensures consistent linear motion of the trigger back and forth, relieve some tasks that would otherwise have to be controlled manually in a less "regulated" firearm. Under ATF's new definition, all of these relieve some, though not all, of the manual burdens of firing a semiautomatic firearm and thus absurdly render the overall process of shooting multiple rounds with multiple movements of the trigger "automatic."

8

ATF, at 33, tries to integrate the contrary notions of manual and automatic shooting by claiming that continued manual input – pushing the forebody forward – is irrelevant because it is merely one of the "conditions" that allow the "self-regulating" cycle to continue automatically. But that is sophistry.

The "condition" for automatic fire is defined by the statute – "by a *single* function of the trigger." (Emphasis added.) If it is a further condition that the shooter continues to perform manual functions necessary to shoot the next shot, then all semiautomatic firearms would be covered. Continuously moving one's trigger finger back would then merely be a "condition" for the firearm to fire multiple shots automatically. Substituting an indeterminately human-mediated process as the replacement for ordinary understanding of "shoot[s] … automatically" renders that language meaningless or, at best, fatally ambiguous.

ATF's regulatory definition thus contradicts not only the very premise of the statutory definition distinguishing automatic from semiautomatic firearms, but also Congress's express deletion of the word "semiautomatic" in 1968 so as to narrow the definition and avoid any confusion on precisely this point.

Contrary to ATF's claim, at 29-30, that Plaintiffs' current, and its own former, reading of the statute would mean no aftermarket device would *ever* be deemed to convert an AR-15 or similar semiautomatic rifle into a machinegun, there are many after-market modifications that operate not by helping to move the

9

*trigger* back and forth but by interfering with the *disconnector* inside the fire-control group, thereby letting the *hammer* repeatedly and automatically continue to strike so long as the trigger remains depressed. *See* Guedes Br. 5-6 (fire control group illustrations). For example, the Drop-in Auto Sear ("DIAS") is an aftermarket device that would do exactly that and that is properly held to convert a semiautomatic firearm into an automatic firearm. *See* http://www.quarterbore.com/nfa/dias.html; ATF Rul. 81-4. [5] A device known as the "Lightning Link" would also yield the same result by "disabling" the disconnector. http://www.quarterbore.com/nfa/lightninglink.html. The DIAS would allow the trigger in an AR-15 to operate in the same manner as a M-16 machinegun and the Lightning Link would allow a firearm to fire more than one round when the trigger was pulled and held to the rear. *See* Addendum at 43. Plaintiffs' reading draws precisely the same distinction that Congress did in its definition, and only would bar devices and modifications that in fact operate in the same manner as machineguns – firing multiple rounds with a "*single* function of the trigger."

ATF, at 30-31, also seeks to organize a parade-of-horribles, claiming that its former, and Plaintiffs' current, definition would allow all manner of mechanical assist devices. Its examples, however, are ill-conceived. The "LV-15 Trigger Reset

---

[5] Available at https://www.atf.gov/firearms/docs/ruling/1981-4-auto-sear/download.

Devices," for example, were designed to assist trigger release under certain circumstances, thus improving the speed in which the trigger can repeatedly be pulled and released. But that is not why they were deemed automatic firearms. Rather, upon testing it was discovered that holding the trigger retracted at a fixed distance with a zip-tie led to continuous fire and hence the devices shot multiple rounds automatically with a *single* function of the trigger. ATF Addendum 13-17. [6] The "AutoGlove," is described by the Government at 31, as "a glove with a battery-operated piston attached to the index finger that pulled and released the trigger on the shooter's behalf when the shooter held down a plunger to activate the motor." ATF determined that the "on" switch for the electrically driven device was the trigger and needed only to be depressed and held once to result in continuous fire. ATF Addendum 27. That determination is debatable given the considerable tension with the 1955 Gatling gun ruling discussed above, and introduces considerable ambiguity as to what constitutes a trigger. In any event, if such examples are a problem on policy grounds, that is a legislative question, not a definitional one.

ATF's claim, at 34, that Plaintiffs render the word "automatically" superfluous by conflating it with "single function of the trigger" is incorrect. A

---

[6] The distinction can be seen in ATF's approval of the so-called Hellfire trigger, which attaches a spring behind the trigger in order to speed release and reset after the trigger is pulled. Reply Addendum 10.

"single function of the trigger" defines the limits of the manual input involved, and "shoots … automatically" describes what may or may not happen next – shooting more than one round without further external input. Indeed, ATF's Final Rule itself rebuts its accusation with the example of a type of pump-action shotgun that can be repeatedly fired so long as the trigger remained depressed but does not act automatically because subsequent shots require the manual action of moving the "pump" back and forth, even if not the trigger. 83 Fed. Reg. 66534.

Finally, from a macro-perspective, ATF's sudden need to "revisit[]," ATF Br. 23, at the direction of President Trump, *id*. at 7, over 70 years of interpretation cannot justify the new rule. Even if its prior consistent interpretations of the statutory definition were indeed inconsistent or ultimately erroneous, that would merely establish serious ambiguity, not the validity of its latest ambiguous revision. Furthermore, even assuming, *arguendo*, that its prior definitions were not the best ones, the fact that Congress not only reenacted the statutory language, but in fact narrowed it by removing the term "semiautomatically," demonstrates that Congress ratified the narrower definition or, at a minimum, illustrated the existing public meaning of the language at the time the modern version of the definition was adopted. Whatever errors ATF imagines may have existed in the government's narrow contemporaneous understanding of the original statutory language, that narrow understanding was ultimately ratified and became part of the public

understanding of the statutory language long ago. ATF's second thoughts or policy preferences, whether in 2006 or today, have no legal force or interpretive merit.

### B. Lenity

ATF, at 19, 36, concedes the court below erred in applying *Chevron* but ignores its findings that the statute and the new definition purporting to interpret it were ambiguous. JA019-20, 37, 39. While Plaintiffs contend the statute provides plain support for their and the government's historical reading of the definition, it provides, *at best,* only ambiguous support for ATF's revisionist reading.  Lenity requires the narrower reading in such circumstances. Guedes Br. 20-22.

## II.   <u>Other Injunction Elements</u>

ATF does not dispute here that the other preliminary injunction elements overwhelmingly favor Plaintiffs and that the district court abused its discretion in not weighing them against the prospects for success. Guedes Br. 26-28. That alone warrants reversal and a preliminary injunction to allow this case to be litigated at a pace that allows for reasoned deliberation and a full consideration of the arguments and the law. And the liberty interests of hundreds of thousands of Americans, threatened with imminent felony prosecution or property loss, surely tip the scales in favor of an injunction.

## CONCLUSION

This Court should reverse and order a preliminary injunction pending review.

Respectfully Submitted,

/s/ Joshua Prince
Joshua Prince, Esq.
D.C. Bar No. PA0081
Joshua@princelaw.com

/s/ Adam Kraut
Adam Kraut, Esq.
D.C. Bar No. PA0080
AKraut@princelaw.com

Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
610-845-3903 (f)

*Counsel for Plaintiffs-Appellants*

/s/ Erik S. Jaffe
Erik S. Jaffe
D.C. Bar No. 440112
Schaerr | Jaffe LLP
1717 K Street NW
Suite 900
Washington, DC 20006
202-787-1060 (t)
ejaffe@schaerr-jaffe.com

*Of Counsel*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit set forth in Fed. R. App. P. 32(a)(7)(B)(i) and this Court's order regarding combined word limits because, according to the word-count feature of Microsoft Word, it contains 3,197 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(4) and the type style requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14 point font.

Dated: March 15, 2019                    Respectfully Submitted,

/s/ Adam Kraut
Adam Kraut, Esq.
D.C. Bar No. 0080
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 (t)
610-845-3903 (f)
AKraut@princelaw.com
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2019, I electronically filed the foregoing with

the Clerk of Court for the United States Court of Appeals for the District of

Columbia Circuit by using the CM/ECF system. I certify that all participants in this

case are registered CM/ECF users and that service will be accomplished by the

CM/ECF system.

/s/ Adam Kraut
Adam Kraut, Esq.

# ADDENDUM

## Table of Contents

Machinegun Defined Timeline ........................................................................1

IRS Rev. Rul. 55-528 .................................................................................2

ATF Rul. 2004-5 ....................................................................................3

November 17, 2003 Letter to Bowers (Re: Akins Type Device) ............................6

January 24, 2004 Letter to Bowers (Re: Akins Type Device) .................................8

August 3, 1990 Hell-Fire Classification Letter ......................................................10



Rev. Rul. 55-528 (IRS RRU), 1955-2 C.B. 482, 1955 WL 9410
Internal Revenue Service (I.R.S.)
Revenue Ruling
Published: 1955

Pursuant to consideration and evaluation of available data respecting Gatling guns, the Internal Revenue Service has concluded the such guns fall within two classifications, as follows:

1. Any crank-operated gear-driven Gatling gun (produced under 1862 to 1893 patents) employing a cam action to perform the functions of repeatedly cocking and firing the weapon, as well as any such gun actuated by an electric motor in lieu of a hand-operated crank (produced under 1893 and later patents), while being a forerunner of fully automatic machine guns, is not designed to shoot automatically or semiautomatically more than one shot with a single function of the trigger. Such weapons are held *not* to be firearms within the purview of the National Firearms Act (Chapter 53 of the Internal Revenue Code of 1954).

2. Any Gatling gun designed or redesigned to employ the hand crank only to sear off the first round of ammunition, thence becoming a gas-operated fully automatic machine gun (adapter patented in 1895) is held to be a firearm within the purview of the National Firearms Act, specifically, section 5848(2) of the Internal Revenue Code of 1954.

Rev. Rul. 55-528 (IRS RRU), 1955-2 C.B. 482, 1955 WL 9410

2



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

Washington, DC 20226

**26 U.S.C. 5845(b): DEFINITIONS (MACHINEGUN)**
**27 CFR 479.11: MEANING OF TERMS**

*The 7.62mm Aircraft Machine Gun, identified in the U.S. military inventory as the "M-134" (Army), "GAU-2B/A" (Air Force), and "GAU-17/A" (Navy), is a machinegun as defined by 26 U.S.C. 5845(b). Rev. Rul. 55-528 modified.*

**ATF Rul. 2004-5**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has examined the 7.62mm Aircraft Machine Gun, commonly referred to as a "Minigun." The Minigun is a 36-pound, six-barrel, electrically powered machinegun. It is in the U.S. military inventory and identified as the "M-134" (Army), "GAU-2B/A" (Air Force), and "GAU-17/A" (Navy). It is a lightweight and extremely reliable weapon, capable of discharging up to 6,000 rounds per minute. It has been used on helicopters, fixed-wing aircraft, and wheeled vehicles. It is highly adaptable, being used with pintle mounts, turrets, pods, and internal installations.

The Minigun has six barrels and bolts which are mounted on a rotor. The firing sequence begins with the manual operation of a trigger. On an aircraft, the trigger is commonly found on the control column, or joystick. Operation of the trigger causes an electric motor to turn the rotor. As the rotor turns, a stud on each bolt travels along an elliptical groove on the inside of the housing, which causes the bolts to move forward and rearward on tracks on the rotor. A triggering cam, or sear shoulder, trips the firing pin when the bolt has traveled forward through the full length of the bolt track. One complete revolution of the rotor discharges cartridges in all six barrels. The housing that surrounds the rotor, bolts and firing mechanism constitutes the frame or receiver of the firearm.

The National Firearms Act defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b). The term also includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such

3

- 2 -

parts are in the possession or under the control of the person." Id.; see 18 U.S.C. 921(a)(23); 27 CFR 478.11, 479.11.

ATF and its predecessor agency, the Internal Revenue Service (IRS), have historically held that the original, crank-operated Gatling Gun, and replicas thereof, are not automatic firearms or machineguns as defined. See Rev. Rul. 55-528, 1955-2 C.B. 482. The original Gatling Gun is a rapid-firing, hand-operated weapon. The rate of fire is regulated by the rapidity of the hand-cranking movement, manually controlled by the operator. It is not a "machinegun" as that term is defined in 26 U.S.C. 5845(b) because it is not a weapon that fires automatically.

The Minigun is not a Gatling Gun. It was not produced under the 1862 - 1893 patents of the original Gatling Gun. While using a basic design concept of the Gatling Gun, the Minigun does not incorporate any of Gatling's original components and its feed mechanisms are entirely different. Critically, the Minigun shoots more than one shot, without manual reloading, by a single function of the trigger, as prescribed by 26 U.S.C. 5845(b). See United States v. Fleischli, 305 F.3d 643, 655-656 (7th Cir. 2002). See also Staples v. United States, 511 U.S. 600, 603 (1994) (automatic refers to a weapon that "once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted"); GEORGE C. NONTE, JR., FIREARMS ENCYCLOPEDIA 13 (Harper & Rowe 1973) (the term "automatic" is defined to include "any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device - in other words, a machinegun"); WEBSTER'S II NEW RIVERSIDE -UNIVERSITY DICTIONARY (1988) (defining automatically as "acting or operating in a manner essentially independent of external influence or control"); JOHN QUICK, PH.D., DICTIONARY OF WEAPONS AND MILITARY TERMS 40 (McGraw-Hill 1973) (defining automatic fire as "continuous fire from an automatic gun, lasting until pressure on the trigger is released").

The term "trigger" is generally held to be the part of a firearm that is used to initiate the firing sequence. See United States v. Fleischli, 305 F.3d at 655-56 (and cases cited therein); see also ASSOCIATION OF FIREARMS AND TOOLMARK EXAMINERS (AFTE) GLOSSARY 185 (1st ed. 1980) ("that part of a firearm mechanism which is moved manually to cause the firearm to discharge"); WEBSTER'S II NEW RIVERSIDE-UNIVERSITY DICTIONARY (1988) ("lever pressed by the finger in discharging a firearm").

*Held*, the 7.62mm Minigun is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. Consequently, the 7.62mm Minigun is a machinegun as defined in section 5845(b) of the National Firearms Act. See United States v. Fleischli, 305 F.3d at 655-56. Similarly, the

4

- 3 -

housing that surrounds the rotor is the frame or receiver of the Minigun, and thus is also a machinegun. Id.; see 18 U.S.C. 921(a)(23); 27 CFR 478.11, 479.11.

To the extent this ruling is inconsistent with Revenue Ruling 55-528 issued by the IRS, Revenue Ruling 55-528, 1955-2 C.B. 482, is hereby modified.

Date signed: _____AUG 18 2004_____

Director



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

NOV 1 7 2003

903050:RDC
3311/2004-096

Mr. Thomas Bowers
Post Office Box 430
Cornelius, Oregon 97113

Dear Mr. Bowers:

This refers to your recoiling metal stock assembly,
designed for use on an SKS type semiautomatic rifle, that
was received by the Firearms Technology Branch, Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), on
August 21, 2003 for the purposes of examination and
classification.

Our evaluation indicates that the submitted sample stock
assembly measures approximately 36 inches long and
approximately 9-7/8 inches at its widest point.  It is
marked "BOWERS", "CORNELIUS OR", and "AA1".  The
following is a list of its physical characteristics:

- rectangular channel, approximately 22-5/16 inches
  long;
- barrel mounting block/spring actuated recoiling
  mechanism affixed to the forward end of the
  rectangular channel;
- access cutout in the bottom of the rectangular
  channel for the trigger group and magazine;
- two adjustable screws affixed to the underside of
  the rectangular channel; and
- tubular pistol grip/shoulder stock assembly welded
  to the underside of the rectangular channel.

The proposed theory of operation of this stock involves
the application of the movement of the counter recoiling
rifle to initiate a rapid succession of semiautomatic
fire.  The shooter places his trigger finger behind the
two adjustable screws and forward of the weapon's
trigger.  After the weapon is initially fired and the
action is moved to the rear (by the recoiling mechanism),
the subsequent forward movement of the action is halted

**WWW.ATF.TREAS.GOV**

-2-

Mr. Thomas Bowers

by the shooter's trigger finger being held against the
adjustable screws. The trigger is then depressed, and a
second firing of the weapon commences. The movements of
the action within the stock assembly are used to
consecutively fire the weapon in lieu of the traditional
method of manually pulling the trigger.

The action of a semiautomatic SKS-type 7.62x39mm rifle
from our firearms reference collection was placed within
the submitted stock. The weapon was then test fired.
Both of the adjustable screws fractured, breaking away
from the underside of the stock. These fractures
occurred on the second test firing. The weapon did not
fire more than one shot by a single function of the
trigger.

The National Firearms Act (NFA), 26 U.S.C. § 5845(b),
defines the term "machinegun" to include the following:

…any weapon that shoots, is designed to shoot, or can be
readily restored to shoot, automatically more than one shot,
without manual reloading, by a single function of the trigger.
This term shall also include the frame or receiver of any such
weapon, any part designed and intended solely and exclusively,
or combination of parts designed and intended, for use in
converting a weapon into a machinegun, and any combination of
parts from which a machinegun can be assembled if such parts
are in the possession or under the control of a person.

Our examination has determined that the submitted stock
assembly does not constitute a machinegun as defined in
the NFA. It is not a part or parts designed and intended
for use in converting a weapon into a machinegun.

We thank you for your submitted assembly and trust that
the foregoing has been responsive.

                    Sincerely yours,


                    Sterling Nixon
           Chief, Firearms Technology Branch

7



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

JAN 2 9 2004          903050:RDC
                     3311/2004-308

www.atf.gov

Mr. Thomas Bowers
Post Office Box 430
Cornelius, OR  97113

Dear Mr. Bowers:

This refers to your letter of January 21, 2004, to the
Firearms Technology Branch, ATF, in which you request
clarification of our previous correspondence
(3311/2004-096) regarding the manufacture of a
recoiling metal stock assembly that is designed for
use on an SKS-type semiautomatic rifle.

As noted previously, the proposed theory of operation
of this stock involves the application of the movement
of the counter recoiling rifle to initiate a rapid
succession of semiautomatic fire.  Our examination and
subsequent classification revealed that the stock did
not constitute a "machinegun" as that term is defined
in the National Firearms Act (NFA), 26 U.S.C.
Chapter 53.

As indicated, during the course of our examination and
testing of the item (SKS barreled action installed
into the submitted stock), two set-screws dislodged
from the frame.  The weapon did not fire more than one
shot by a single function of the trigger at any point
throughout the testing.

Our classification of the stock assembly was rendered
despite the fact that the screws dislodged from the
frame.  The theory of operation was clear even though
the rifle/stock assembly did not perform as intended.

In conclusion, your prototype shoulder stock assembly
does not constitute a "machinegun" as defined in the
NFA.  This evaluation is valid *provided that when the*

8

-2-

Mr. Thomas Bowers

*stock is assembled with an otherwise unmodified SKS semiautomatic rifle, the rifle does not discharge more than one shot by a single function of the trigger.*

We trust the foregoing has been responsive to your follow-up inquiry.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch

# IMPORTANT! Carry this letter with you at all times!



DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D C 20226

AUG  3 1990                    LE:F:TE:EMO

This refers to your letter of July 30, 1990, with which you
submitted a trigger attachment designated "Hell-Fire".  The
device was submitted for classification under the provisions
Chapter 44, Title 18 United States Code (U.S.C.), and
Chapter 53, Title 26, U.S.C.

Examination of the submitted sample indicates that it is
composed of a mounting block which attaches to the trigger
guard of a Ruger Mini 14 rifle, and a piece of spring wire
which bears on the rear of the weapons trigger.  The tension
of the spring can be adjusted by means of a modified wing.

The submitted sample does not affect the design of a
semiautomatic rifle.  With the device attached, the weapon
is capable of firing only one shot with each pull of the
trigger.

The "Hell-Fire" trigger attachment, as submitted, is not
subject to any of the provisions of Chapter 44, Title 18,
U.S.C., or Chapter 53, Title 26, U.S.C.  However, if the
design, dimension, or function of the device is changed,
this classification is subject to review.

The submitted sample is being retained in this office.

We trust that the foregoing has been responsive to your
inquiry.  If we may be of any further assistance, please
contact us.

Sincerely yours,

Edward M. Owen, Jr.
Chief, Firearms Technology Branch

10